[ORAL ARGUMENT NOT YET SCHEDULED]
**No. 25-1064**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

PJM TRANSMISSION OWNERS,

*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review of Orders of the Federal Energy Regulatory Commission

**TRANSMISSION OWNER PETITIONERS' JOINT BRIEF**

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
Phone: (610) 774-4775
Fax:     (610) 774-4102
Email:  SMNadel@pplweb.com

[Additional Counsel On Inside Pages]

John Longstreth
Donald A. Kaplan
Kimberly B. Frank
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 778-9000
Fax:     (202) 778-9100
Email: john.longstreth@klgates.com
        don.kaplan@klgates.com
        kimberly.frank@klgates.com
        chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
Phone:  (202) 429-8186
Email:  mkallen@steptoe.com
        wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW, Suite 200
Washington, D.C. 20004
Phone:  (202) 824-8011
Email:  molly.suda@duke-energy.com

*Counsel for Duke Energy*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20001
Phone:  (301) 956-6754
Email:  gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
Phone:  (703) 682-6337
Email:  William.rappolt@AES.COM

*Counsel for The Dayton Power & Light Co.*

David M. Gossett
Michael Kunselman
Richard P. Sparling
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
Phone:  (202) 973-4200
Email:  davidgossett@dwt.com
        michaelkunselman@dwt.com
        ricksparling@dwt.com

(Page 2 of Total)

Sara C. Weinberg
Assistant General Counsel – Federal
Regulatory
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A
Cayce, South Carolina 29033
(803) 217-5753
Sara.Weinberg@dominionenergy.com

Cheri Yochelson
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
Cheri.M.Yochelson@dominionenergy.com

*Counsel for Virginia Electric & Power
Company*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C.  20001-3980
Phone:  (202) 383-0100
Fax:  (202) 637-3593
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

Denise R. Foster Cronin
Sr. Vice President, Federal and RTO
Regulatory Affairs
East Kentucky Power Cooperative, Inc.
4775 Lexington Road, P.O. Box 707
Winchester, KY  40392-0707
Office:  (859)745-9615

*Counsel for East Kentucky Power
Cooperative, Inc.*

Morgan E. Parke
Associate General Counsel
Amanda Parker
FERC Attorney
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
aparker@firstenergycorp.com

*Counsel for the FirstEnergy
Transmission Companies*

Regina Y. Speed-Bost
Founder and Managing Partner
SB Law, PLLC
200 Massachusetts Ave., N.W.
7th Floor
Washington, D.C.  20001
Phone:  (202) 963-2700
Email:  rspeed-bost@sblawlegal.com

*Counsel for Duquesne Light Company*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corp.
1 Riverside Plaza
Columbus, OH 43215
Phone:  (614) 716-2941
Email:  clbumgartner@aep.com

*Counsel for American Electric Power
Service Corporation*

iv

Uju Okasi
Associate Counsel - Regulatory
PSEG Services Corporation
601 New Jersey Ave., N.W., Suite 310
Washington, D.C. 20001
obianuju.okasi@pseg.com

*Counsel for Public Service Electric and Gas Company*

November 7, 2025

v

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.  Parties

The parties to this proceeding are as follows:

### A. Petitioners

Petitioners PJM Transmission Owners ("Transmission Owners") are investor-owned public utilities and a cooperatively owned utility that own transmission facilities operated and planned by PJM Interconnection, L.L.C. ("PJM"), a regional transmission organization overseeing the operation of the electric transmission system and associated energy markets serving thirteen states and the District of Columbia.  They are:

> American Electric Power Service Corporation
> Atlantic City Electric Company
> Baltimore Gas and Electric Company
> Commonwealth Edison Company
> Dayton Power & Light Co.
> Delmarva Power & Light Company
> Dominion Energy Services, Inc.
> Duke Energy Corporation
> Duquesne Light Company
> East Kentucky Power Cooperative, Inc.
> Exelon Corporation
> FirstEnergy Transmission Companies
> PECO Energy Company
> Potomac Electric Power Company
> PPL Electric Utilities Corporation
> Public Service Electric and Gas Company

### B.  Respondent

Respondent is the Federal Energy Regulatory Commission ("FERC").

## C. Intervenors

### 1. For Petitioners

PJM Interconnection, L.L.C.

### 2. For Respondent

American Municipal Power, Inc.
Maryland Office of People's Counsel
New Jersey Division of Rate Counsel
Old Dominion Electric Cooperative
Office of the Ohio Consumers' Counsel
PJM Industrial Customer Coalition

## D. Parties Below

The parties in the FERC proceedings below included the following:

Advanced Energy United
American Clean Power Association
American Electric Power Service Corporation
American Municipal Power, Inc.
American Transmission Systems, Incorporated
Americans for a Clean Energy Grid
Blue Ridge Power Agency
Buckeye Power, Inc.
Calpine Corporation
Central Transmission, LLC
Clean Energy Buyers Association
Constellation Energy Generation, LLC
The Dayton Power and Light Company
DC Energy, LLC
Delaware Division of the Public Advocate
Dominion Energy Services, Inc.
Duke Energy Carolinas, LLC
Duke Energy Corporation
Duke Energy Indiana, LLC
Duke Energy Kentucky, Inc.
Duke Energy Ohio, Inc.
Duke Energy Progress, LLC

ii

Duquesne Light Company
East Kentucky Power Cooperative, Inc.
Exelon Corporation
FirstEnergy Service Company
Illinois Attorney General's Office
Illinois Citizens Utility Board
Illinois Commerce Commission
Independent Market Monitor for PJM
Indiana Office of Utility Consumer Counselor
Jersey Central Power & Light Company
Kentucky Attorney General
Keystone Appalachian Transmission Company
LS Power Development, LLC
Maryland Office of People's Counsel
Maryland Public Service Commission
Michigan Public Service Commission
Mid-Atlantic Interstate Transmission LLC
Monongahela Power Company
Natural Resource Defense Council
New Jersey Division of Rate Counsel
New York Power Authority
New York State Electric & Gas Corporation
NextEra Energy Transmission MidAtlantic, Inc.
North Carolina Electric Membership Corporation
Office of the Ohio Consumers' Counsel
Office of the People's Counsel for the District of Columbia
Ohio Federal Energy Advocate
Old Dominion Electric Cooperative
Organization of PJM States, Inc.
Pennsylvania Public Utility Commission
PJM Industrial Customer Coalition
PJM Interconnection, L.L.C.
PJM Power Providers Group
PPL Electric Utilities Corporation
Public Citizen, Inc.
Public Service Electric and Gas Company
Rockland Electric Company
Rolling Hills Generating L.L.C.
Sierra Club
Silver Run Electric, LLC

Solar Energy Industries Association
Southern Maryland Electric Cooperative, Inc.
Sustainable FERC Project
The Potomac Edison Company

### E. Amici

The PJM Transmission Owners are unaware of any person that has or intends

to submit an amicus brief.

## II. Rulings Under Review

1. *Duquesne Light Company, et al.*, Order Rejecting Consolidated Transmission Owners Agreement Amendments and Denying Complaint, Docket Nos. ER24-2336-000, ER24-2336-001, ER24-2338-000, ER24-2338-001, and EL24-119-000, 189 FERC ¶ 61,181 (Dec. 6, 2024) ("Initial Order"), JA___;

2. *Duquesne Light Company, et al.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. ER24-2336-002, ER24-2338-002, and EL24-119-001, 190 FERC ¶ 62,075 (Feb. 6, 2025) ("Notice of Denial of Reh'g"), JA___; and

3. *Duquesne Light Company, et al.,* Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, Docket Nos. ER24-2336-002, ER24-2338-002, and EL24-119-001, 192 FERC ¶ 61,051 (July 14, 2025) ("Reh'g Order"), JA_____.

## III. Related Cases

The PJM Transmission Owners are not aware of any related cases.

iv

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioners submit the following corporate disclosure statements:

### CORPORATE DISCLOSURE STATEMENT OF AMERICAN ELECTRIC POWER SERVICE CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, American Electric Power Service Corporation ("AEPSC") states that it is a corporation organized and existing under the laws of the State of New York.  AEPSC is a wholly owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the Nasdaq Exchange.  AEP has no parent company.  Certain institutional investors, including Vanguard, may from time to time hold 10 percent or more of the outstanding shares of AEP but to AEP's knowledge no publicly held company has a 10 percent or greater ownership interest in AEP.

Among its many subsidiaries, AEP owns nine electric operating companies and seven transmission companies and is a joint owner in several additional transmission companies.  AEPSC provides a variety of administrative and technical services to AEP's affiliates, including Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, AEP Indiana Michigan Transmission Company, AEP Kentucky

v

Transmission Company, AEP Ohio Transmission Company, and AEP West Virginia

Transmission Company, on behalf of which AEPSC participated in the proceedings

before the Federal Energy Regulatory Commission that resulted in the Orders as to

which review is sought in this Court.

## CORPORATE DISCLOSURE STATEMENT OF
## THE DAYTON POWER AND LIGHT CO. D/B/A AES OHIO

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, Petitioner The Dayton Power and Light Co. d/b/a AES Ohio The Dayton Power & Light Company d/b/a AES Ohio ("Dayton") submits the following disclosure statement.

Dayton is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Dayton, Ohio.  Dayton is a public utility company subject to the jurisdiction of FERC.  Dayton is an owner of transmission and distribution facilities located within PJM Interconnection, L.L.C.

Dayton is a subsidiary of DPL, Inc., which is a subsidiary of AES DPL Holdings, LLC.  AES DPL Holdings, LLC is a subsidiary of The AES Corporation ("AES").  AES is a Delaware corporation with its principal place of business in Arlington, Virginia.  AES has issued shares of stock and debt securities to the public. Investment funds owned by the Vanguard Group Inc. ("Vanguard") hold over ten percent of the publicly-traded shares of AES.  Vanguard is investor-owned by its fund shareholders.

## CORPORATE DISCLOSURE STATEMENT OF
## DUKE ENERGY BUSINESS SERVICES LLC, DUKE ENERGY OHIO, INC. AND DUKE ENERGY KENTUCKY, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of this Court, Petitioners Duke Energy Business Services LLC ("DEBS"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("DEO") (collectively, "Duke Energy") provide the following:

DEBS certifies that it is a Delaware limited liability company. DEBS is a direct, wholly-owned subsidiary of Duke Energy Corporate Services, Inc., which is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

DEK certifies that it is a non-governmental corporation organized and existing under the laws of Kentucky. DEK is a direct, wholly-owned subsidiary of DEO. DEO certifies that it is a non-governmental corporation organized and existing under the laws of Ohio. DEO is a direct, wholly-owned subsidiary of Cinergy Corp. Cinergy Corp. is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

Duke Energy Corporation is publicly traded on the New York Stock Exchange. There is no company that has a 10 percent or greater ownership interest in Duke Energy Corporation.

## CORPORATE DISCLOSURE STATEMENT OF
## PPL ELECTRIC UTILITIES CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, Petitioner PPL Electric Utilities Corporation ("PPL Electric") submits the following required Disclosure Statement:

PPL Electric is a wholly owned indirect subsidiary of PPL Corporation. The Vanguard Group has a 10% or greater ownership interest in PPL Corporation. No other publicly held company has a 10% or greater ownership interest in PPL Corporation.

Pursuant to the requirement of Circuit Rule 26.1(b) that movants provide a statement of general nature and purpose relevant to the litigation, PPL Electric hereby states as follows:

PPL Electric is a Pennsylvania Corporation and owner of transmission and distribution facilities located within PJM Interconnection, L.L.C. PPL Electric is a provider of last resort in central and eastern Pennsylvania under Pennsylvania's Electric Generation Customer Choice and Competition Act, 66 Pa. C. S. § 2801, *et seq*.

## CORPORATE DISCLOSURE STATEMENT OF
## VIRGINIA ELECTRIC AND POWER COMPANY D/B/A
## DOMINION ENERGY VIRGINIA

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("Dominion"), hereby provides the following Corporate Disclosure Statement:

Dominion is a Virginia corporation and is regulated by the Federal Energy Regulatory Commission as a "public utility" under the Federal Power Act. Dominion generates, transmits, and distributes electricity for sale in Virginia and North Carolina. Dominion Energy Virginia is a wholly-owned subsidiary of Dominion Energy, Inc. ("Dominion Energy") (NYSE: D), which is a publicly-held company incorporated in the Commonwealth of Virginia. To Dominion's knowledge, no publicly-held corporation owns 10 percent or greater ownership interest in Dominion Energy. However, from time to time pursuant to Federal Energy Regulatory Commission blanket authorizations, certain institutional investors may hold 10 percent or more of the outstanding shares of Dominion Energy, and Dominion currently understands that affiliates of The Vanguard Group, Inc. may hold more than 10 percent of Dominion Energy's outstanding shares.

x

## CORPORATE DISCLOSURE STATEMENT OF
## THE FIRSTENERGY TRANSMISSION COMPANIES

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, Petitioners American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Keystone Appalachian Transmission Company, Mid-Atlantic Interstate Transmission LLC, Monongahela Power Company, The Potomac Edison Company, and Trans-Allegheny Interstate Line Company (collectively the "FirstEnergy Transmission Companies") are all direct or indirect subsidiaries of FirstEnergy Corp., a holding company engaged, through its subsidiaries, in the generation, transmission and distribution of power throughout the eastern portion of the United States. No publicly held company owns more than 10% of FirstEnergy Corp.

xi

## CORPORATE DISCLOSURE STATEMENT OF
## DUQUESNE LIGHT COMPANY

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, Duquesne Light Company ("Duquesne Light") certifies as follows:

Duquesne Light is engaged in the transmission, distribution, and sale of electricity to retail and wholesale customers in Pennsylvania within the footprint of the PJM Interconnection, LLC regional transmission organization ("PJM RTO" or "PJM"). Duquesne Light is a Market Participant in PJM and is a wholly owned subsidiary of Duquesne Light Holdings.

In May 2007, Duquesne Light was acquired by a consortium of private equity investors. The consortium consists of several institutional investors which own all of the common equity of Duquesne Light's parent company, DQE Holdings LLC. The members of the consortium are: GIC Pte. Ltd., John Hancock Financial/PGGM Infrastructure Fund, and APG Americans Infrastructure/CalSTRS/Argo Infrastructure Partners.

No publicly held company owns more than 10% of Duquesne Light.

## CORPORATE DISCLOSURE STATEMENT OF
## EXELON CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, Exelon Corporation ("Exelon") submits the following disclosure statement.

Exelon is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal offices at 10 South Dearborn Street, Chicago, Illinois 60603.  Exelon has no parent company.  The Vanguard Group, Inc. and BlackRock, Inc. each hold a greater than 10 percent voting interest in Exelon pursuant to FERC blanket authorization under Federal Power Act Section 203, 16 U.S.C. § 824b.  Of relevance to this proceeding, Exelon is engaged in the purchase, transmission, distribution, and sale of electricity through its electric utility subsidiaries, Commonwealth Edison Company, PECO Energy Company, Baltimore Gas and Electric Company, Potomac Electric Power Company, Delmarva Power & Light Company and Atlantic City Electric Company, all of which are electric utilities under the Federal Power Act subject to regulation by the Federal Energy Regulatory Commission.

## CORPORATE DISCLOSURE STATEMENT OF
## EAST KENTUCKY POWER COOPERATIVE, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, East Kentucky Power Cooperative, Inc. ("EKPC") states as follows:

Petitioner EKPC is a not-for-profit generation and transmission cooperative that provides wholesale electric power to 16 owner-member cooperatives in Kentucky.  EKPC's principal place of business is in Winchester, Kentucky.  EKPC is owned by its 16 retail electric distribution cooperative members.  None of EKPC's members owns 10% or more of EKPC.  Relevant to this proceeding, EKPC is a generation- and transmission-owning member and customer of PJM Interconnection, L.L.C.

## CORPORATE DISCLOSURE STATEMENT OF
## PUBLIC SERVICE ELECTRIC AND GAS COMPANY

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Fed. R. App. P. 26.1, and Rule 26.1 of the General Rules of the United States Court of Appeals for the District of Columbia Circuit, Public Service Electric and Gas Company ("PSE&G") hereby provides this corporate disclosure statement.

1. PSE&G is a wholly owned, direct subsidiary of Public Service Enterprise Group Incorporated ("PSEG"). The principal and executive offices of PSEG are located at 80 Park Plaza, Newark, New Jersey 07102. PSEG is a public utility holding company engaged in, among other things, the generation, transmission, and sale of electric energy through its subsidiaries.

2. PSE&G is a public utility company organized under the laws of the State of New Jersey. PSE&G is presently engaged in, among other things, the transmission and distribution of electricity and the distribution of natural gas in New Jersey. PSE&G owns transmission facilities in PJM Interconnection, L.L.C.

PSEG has publicly-held common stock outstanding. PSE&G has publicly-held debt securities outstanding. The Vanguard Group, Inc. and BlackRock, Inc. each hold a greater than 10 percent voting interest in PSEG pursuant to Federal

xv

Energy Regulatory Commission blanket authorization under Federal Power Act Section 203, 16 U.S.C. § 824b.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................xix

GLOSSARY .....................................................................................xxiv

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ...........................................................3

STATUTES AND REGULATIONS ..........................................................4

STATEMENT OF THE CASE .................................................................4

    A.    FERC's Authority Under Section 205 Of The FPA. ..........................4

    B.    Regional Transmission Organizations ("RTOs") ...............................6

    C.    The Owners Agreement Between PJM And The Transmission Owners Creates PJM As An RTO..........................................................8

    D.    The Need For Amendments To The Owners Agreement, PJM's Negotiation of Them, And The FERC Proceedings That Considered Them....................................................................................................10

        1.    Summary of the Amendments .................................................10

        2.    The Pre-Filing Stakeholder Process and Amendments Filing..12

        3.    The Initial Order And Rehearing Order....................................14

SUMMARY OF ARGUMENT ...............................................................15

STANDING .........................................................................................16

ARGUMENT .......................................................................................18

I.    Standard of Review...........................................................................18

II.    FERC Exceeded Its Limited Authority To Review Contracts Under Section 205 ......................................................................................19

    A.    Utilities' Rights To Enter Into Voluntary Contracts And To File Changes To Those Contracts Are Fundamental To The FPA. ...........19

    B.    FERC Ignored The Limitations On Its Authority To Reject An Agreement Bilaterally Negotiated In Good Faith. ............................22

III.    FERC's Stated Bases For Rejecting The Agreement Amendments Misread The Text And Are Arbitrary and Capricious. .........................24

    A.    PJM Independence .......................................................................25

**1.** FERC's Preference For RTO Independence Cannot Overcome The Transmission Owners' FPA And Contract Rights. .................................................................25

**2.** The Agreement Amendments Enhance PJM's Independence..27

**3.** FERC's Finding That The Amendments Give  Transmission Owners The Opportunity To Impede PJM's Independence Misreads Them..........................................................29

**B.** The Overlap Provisions Are Contractual, Consistent With Precedent, And Place No Obligations On, Nor Disadvantage, Non-Incumbents. ...................................................................37

**1.** The Overlap Provisions Embody The Parties' Negotiated Agreement To Establish A Coordination Process To Improve Planning Efficiency...................................................38

**2.** FERC Never Explains How The Placement of The Overlap Provisions Supports A Finding That the Provisions Are Unjust And Unreasonable. .........................................40

**3.** FERC's Assertion That The Overlap Provisions Affect Other Market Participants Does Not Establish That The Overlap Provisions Are Not Just And Reasonable. ...............................41

**C.** FERC Improperly Rejected The Application Of The Supreme Court's *Mobile-Sierra* Presumption To The Agreement Amendments.......................................................................43

**1.** The *Mobile-Sierra* doctrine.......................................................43

**2.** There Is No "Contract of General Applicability" Exception To *Mobile-Sierra* And The Original And Amended Owners Agreement Are The Types Of Agreement That *Mobile-Sierra* Is Intended To Protect.............................................46

**3.** The Protected Provisions Of The Agreement Amendments Do Not Unfairly Tilt The Playing Field..................................52

CONCLUSION.......................................................................................57

xviii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656 (D.C. Cir. 2017)....................7

*\*Am. Mun. Power, Inc. v. FERC*,
    86 F.4th 922 (D.C. Cir. 2023).................................................2, 19, 38, 40, 42

*\*Atlantic City Elec. Co. v. FERC*,
    295 F.3d 1, 9 (D.C. Cir. 2002)..................... 2, 5, 8, 9, 10, 20, 21, 25, 26, 36, 44

*Atlantic City Elec. Co. v. FERC*,
    329 F.3d 856 (D.C. Cir. 2003)....................................................................9

*Cap. Power Corp. v. FERC*,
    No. 23-1134, 2025 WL 2738420 (D.C. Cir. Sep. 26, 2025) ............................4, 7

*Cities of Bethany v. FERC*,
    727 F.2d 1131 (D.C. Cir. 1984)..........................................................5, 20, 22

*City of Piqua v. FERC*,
    610 F.2d 950 (D.C. Cir. 1979)..................................................................6, 23

*City of Winnfield v. FERC*,
    744 F.2d 871 (D.C. Cir. 1984)....................................................................5

*Duke Power Co. v. FERC*,
    864 F.2d 823 (D.C. Cir. 1989)...................................................................30

*Emera Me. v. FERC*,
    854 F.3d 9 (D.C. Cir. 2017)......................................................................22

*Exelon Corp. v. FERC*,
    911 F.3d 1236 (D.C. Cir. 2018).................................................................17

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)...............................................................................18

*FPC v. Sierra Pac. Power Co.*,
    350 U.S. 348 (1956)..........................................................................9, 43, 44

xix

*Hecate Energy LLC v. FERC,
126 F.4th 660 (D.C. Cir. 2025)..............................................6, 15-16, 22, 23, 24

LeMoyne-Owen College v. NLRB,
357 F.3d 55 (D.C. Cir. 2004)...........................................................................33

Loper Bright Enters. v. Raimondo,
603 U.S. 369 (2024).....................................................................18, 50, 51, 52

Louisville Gas & Elec. Co. v. FERC,
149 F.4th 693 (D.C. Cir. 2025)..........................................................................4

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992)...................................................................................16, 17

Midwest ISO Transmission Owners v. FERC,
373 F.3d 1361 (D.C. Cir. 2004)..........................................................................7

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of
Snohomish Cnty.,
554 U.S. 527 (2008).........................5, 6, 43, 44, 46, 47, 51, 52, 53, 56

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
463 U.S. 29 (1983)....................................................................................18, 41

Nat. Res. Def. Council v. EPA,
489 F.3d 1250 (D.C. Cir. 2007).......................................................................51

Neb. Pub. Power Dist. v. FERC,
957 F.3d 932 (8th Cir. 2020) ...........................................................................56

*NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n,
558 U.S. 165 (2010)..............................1, 6, 20, 43, 44, 46, 47, 48, 49

Potomac Elec. Power Co. v. FERC,
210 F.3d 403 (D.C. Cir. 2000).........................................................................47

Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC,
272 F.3d 607 (D.C. Cir. 2001)................................................................7, 16, 48

Quality Prods. & Concepts Co. v. Nagel Precision, Inc.,
666 N.W.2d 251 (Mich. 2003)..........................................................................19

xx

*In re Sealed Case,*
    237 F.3d 657 (D.C. Cir. 2001)..................................................................51

*Sierra Club v. FERC,*
    68 F.4th 630 (D.C. Cir. 2023)..................................................................4

*St. Joe Corp. v. McIver,*
    875 So. 2d 375 (Fla. 2004) ....................................................................19

*Transmission Agency of N. Cal. v. FERC,*
    495 F.3d 663 (D.C. Cir. 2007).............................................................7, 49

*U.L. Coleman Co., v. Bossier City-Parish Metro. Planning Comm'n,*
    Civ. No. 08-2011, 2017 WL 970285 (W.D. La. Mar. 13, 2017)........................53

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,*
    350 U.S. 332 (1956).........................................................................9, 20, 43

*W. Deptford Energy, LLC v. FERC,*
    766 F.3d 10 (D.C. Cir. 2014)...............................................................18, 41

*Wabash Valley Power Ass'n, v. FERC,*
    45 F.4th 115 (D.C. Cir. 2022)..............................................................50, 51

*World Shipping Council v. Fed. Mar. Comm'n,*
    152 F.4th 215 (D.C. Cir. 2025)................................................................17

**Agency Decisions**

*Alabama Power Co.,*
    190 FERC ¶ 61,151 (2025)......................................................................49

*Alliance Cos.,*
    100 FERC ¶ 61,137 (2002)......................................................................10

*City of Vernon v. Cal. Indep. Sys. Operator, Corp.,*
    94 FERC ¶ 61,141 (2001)........................................................................30

*Jersey Cent. Power & Light Co.,*
    2 FERC ¶ 63,046, at 65,269 (1978).........................................................37

*Mkt.-Based Rates for Wholesale Sales of Elec. Energy, Capacity &
Ancillary Servs. by Pub. Utils.*, Order No. 697, FERC Stats. &
Regs. ¶ 31,252 (2007) ...................................................................................20

*Nev. Power Co. v. Duke Energy Trading & Mktg., L. L. C.*,
99 FERC ¶ 61,047 (2002) ...............................................................................21

*Nw. Reg'l Transmission Ass'n*,
71 FERC ¶ 61,397 (1995) ...............................................................................30

*Pennsylvania-New Jersey-Maryland Interconnection*,
105 FERC ¶ 61,294 (2003) ....................................................................9, 29, 31

*Pennsylvania-New Jersey-Maryland Interconnection*,
81 FERC ¶ 61,257 (1997) .................................................................................8

*PJM Interconnection, L.L.C.*,
109 FERC ¶ 61,012 (2004) .............................................................................56

**PJM Interconnection, L.L.C.*,
114 FERC ¶ 61,283 (2006) .................................................................10, 39, 56

*PJM Interconnection, L.L.C.*,
192 FERC ¶ 61,258 (2025) ...............................................................................5

*PJM Interconnection, L.L.C.*,
96 FERC ¶ 61,061 (2001) .................................................................................9

*PJM Interconnection, L.L.C.*,
Initial Order, 189 FERC ¶ 61,181 (2024) 3, 12, 14, 24, 33, 34, 39, 41, 42, 50, 56

*PJM Interconnection, L.L.C.*,
Reh'g Order, 192 FERC ¶ 61,051 (2025) . 2, 4, 10, 12, 15, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 39, 41, 42, 44, 46, 53, 54

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706 (2018) ...........................................18

Federal Power Act, 16 U.S.C. §§ 791–828 (2018) .................................................1

Federal Power Act, 16 U.S.C. § 824a (2018) ......................................................26

*Federal Power Act, Section 205, 16 U.S.C. § 824d (2018) ............................1, 3, 4

Federal Power Act, Section 206, 16 U.S.C. § 824e (2018) .................................4, 11

Federal Power Act, Section 313, 16 U.S.C. § 825*l*(b) (2018) ..................................3

**Other Authorities**

18 C.F.R. § 35.34 (2025) ...............................................................................26

\* Authorities chiefly relied on are marked with an asterisk

**GLOSSARY**

| | |
|---|---|
| Agreement Amendments or Amendments | The amendments rejected by FERC in the underlying proceeding. |
| Application | Amendments to the Consolidated Transmission Owners Agreement, *PJM Interconnection L.L.C.*, FERC Docket No. ER24-2336 (filed June 21, 2024) |
| Atlantic City Settlement | Settlement Agreement, Docket No. OA97-261-006 *et al.* (filed Oct. 3, 2003), *as modified* Modification of Settlement Agreement, Docket No. OA97-261-009 *et al.* (filed Jan. 20, 2004 and corrected Jan. 23, 2004). |
| Atlantic City Settlement Order | *Pennsylvania-New Jersey-Maryland Interconnection*, 105 FERC ¶ 61,294 (2003), *appeal dismissed sub nom., Old Dominion Elec. Coop. v. FERC*, 171 F. App'x 862 (D.C. Cir. 2005). |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act, 16 U.S.C. §§ 791–828. |
| Initial Order | *Duquesne Light Company, et al.*, Order Rejecting Consolidated Transmission Owners Agreement Amendments and Denying Complaint, Docket Nos. ER24-2336-000, ER24-2336-001, ER24-2338-000, ER24-2338-001, and EL24-119-000, 189 FERC ¶ 61,181 (Dec. 6, 2024). |
| McGlynn Affidavit | *PJM Interconnection, L.L.C.*, Motion for Leave to Answer & Answer, Reply Aff. of Paul F. McGlynn on Behalf of PJM Interconnection, L.L.C., FERC Docket No. ER24-2336 (filed Sep. 26, 2024). |
| Notice of Denial of Rehearing | *Duquesne Light Company, et al.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. ER24-2336-002, ER24-2338-002, and EL24-119-001, 190 FERC ¶ 62,075 (Feb. 6, 2025). |

xxiv

| | |
|---|---|
| Owners Agreement | PJM Consolidated Transmission Owners Agreement |
| PJM | PJM Interconnection, LLC |
| PJM Board | PJM's governing body the Board of Managers |
| PJM Complaint | *PJM Interconnection, L.L.C.,* FPA Section 206 Filing of PJM Interconnection, L.L.C., FERC Docket No. EL24-119-000, at 9 (June 21, 2024). |
| Planning Protocol | The regional transmission planning rules in PJM. |
| Protected Provisions | Articles 2, 4, 5, 6 or 7 and Attachment B of the Owners Agreement |
| Rehearing Order | *Duquesne Light Company, et al.,* Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, Docket Nos. ER24-2336-002, ER24-2338-002, and EL24-119-001, 192 FERC ¶ 61,051 (July 14, 2025). |
| RTOs | Regional Transmission Organizations |
| Shah Affidavit | Amendments to the Consolidated Transmission Owners Agreement, *PJM Interconnection L.L.C.*, FERC Docket No. ER24-2336, Exhibit C, Declaration of Pulin Shah (filed June 21, 2024). |
| Transmission Owners | PJM Transmission Owners |

**INTRODUCTION**

The "regulatory system" created by the Federal Power Act ("FPA"), 16 U.S.C. §§ 791–828, is, in the Supreme Court's words, "premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity." *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 173 (2010) ("*NRG Power*") (quoting *Permian Basin Area Rate Cases*, 390 U. S. 747, 822 (1968)). Contractual parties have the right to select their counterparties, decide what rights or interests to give or to withhold, and establish the specific terms and conditions governing their agreement.

The voluntary agreement in this case is the Consolidated Transmission Owners Agreement ("Owners Agreement"). Under that Agreement, Petitioners PJM Transmission Owners ("Transmission Owners") assigned to PJM Interconnection, L.L.C. ("PJM"), operational control of over $80 billion of their electric transmission assets, the planning for the expansion of these assets, and a portion of their statutory filing rights under FPA section 205, 16 U.S.C. § 824d. PJM, in turn, agreed to assume those significant responsibilities.

After more than 20 years of experience with the Owners Agreement, PJM and the Transmission Owners determined that amendments ("Agreement Amendments" or "Amendments") were required to provide PJM independent authority to file with

1

FERC proposed tariff changes to its electric transmission planning protocol (section 205 filings), filing authority the Transmission Owners had delegated to PJM in the first instance, rather than remaining hamstrung by vetoes from its Members Committee composed largely of non-utilities. PJM and the Transmission Owners also updated and clarified certain rights and responsibilities under the Agreement. Lengthy and careful bilateral negotiations resulted in the Amendments filed with the Federal Energy Regulatory Commission ("FERC") for acceptance. Although FERC correctly found the negotiations were undertaken in good faith, Reh'g Order, P40, JA____, it rejected the Amendments. In so doing, FERC exceeded its statutory role, failing to consider whether the Amendments as a whole were in the public interest and rejecting reasonable choices of the contracting parties, on the apparent basis that another deal better fit its preferences and those of protesting third parties.

The Owners Agreement and the Amendments go to the heart of each Transmission Owner's FPA section 205 "right to file rates and terms for services rendered with its assets." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) ("*Atlantic City*"), *petition to enforce mandate granted*, 329 F.3d 856 (D.C. Cir. 2003). FERC cannot force transmission owners to give up these statutory filing rights, *id.*, 295 F.3d at 10, and "PJM's authority to oversee and operate the electrical grid is limited to that granted to it by transmission owners in the Owners Agreement." *Am. Mun. Power, Inc. v. FERC*, 86 F.4th 922, 927 (D.C. Cir. 2023).

2

FERC's review of the Amendments is limited to determining whether they fall within a broad zone of just and reasonable rates and practices—an inquiry that in the context of a fairly negotiated contract requires a finding that the Amendments are unequivocally not in the public interest. FERC made no such public interest finding, and incorrectly held on the basis of an exception it has invented to binding Supreme Court precedent that the contract was not eligible for such protection. The findings FERC did make misstated and misinterpreted the Amendments, adopted unsupported assertions, misapplied its precedent, and reached conclusions without adequate support in the record.

On rehearing, FERC signaled it would be receptive to more limited amendments to the Owners Agreement. Reh'g Order, PP104-105, JA___. But FERC's role is to make a fair assessment of whether the agreement before it is just and reasonable, not to compel an agreement it believes might be better. FERC's decision should be reversed and the case remanded with instructions to accept the Amendments.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction under 16 U.S.C. § 825*l*(b). On June 21, 2024, the Agreement Amendments were filed under FPA section 205, and PJM made contingent implementing filings. Initial Order, P1, JA___. FERC rejected the Agreement Amendments and denied PJM's implementing filings, and the

Petitioners timely sought rehearing, which FERC denied by operation of law on February 6, 2025. JA____. On February 14, 2025, Petitioners filed a timely petition for review based on that deemed denial. JA____.

FERC issued a Rehearing Order on July 14, 2025, affirming rejection of the Agreement Amendments, but instead of denying PJM's filing to implement the transfer of the planning protocol to its Tariff dismissed it without prejudice. Reh'g Order, P21, JA___. This petition encompasses that order. *See Sierra Club v. FERC*, 68 F.4th 630, 646 (D.C. Cir. 2023), *subsequent history omitted*.

## STATUTES AND REGULATIONS

Relevant statutes are provided in the addendum.

## STATEMENT OF THE CASE

### A. FERC's Authority Under Section 205 Of The FPA.

"The main goal of the FPA is to encourage the orderly development of plentiful supplies of electricity at reasonable prices." *Louisville Gas & Elec. Co. v. FERC,* 149 F.4th 693, 698 (D.C. Cir. 2025). FPA section 205 requires that rates and charges demanded or received by a public utility be just and reasonable and not unduly discriminatory or preferential. 16 U.S.C. §§ 824d(a), 824e(a). Under this just and reasonable standard, "utilities must be able to recover costs, service their debt, and compete with comparably risky enterprises for investors." *Cap. Power Corp. v. FERC*, No. 23-1134, 2025 WL 2738420, at *4 (D.C. Cir. Sep. 26, 2025)

4

(first citing *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 532 (2008) ("*Morgan Stanley*").

Section 205 "is intended for the benefit of the utility — *i.e.*, as a means of enabling it to increase its rates within what has been called the 'zone of reasonableness.'" *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984). Section 205 limits FERC's authority in two ways. First, section 205 gives the utility, not FERC or any other party, the statutory "right to file rates and terms for services rendered with its assets." *Atlantic City*, 295 F.3d at 9. The "power to initiate rate changes rests with the utility and cannot be appropriated by FERC" under section 205. 295 F.3d at 10. Second, FERC's "authority to review rates under [section 205] is limited to an inquiry into whether the rates proposed are reasonable—and not[] whether a proposed rate schedule is more or less reasonable than alternative rate designs." *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984).

FERC's "role in evaluating PJM's proposal [under section 205] is essentially passive and reactive, confined to evaluating the proposal before [it] to determine whether it meets the statutory standard, such that it is not the Commission's prerogative to reject the proposal simply because a better approach might be available." *PJM Interconnection, L.L.C.*, 192 FERC ¶ 61,258, P35 (2025). Under section 205, FERC cannot demand changes from the utility that "result in an entirely different rate design than the utility's original proposal," including modifications

5

that "undo the compromise that had been the basis for the utility's proposal" and "eviscerate the terms of the bargain" of the negotiated amendments. *Hecate Energy LLC v. FERC*, 126 F.4th 660, 667 (D.C. Cir. 2025).

Public utilities establish rates and other terms and conditions either through generally applicable tariffs or, as here, through negotiated contracts. "One []policy [underlying section 205(d)] is to recognize private contractual arrangements between parties to a utility agreement." *City of Piqua v. FERC*, 610 F.2d 950, 953-54 (D.C. Cir. 1979). The Supreme Court has recognized the "commonsense notion that" contracting parties in a FERC-regulated market are "often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them," and therefore, "only when the mutually agreed-upon contract rate or term seriously harms the consuming public may the Commission declare it not to be just and reasonable." *Morgan Stanley*, 554 U.S. at 545-46. *See NRG Power*, 558 U.S. at 167-68 (public interest standard is an application of the just-and-reasonable standard to rates set by contract).

**B. Regional Transmission Organizations ("RTOs")**

In the late 1990s, FERC required vertically integrated public utilities to unbundle generation and transmission services and sell them separately. . . . [I]mproved transmission technology allowed generators to sell power over longer distances. These longer distances brought additional transaction costs: Generators faced multiple transmission utilities along the route, each with its own tariffs, prices,

6

and terms of service.  To reduce these transaction costs, transmission owners formed regional "independent system operators" [ISOs] working under a common tariff.

*Cap. Power Corp.*, 2025 WL 2738420, at *1-2 (citations omitted).  FERC "encouraged—but did not require—the development of multi-utility regional transmission organizations (RTOs)." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1364 (D.C. Cir. 2004).

> By assuming operational control but not ownership of the transmission facilities, [RTOs] separate operation of the transmission grid and access to it from economic interests in generation, and promote efficiency by taking advantage of economies of scale in segmentation and control of facilities.   . . . FERC encouraged all transmission-owning entities in the Nation, including non-public entities, to voluntarily place their transmission facilities under the control of RTOs.

*Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 667 (D.C. Cir. 2007) (cleaned up).

PJM is one such voluntarily-established RTO.  *See Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC*, 272 F.3d 607, 613-16 (D.C. Cir. 2001) (confirming RTO membership is voluntary).  "As an RTO, PJM coordinates the movement of electricity across the region" and "operates transmission facilities owned by member utilities, approves the construction of new facilities, and files tariffs allocating among its members the costs of the facilities." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017).  The relationship between a transmission

7

owner and a regional operator is contractual, and the contract that defines it can be mutually amended or terminated. *See Atlantic City*, 295 F.3d at 11.

### C. The Owners Agreement Between PJM And The Transmission Owners Creates PJM As An RTO.

The Owners Agreement is the foundational agreement by which the Transmission Owners collectively contract with PJM to delegate control of over $80 billion of transmission infrastructure assets to PJM for specified purposes, and give PJM specified responsibilities related to the planning and operation of the regional transmission system. PJM, in turn, agrees to undertake those significant operational and planning responsibilities, recognizing the Transmission Owners retain any rights not specifically assigned to PJM. Amendments to the Consolidated Transmission Owners Agreement, *PJM Interconnection L.L.C.*, FERC Docket No. ER24-2336, at 7, 12-13, (filed June 21, 2024) ("Application"), JA___. If not for the Owners Agreement, these responsibilities would be retained by the Transmission Owners, and PJM would not exist. *See* CTOA §5.6, JA___.

In the first transmission owners agreement, the Transmission Owners retained their section 205 filing rights over the entire PJM Tariff, although PJM could veto proposed Tariff changes in certain limited circumstances. *See Pennsylvania-New Jersey-Maryland Interconnection*, 81 FERC ¶ 61,257, at 62,236 (1997). When FERC purported to require the Transmission Owners to cede all their filing rights to PJM, they appealed to this Court, which held FERC lacked the power to do so.

8

*Atlantic City*, 295 F.3d at 9-11.  A second *Atlantic City* decision, necessary to enforce the first, confirmed "when FERC attempts to deprive the utilities of their rights to initiate rate design changes with respect to services provided by their own assets, FERC has exceeded its jurisdiction."  329 F.3d at 859 (cleaned up).

Following these decisions, PJM and the Transmission Owners entered into a settlement allocating between them the responsibilities for different portions of the PJM Tariff and the right to file changes to those portions.  FERC accepted the settlement, recognizing it was a voluntary delegation of rights.  *Pennsylvania-New Jersey-Maryland Interconnection*, 105 FERC ¶ 61,294, PP 30-33 (2003) ("Atlantic City Settlement Order"), *appeal dismissed sub nom., Old Dominion Elec. Coop. v. FERC*, 171 F. App'x 862 (D.C. Cir. 2005).  The settlement included a *Mobile-Sierra* clause "governing revisions to the parties' voluntary agreement," which the parties added to provide regulatory certainty that their agreement could not be amended without their consent unless the change was required by the public interest.  *Id.* P32.[1]

In July 2001, PJM became an RTO.  *PJM Interconnection, L.L.C.*, 96 FERC ¶ 61,061 (2001).  PJM then expanded to include additional transmission owners by

---

[1] The *Mobile-Sierra* doctrine originated in the twin 1956 decisions, *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) ("*Mobile*") and *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) ("*Sierra*"), and holds that a FERC-filed contract can be abrogated only when unequivocally required by the public interest. *See* p.43, *infra.*

9

executing multiple transmission owner agreements with new parties. *See, e.g., Alliance Cos.*, 100 FERC ¶ 61,137 (2002). At FERC's urging, PJM and all the transmission owners party to existing agreements consolidated those agreements into the Owners Agreement. *PJM Interconnection, L.L.C.*, 114 FERC ¶ 61,283, P10, ordering para. (A) (2006). The Owners Agreement has been largely unchanged since 2006.

Under the Owners Agreement, PJM and the Transmission Owners agreed to the terms and conditions under which the Transmission Owners transfer filing rights and operational and planning responsibility to PJM. CTOA, Preamble, JA___. A Transmission Owner can also completely reclaim its rights and responsibilities by withdrawing from the Owners Agreement, subject to conditions not relevant here. *Atlantic City*, 295 F.3d at 9-12; CTOA, § 3.2, JA__.

### D. The Need For Amendments To The Owners Agreement, PJM's Negotiation of Them, And The FERC Proceedings That Considered Them.

#### 1. Summary of the Amendments

The Amendments help PJM and the Transmission Owners address issues necessary for regional grid reliability and security in an industry with rapidly evolving needs. Application at 19-24, 40-41, 45, JA____-____, ____-____, ____. They were the product of months of arm's-length negotiations between sophisticated parties that FERC found were conducted in good faith. Reh'g Order, P40, JA____.

The Amendments provide PJM with independent section 205 filing rights over the regional transmission planning rules ("Planning Protocol") and support PJM's plenary responsibility for regional transmission planning. Application at 19, JA___. By moving the Planning Protocol to the PJM Tariff, which is currently in the PJM Operating Agreement and requires a vote of the PJM Members Committee to change, the Amendments give PJM the independent authority to modify its transmission planning criteria through FPA section 205 filings. Currently this authority depends on the vote of a Members Committee that has become dominated by non-utilities not authorized to make section 205 filings.

Without independent section 205 filing rights over the Planning Protocol, PJM can only pursue necessary changes to it by filing a complaint under FPA section 206, 16 U.S.C. § 824e, requiring it to prove first to FERC that the Planning Protocol provisions it wants to replace are unjust and unreasonable. This significantly limits PJM's ability to improve the Planning Protocol. PJM is the only RTO without independent planning authority. *See* Application at 2, JA____; *id.*, Exhibit C, Decl. of Pulin Shah ¶ 5 ("Shah Aff."), JA___.

The Amendments included several other provisions clarifying the parties' rights under the Owners Agreement. Application at 19-25, JA____-____. These include: (i) prohibiting either party from making unilateral section 205 filings inconsistent with the Agreement, *see* Amended CTOA, § 7.9, JA____; (ii) dispute

11

resolution procedures essentially identical to those already in the Agreement to apply to disputes over whether a proposed filing is inconsistent with the Agreement, *see* proposed Attachment B, JA____; (iii) clarifying that PJM's planning will be in accordance with the Owners Agreement and the Planning Protocol, *see* Amended CTOA, §§ 4.1.4(a)(iii), 6.3.3(ii), and 6.3.4(a)(iii), JA___, ___, ___; (iv) requiring PJM to continue to perform under the Owners Agreement even if it loses its status as an RTO, *see* Amended CTOA, § 6.3.5, JA____; (v) requiring the parties consult when a transmission project PJM determines should be included in a regional plan overlaps with a local project proposed by a transmission owner, *see* Amended CTOA, §§ 4.1.4(b)(ii), 6.3.4(b)(ii) (the "Overlap Provisions"), JA____, ____; and (vi) extending existing protections against unilateral amendments to the Agreement. *See* Amended CTOA, § 7.5.1, JA____.  FERC addressed each of these in its orders, and did not address other proposed changes.  Initial Order, P23, JA___; Reh'g Order, P23, JA___.

### 2.  The Pre-Filing Stakeholder Process and Amendments Filing

The Agreement Amendments were considered and discussed for months by the Transmission Owners, PJM's governing body the Board of Managers ("PJM Board"), other PJM members, and stakeholders before they were filed with FERC. PJM members received more than a month's notice that the Transmission Owners Agreement Administrative Committee would vote on the Amendments at its March

12

2024 meeting. *PJM Interconnection, L.L.C.,* August 15, 2024 Answer, FERC Docket No. 2336, at 5, JA___. The Transmission Owners discussed the Agreement Amendments with the Members Committee and postponed their own vote for three months to provide requested information to PJM members and others. *PJM Interconnection, L.L.C.,* FPA Section 206 Filing of PJM Interconnection, L.L.C., FERC Docket No. EL24-119-000, at 9 (June 21, 2024) ("PJM Complaint"), JA___.

PJM's Board carefully and deliberately considered arguments and concerns from members and non-member stakeholders, including regulators in PJM states. The PJM Board delayed its vote on the Amendments at the states' request. PJM Complaint at 9, R.17, JA____. PJM also followed its process for amending the Operating Agreement, *see* Operating Agreement, § 18.6, JA__, and proposed to the Members Committee a section 205 filing to move the Protocol to the PJM Tariff, which the Members Committee rejected. PJM Complaint at 10-11, JA____. The PJM Board carefully considered this vote and the positions of its members and directed PJM staff to proceed with the filing to move the Protocol, acknowledging the Owners Agreement must be revised to do so and that the Amendments to do so were reasonable. *Id*. at 11, JA__. Independently determining it was best to proceed with moving the protocol notwithstanding the members' vote, the Board authorized implementing filings, including a section 206 complaint it believed necessary.

13

PJM, acting on behalf of the Transmission Owners, submitted the Agreement Amendments to FERC pursuant to section 205 on June 21, 2024.  Application at 2, 51, 54, JA__.  The same day PJM made implementing filings under sections 205 and 206 contingent on FERC accepting the Amendments.  Initial Order PP1, 12-14, 22, R.176, JA___.  The Transmission Owners provided additional information FERC had requested in a Deficiency Letter.  Deficiency Resp., JA___.

### 3.  The Initial Order And Rehearing Order

On December 6, 2024, FERC rejected the Agreement Amendments and denied or dismissed PJM's implementing  filings.  Initial Order, P1, JA___.  The order rejected portions of the Amendments on "three independent grounds."  *Id.* P23, JA____.  First, FERC asserted certain provisions "violate the independence requirements of Order No. 2000," namely that "regional transmission operators be independent of control by any market participant or class of market participants in both reality and perception."  *Id*. P43 (citation omitted), JA___.  Second, FERC rejected the Overlap Provisions (sections 4.1.4(b)(ii) and 6.3.4(b)(ii)) because they "include[d] substantive transmission planning rules."  *Id*. PP23, 51, JA___, ___; *see id.* PP55-56, JA___-___.  Third, FERC rejected section 9.16.3's application of *Mobile-Sierra* to provisions in the Owners Agreement incorporating the Transmission Owners' delegation of rights to PJM (the "Protected Provisions"),

14

claiming they "do not qualify for such protection either as a matter of law or through the exercise of the Commission's discretion." Initial Order, PP23, 74-81, JA___.

On rehearing, FERC set aside the Initial Order in part. Reh'g Order, P3, JA___. FERC reached the same conclusion as to the Agreement Amendments, but instead of denying the PJM Complaint dismissed it without prejudice, noting the "PJM Board has the authority to petition the Commission under FPA section 206 to modify a provision or schedule of the [Operating Agreement]," which includes the Planning Protocols, but making no mention of the provisions to which FERC objected. *Id*. P105, JA___.

## SUMMARY OF ARGUMENT

FERC improperly rejected bilaterally and fairly negotiated Amendments to the Owners Agreement under which the Transmission Owners have voluntarily delegated operating and planning control over their valuable assets to PJM along with statutory filing rights necessary to implement the delegation. Rather than stay within its required "passive and reactive" role to assess whether the agreement in its totality, and to reject it only if on an overall basis it is not just and reasonable because it is unequivocally not in the public interest, FERC picked out certain provisions it disapproved of, provided arbitrary and unsupported reasons to reject them in isolation, and invited the parties to resubmit a different agreement without them. In doing so, FERC violated this Court's express direction that it not "undo the

compromise" reflected in the Amendments and "eviscerate the terms of the bargain." *See Hecate Energy*, 126 F.4th at 667.

The reasons FERC advanced against selected provisions of the Amendments do not withstand scrutiny. First, the Amendments inarguably enhance PJM's independence by providing it the exclusive authority to make section 205 filings to amend its planning rules. FERC's conclusion that PJM's independence is compromised by a dispute resolution provision of the type it has approved before, including in the Owners Agreement itself, is incorrect and takes no account of the undisputed enhancement of PJM's independence made possible by the Amendments. Second, FERC's rejection of provisions requiring the Transmission Owners and PJM to consult when they plan projects that overlap is inconsistent with its own precedent and practice, and improperly interferes with the expansion of arrangements FERC has previously allowed and this Court has approved. Finally, FERC's conclusion that the Amendments do not qualify for protection under the Supreme Court's *Mobile-Sierra* doctrine ignores a consistent line of Supreme Court precedent rejecting attempts to add exceptions to the doctrine and wholly unsupported by any judicial precedent.

### STANDING

A party has standing to challenge a FERC order if it suffers an injury in fact caused by the Order complained of that is redressable by a favorable decision. *See*

16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). *See also Pub. Util. Dist. No. 1 of Snohomish Cnty.,* 272 F.3d at 613 (party is aggrieved under FPA § 313(b), 16 U.S.C. § 825*l*(b) if it meets constitutional standing requirements). There is "ordinarily little question that a party regulated by a challenged rule has standing to challenge it." *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (quoting *Lujan*, 504 U.S. at 561–62)). The standing of such "undisputedly regulated" entities is "self-evident." *Id.*

The parties here have submitted an agreement to FERC that improves and clarifies their ability to manage their responsibilities to own and operate the transmission system, and FERC has disallowed it. This Court has held that FERC's approval of proposed amendments to an RTO's operating agreement can cause injury in fact. *See Exelon Corp. v. FERC*, 911 F.3d 1236, 1240 (D.C. Cir. 2018). This reasoning applies to disapproval as well. FERC directly regulated the parties by interfering with their contractually-negotiated arrangements.

Specific injuries, moreover, flow to the Transmission Owners under the current Owners Agreement that would be addressed by the Amendments, as discussed in more detail in the record. Shah Aff., JA____; *PJM Interconnection, L.L.C.*, Motion for Leave to Answer & Answer, Reply Aff. of Paul F. McGlynn on Behalf of PJM Interconnection, L.L.C., FERC Docket No. ER24-2336 (filed Sep. 26, 2024) ("McGlynn Aff."), JA___. FERC's rejection of the Amendments allows

17

those injuries to continue. *See* Shah Aff. ¶¶ 10-34, JA___-___; McGlynn Aff. ¶¶ 15-16, JA___. An order from this Court reversing FERC's determination would redress this harm.

**ARGUMENT**

**I.    Standard of Review**

The Court must "set aside" agency orders that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," including agency actions "contrary to constitutional right," "in excess of statutory jurisdiction," "without observance of procedure required by law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2). FERC must therefore "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Agencies must also acknowledge and reasonably explain any departures from precedent. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (citation omitted). This Court must decide "*all* relevant questions of law" arising on review of agency actions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). Interpretation of a contract is a question of law.

18

## II. FERC Exceeded Its Limited Authority To Review Contracts Under Section 205

### A. Utilities' Rights To Enter Into Voluntary Contracts And To File Changes To Those Contracts Are Fundamental To The FPA.

FERC's orders interfere with the Transmission Owners' basic and fundamental rights under the FPA and contract law. The Agreement and Amendments address the Transmission Owners' *voluntary* delegation of the operation and planning of over $80 billion dollars of transmission assets they own to fulfill a significant part of their FPA public utility service obligations and a concomitant delegation of their statutory filing rights. The Amendments clarify the terms and conditions under which this delegation is made. Like any other contracting party, the Transmission Owners have the right to define the terms and conditions of their delegation. *See Am. Mun. Power*, 86 F.4th at 927 (limiting PJM's authority "to that granted to it by transmission owners in the Owners Agreement"). This right includes the ability, with the agreement of their counterparty PJM, to clarify or amend that delegation. *See, e.g., St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004) ("It is well established that the parties to a contract can discharge or modify the contract…"); *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 257 (Mich. 2003) ("[T]he freedom to contract principle . . . permits parties to enter into new contracts or modify their existing agreements.").

19

Section 205 gives the ***utility***—not FERC, a state regulator, a nonfiling transmission owner , a consumer advocate, a commercial or industrial customer, or any other party—"the right to file rates and terms for services rendered with its assets." *Atlantic City*, 295 F.3d. at 9. That right is the utility's to exercise or delegate if it so chooses; FERC cannot transfer, limit, or abrogate it by regulation or order. *Id*. at 9-11. Nor can FERC grant parties other than the utility the authority to make section 205 filings. *Id.*

The utility-protecting provisions of section 205 apply with even more force to contracts. The FPA contemplates their abrogation "only in circumstances of unequivocal public necessity." *NRG Power*, 558 U.S. at 173. The "animating purpose" of this doctrine, known as *Mobile-Sierra, see* p.9 n.1 *supra*, is promotion of "the stability of supply arrangements which all agree is essential to the health of the energy industry." *Id.* (quoting *Mobile*, 350 U. S. at 344). *See Cities of Bethany*, 727 F.2d at 1139 ("[P]reservation of private contracts within the context of a rate-setting statutory scheme promotes economic stability."); *Mkt.-Based Rates for Wholesale Sales of Elec. Energy, Capacity & Ancillary Servs. by Pub. Utils.*, Order No. 697, FERC Stats. & Regs. ¶ 31,252, P6 (2007) (noting the chilling effect on investments caused by "uncertainties regarding rate stability and contract sanctity"), *subsequent history omitted*.

20

The stability provided by voluntary contractual agreements is particularly important here where the Amendments improve and clarify the basic structure under which the Transmission Owners' assets will be operated and planned for decades to come. As FERC put it in a similar long-term context: "Competitive power markets simply cannot attract the capital needed to build adequate generating infrastructure without regulatory certainty." *Nev. Power Co. v. Duke Energy Trading & Mktg., L. L. C.*, 99 FERC ¶ 61,047, at 61,190 (2002), *subsequent history omitted*. This is not only true for individual power sale contracts of the type at issue in the original *Mobile-Sierra* cases; regulatory certainty is even more necessary when dealing with significant transmission investments over the long-term horizons encompassed by the Owners Agreement.

The FERC orders under review do not accommodate these fundamental FPA principles. FERC must respect basic contractual and statutory rights and does not have the authority to structure the electric transmission system to its liking without regard for these rights. *Atlantic City*, 295 F.3d at 10 ("The power to initiate rate changes … [under section 205] cannot be appropriated by FERC.").

FERC's consideration of the Amendments thus proceeded from entirely incorrect premises. FERC's failure to respect these principles and rights undermines substantial long-term commitments, such as the Owners Agreement, that make PJM and other RTOs possible.

21

## B. FERC Ignored The Limitations On Its Authority To Reject An Agreement Bilaterally Negotiated In Good Faith.

In concluding the Agreement Amendments were not just and reasonable, FERC fundamentally ignored the limitations on its authority and exceeded the "essentially passive and reactive role" this Court prescribes. *Hecate Energy*, 126 F.4th at 662. It failed to consider whether the Amendments were just and reasonable on an overall basis, and instead revised the deal by disapproving certain provisions in isolation and then inviting one party to resubmit a different agreement. FERC thus violated this Court's direction that FERC "cannot insist on *or even suggest* modifications that result in an entirely different rate design than the utility's original proposal, including modifications that undo the compromise that had been the basis for PJM's proposal and eviscerate the terms of the bargain underlying the original proposal." *Hecate Energy*, 126 F.4th at 667 (emphasis added)(citation omitted).

FERC's authority is "limited to an inquiry into whether the rates proposed []are reasonable—and not . . . whether a proposed rate schedule is more or less reasonable than alternative rate designs." *Cities of Bethany*, 727 F.2d at 1136. Here, FERC's limited role was to determine whether the contract presented—not some arrangement it might have preferred—fell within the "broad range" of a just and reasonable result. *See Emera Me. v. FERC*, 854 F.3d 9, 26 (D.C. Cir. 2017). In doing so, FERC was required to respect the contractual rights of PJM and the Transmission Owners, including the right to add basic provisions, such as dispute

22

resolution mechanisms, that are ubiquitous in complex contracts to protect the rights of the parties. Deference to such arrangements "does not impair the regulatory powers of the Commission." *City of Piqua*, 610 F.2d at 954.

FERC repeatedly ignored these limitations. First, it "un[did] the compromise that had been the basis for PJM's proposal." *See Hecate Energy*, 126 F.4th at 667. The Amendments resulted from a complex negotiation among sophisticated parties. A central goal was to move the Planning Protocol into the PJM Tariff so that PJM's section 205 filings were not dependent on a Membership Committee dominated by non-utilities not authorized to make section 205 filings. Even though this change eliminated the Transmission Owners' ability to vote on PJM section 205 filings, both PJM and the Transmission Owners concluded it was necessary for PJM to meet critical transmission planning challenges. PJM and the Transmission Owners also negotiated changes to several other provisions in the Agreement that clarified and improved it. This give and take is an ordinary and expected part of any contract negotiation and exactly what FERC is compelled by law to respect.

FERC's approach also violated the principle that it cannot reject a proposal simply because it would have preferred PJM and the Transmission Owners came to a different bargain. Several parties that do not own, operate, or plan transmission assets opined FERC should only approve moving the Planning Protocol and reject the other negotiated provisions of the Amendments. *See, e.g.*, Initial Order, PP31,

23

64, 68, 70, JA\_\_\_\_, \_\_\_\_, \_\_\_\_, \_\_\_\_; *Duquesne Light Co.*, Protest of Consumer Advocates, Docket No. ER24-2336-000, 3 (filed July 22, 2024), JA\_\_\_; *Duquesne Light Co.*, Protest of Harvard Elec. Law Initiative, Docket No. ER24-2336-000, 12 (filed July 22, 2024), JA\_\_\_.  FERC's invitation on rehearing for a new proposal that moves the Planning Protocol without the other provisions of the Amendments reflects improper pressure to effectively rework the parties' agreement.  Reh'g Order, P105, JA\_\_\_.  *See Hecate Energy*, 126 F.4th at 667 (FERC cannot "even suggest modifications" to the utility's original proposal that result in an "entirely different" design).  FERC was required to assess the overall justness and reasonableness of the agreement the parties reached, not call for a different one it might prefer.

FERC exceeded its "passive" role under the FPA.  It improperly discarded the realities of the contract negotiations that led to the Amendments and the limitations on FERC's own authority under section 205.

### III.    FERC's Stated Bases For Rejecting The Agreement Amendments Misread The Text And Are Arbitrary and Capricious.

FERC justified its conclusion that the Agreement Amendments were unjust and unreasonable on three grounds: (1) they "impede" PJM's independence; (2) they locate the Overlap Provisions in the Owners Agreement instead of in other documents; and (3) the Owners Agreement and the Amendments are ineligible for *Mobile-Sierra* protection under a FERC-created exception for "contracts of general

24

applicability."  These conclusions were not based on the actual text or purpose of the Agreement Amendments, mirrored unsubstantiated speculations of third parties, ignored precedent, and improperly sought to advance FERC's policy preferences over the terms of the parties' agreement.  The Court owes no deference to FERC on its reading of the contract and its conclusions are so unreasonable that even deference could not save them.

### A. PJM Independence

FERC's first reason for rejecting the Agreement Amendments was its rationalization  that they undermined PJM's independence.  Notwithstanding that PJM negotiated the Amendments absent bad faith or duress, FERC concluded without good reason that they could undermine PJM independence "in both reality and perception."  Reh'g Order, PP30, 32, JA____-___.  To the contrary, the Amendments enhance PJM's independence.

### 1. FERC's Preference For RTO Independence Cannot Overcome The Transmission Owners' FPA And Contract Rights.

FERC assumed the Amendments would undermine its regulations regarding RTO independence, specifically Order No. 2000.  Reh'g Order, P32, JA___-__.  This is incorrect, as shown below, but even if FERC were correct this Court held in *Atlantic City* that "[n]o matter how 'bedrock' the principle of ISO independence may be, [a FERC Order] is merely a regulation.  It cannot be the basis for denying the

25

petitioners their rights provided by a statute." *Atlantic City*, 295 F.3d at 11. FERC's rejection of the Amendments made the same legal error here in relying on Order No. 2000. *See* Reh'g Order, P37, JA____.[2]

FERC incorrectly attempts to distinguish *Atlantic City* by claiming no statutory rights are at issue here. *Id.* Section 205 grants a transmission owner the right to "set the rates it will charge prospective customers, and change them at will," subject only to "modifi[cation] by the Commission upon a finding that they are unlawful.'" *Atlantic City*, 295 F.3d at 10. The purpose of the Amendments is to identify which of these statutory rights the Transmission Owners will delegate, and the terms of that delegation. These rights are "the very thing that the statute was designed to protect." *Id.*

As in *Atlantic City*, even if FERC were correct, and again it is not, that an alternative approach might better accord with a regulation, it does not have the authority to interfere with the Transmission Owners' right to structure the terms and conditions under which they delegate control over their valuable assets. That is

---

[2] Order No. 2000 simply specifies the requirements for a transmission organization to be an RTO. It does not require PJM to remain an RTO or prohibit the Transmission Owners and other stakeholders from providing the same transmission service and market functions through a different arrangement. *See* 16 U.S.C. § 824a; 18 C.F.R. § 35.34. *See also* Amended CTOA, § 3.2, JA ___ (specifying the requirement to "put in place alternative arrangement for satisfaction of FERC's requirements with respect to comparable transmission services" as a condition of withdrawal from the Owners Agreement).

26

especially so when FERC did not identify any specific prescription of the regulation that the Amendments supposedly violate, merely an amorphous concept of PJM "independence" and an even more amorphous "perception" of that independence by others. Reh'g Order, P32, JA____-___. FERC was required to find that the Amendments fall outside a broad range of just and reasonable results such that they are unequivocally not in the public interest, and did not do so.

### 2. The Agreement Amendments Enhance PJM's Independence.

Far from "impeding" PJM's independence, the Amendments enhance it—as evidenced by the text of the Amendments, affidavits supporting them, and PJM agreeing to them and filing for and actively supporting their acceptance by FERC. As explained in the Transmission Owners' and PJM's undisputed declarations of record supporting the Amendments, freeing PJM from a Members Committee vote before filing to change the Planning Protocol unquestionably enhances PJM's independence. Shah Affidavit, PP3-25, JA____-___; McGlynn Aff. ¶¶ 15-16, JA____. FERC's conclusion to the contrary is not based on the purpose and text of the Amendments or any plausible interpretation of their effect.

A central purpose of the Amendments is to free PJM from having to obtain a super-majority vote of the PJM Members Committee to change its transmission planning rules. Currently, the Owners Agreement requires PJM to conduct regional transmission planning via Planning Protocols located in the Operating Agreement,

27

and any change to the Protocols thus requires a two-third sector-weighted vote of the PJM Members Committee.  Operating Agreement, §§ 8.4, 18.6, JA____, ____.  The Amendments move the regional transmission system planning rules to the PJM Tariff, where PJM has the "exclusive and unilateral right to file for changes" without a Members Committee vote.  Settlement Agreement, Docket No. OA97-261-006 *et al.* (filed Oct. 3, 2003), *as modified* Modification of Settlement Agreement, Docket No. OA97-261-009 et al., § 4.3(B) (filed Jan. 20, 2004 and corrected Jan. 23, 2004) ("*Atlantic City* Settlement"); PJM Tariff, Part I § 9.2(a); Amended CTOA, § 7.5.1, JA____, ____, ____.

Moving the Planning Protocol to the PJM Tariff would eliminate the ability of the Members Committee, which includes the Transmission Owners, to veto PJM filings under section 205.  FERC does not contest that this change enhances PJM's independence, but incorrectly states it is "not part of the proposed Amendments." Reh'g Order, P39 (cleaned up), JA____.  In fact, PJM cannot move the Planning Protocol without an amendment to the Owners Agreement since the move depends on the provision in the Amendments that the Planning Protocol "will be set forth exclusively in PJM Tariff, Schedule 19."  Amended CTOA, §§ 4.1.4(a)(i), 6.3.4(a), JA____, ____.

The Amendments thus inarguably enhance PJM's independence by allowing it to file under section 205 to amend the Planning Protocol without Member

28

Committee interference. FERC's conclusion to the contrary simply misreads the Amendments.

### 3. FERC's Finding That The Amendments Give Transmission Owners The Opportunity To Impede PJM's Independence Misreads Them.

FERC's finding that the Amendments would provide the Transmission Owners with "an exclusive ability to affect which FPA section 205 filings PJM submits," Reh'g Order, P39, JA____, is also premised on a misunderstanding of the Amendments, and in any event cannot overcome the inarguable enhancement of PJM's independence to make Planning Protocol filings made possible by the Amendments. FERC cited several provisions of the Amendments in support of its erroneous conclusion.

### a. The Dispute Resolution Provisions Are Consistent With FERC Precedent And Do Not Affect PJM's Independence.

FERC took issue with section 7.9 of the Amendments, which allows either party to invoke specified dispute resolution procedures if it believes its counterparty intends to make a section 205 filing in contravention of the Owners Agreement. But the Owners Agreement has contained a dispute resolution provision since FERC approved it in 2004. Atlantic City Settlement Order, PP28, 34. Section 7.9 replaces a reference to Operating Agreement dispute resolution procedures with specific

29

procedures nearly identical to those approved by FERC in the *Atlantic City* Settlement.

FERC has consistently held that similar dispute resolution procedures are, as a general matter, consistent with federal law and FERC policy. *See, e.g.*, *City of Vernon v. Cal. Indep. Sys. Operator, Corp.,* 94 FERC ¶ 61,141, at 61,538 (2001) (finding that arbitration as initial process in resolving disagreements is consistent with the FPA and FERC's goals and policies); *Nw. Reg'l Transmission Ass'n*, 71 FERC ¶ 61,397, at 62,562 (1995) (rejecting argument that dispute resolution procedures cause undue delay). *See also Duke Power Co. v. FERC,* 864 F.2d 823, 831 (D.C. Cir. 1989) (FERC may not disregard mandatory arbitration clauses in routine contract disputes). FERC nonetheless found that section 7.9 could permit the Transmission Owners to "delay the filing until after [the] dispute resolution procedures and to potentially influence the filings before they are made with the Commission." Reh'g Order, P44 (footnote omitted), JA____.

FERC did not, and cannot, find that the Transmission Owners could influence a PJM filing other than by demonstrating to a Neutral Party that it would violate the Owners Agreement, a finding PJM could take to FERC if PJM disagreed with it. PJM itself can also invoke the dispute resolution procedures. *See* Amended CTOA, Attachment B, § B(v), JA____:

> Interested parties (including the [Transmission Owners] and PJM) may
> file a complaint seeking review by the FERC of the Neutral Party's

30

decision, and the FERC's authority to interpret whether the proposed filing contravenes the Agreement shall not be limited by the Neutral Party's decision as it relates to these disputes.

FERC submits that the procedures could be used to resolve disputes other than contractual agreements and that the maximum ten-day period to resolve the dispute is too long, but neither of these assertions supports FERC's conclusion. Reh'g Order, P44, JA____. In the *Atlantic City* Settlement, FERC approved almost identical dispute resolution provisions governing a broad range of disputes over section 205 filing rights for cost recovery and allocation and tariff terms and conditions. Atlantic City Settlement Order, PP28, 34. FERC does not explain why a different conclusion is appropriate here. FERC incorrectly states that the provision would apply to "any FPA section 205 filing that PJM might wish to make, including changes to the PJM Tariff, [Operating Agreement], Reliability Assurance Agreement Among Load Serving Entities in the PJM Region," and that nothing in the plain language of section 7.9 limits its applicability. Reh'g Order, PP45, 48, JA____, ____. Section 7.9 is, however, expressly limited to disputes under the Agreement, specifically, a filing that would "contravene any part of Articles 2, 4, 5, 6 or 7 or Attachment B of the [Owners] Agreement." Amended CTOA, § 7.9, JA____. The plain language limits the provision to disputes over the scope of the parties' planning and operating rights delegated under the Agreement, just as the

31

current procedures apply to the closely-related subject of disputes over delegated filing rights.

FERC submits that this broader scope of section 7.9—covering whether the filing violates the Agreement rather than just which party has the right to make the filing—distinguishes its prior acceptance of identical dispute resolution procedures governing filing rights. Reh'g Order, P45, JA___. But FERC does not explain why this distinction matters. Both issues are key parts of the Transmission Owners' fundamental rights to retain all section 205 filing rights not clearly and expressly transferred, and to decide by contract which rights to delegate and the terms and conditions under which they are delegated. There is no sound basis on which to distinguish the two issues, and FERC has not attempted to provide one.

FERC also states that the provision would affect PJM's section 205 rights, Reh'g Order, P48, JA____, but PJM has only the rights the Transmission Owners have assigned it, subject to the good-faith contractual agreement that section 7.9 should govern disputes over the extent of those rights. This is a typical contractual dispute resolution provision of the type FERC has repeatedly approved in other contexts. *See* p.16, *supra*.

The only other concern FERC articulated as to the dispute resolution provision is the maximum 10-day period allowed for the dispute resolution procedures to be followed. FERC initially compared this to a transmission owner veto it rejected as

32

to another RTO, *see* Initial Order, P45, JA____, but conceded on rehearing it is no veto.  Reh'g Order, P44, JA____.  FERC does not contest that it generally takes a minimum of 60 days to resolve protested filings, a clock that FERC restarts when it issues a notice of deficiency (as it did in this case).  FERC's complaint that the parties' attempt to resolve the dispute could add a maximum of 10 days to its general 60-day, and often longer, period to consider filings would "compromise PJM's independence" is implausible and arbitrary to the point of pretext, especially given that PJM itself has negotiated this provision, and that FERC has accepted the same procedures for very closely related issues in the current Owners Agreement.  FERC has also accepted nearly identical dispute resolution provisions in other contexts.  *See* p.16, *supra.*  It is arbitrary and capricious for an agency not to treat similar cases alike, and where "a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument." *LeMoyne-Owen College v. NLRB,* 357 F.3d 55, 60–61 (D.C. Cir. 2004).

### b.  Requiring PJM To Comply With An Agreement It Has Voluntarily Entered Into Does Not Violate Its Independence.

Sections 4.1.4(a), 6.3.3(ii), and 6.3.4(a) of the Amendments amend the Owners Agreement to provide that PJM's planning must comply with the Agreement.  FERC found these sections "contravene Order No. 2000's requirement that RTOs be independent of control by any market participant or class of

33

participants in both reality and perception." Reh'g Order, P32, JA____. The Rehearing Order, however, does not discuss these sections, and justifies its conclusion only with the assertion that requiring PJM to plan the system consistent with the terms of the Owners Agreement "would elevate PJM's obligations to the [Owners Agreement] above Commission rules and regulations" and thus give the Transmission Owners "undue influence over transmission planning and expansion . . . thereby reducing PJM's independent governance." Initial Order, P47, JA____.

FERC provides no basis for the extraordinary claim that it can override in the name of "PJM independence" the contractual terms under which the Transmission Owners voluntarily agree to delegate the authority to manage their transmission assets and to plan their expansion, along with the associated section 205 filing rights. Providing limitations or requirements on that delegation of authority is inherent in the right to grant or withhold it to begin with, and PJM's negotiation of those conditions was free, open, and fully voluntary.

Requiring PJM to comply with the contract on which its authority is based does not interfere with PJM's "ultimate responsibility for both transmission planning and expansion within its region," Initial Order, P47, JA____, any more than the requirement that PJM observe NERC reliability criteria, Good Utility Practice, and plan the system "based on a planning horizon of at least ten years." Amended CTOA, § 6.3.4, JA____. These have been part of the Owners Agreement from the

34

beginning, without any suggestion from PJM or any other party that they limit PJM's independence.

FERC's suggestion that it can abrogate legal rights based merely on the "perception" of protestors of a  conflict with Order No. 2000 is even weaker.  The concept has no limiting principle, and is thus the very definition of an arbitrary and capricious agency action.  The regulation could not in any event take precedence over the Transmission Owners' and PJM's FPA and contract rights, *see* pp.25-27, *supra*, much less third-party "perceptions" of compliance with the regulation.

### c. The Requirement That PJM Continue Performing The Essential Services The Transmission Owners Have Transferred To It By Contract Regardless Of Its RTO Status Is Reasonable And In No Way Undermines PJM's Independence.

The Amendments confirm that PJM must continue providing the operational and planning services the Transmission Owners have assigned it even if its RTO status is questioned.  They do so by adding the words "consistent with its obligations under this Agreement" to section 6.3.5 of the Owners Agreement.  FERC claims  this elevates "PJM's obligations to the [Owners Agreement] above Commission rules and regulations by encumbering PJM's ability to maintain its status as an RTO and tying it to its obligations under the [Owners Agreement] rather than Commission regulations."  Reh'g Order, P54, JA____.

FERC offered no explanation how this provision—designed to assure that PJM and the Transmission Owners will work together to keep the lights on regardless of PJM's regulatory status—would infringe on PJM's independence, but merely asserted that the provision does not comport with PJM independence "in reality and perception." Reh'g Order, PP54-55, JA___. FERC cited two protests for this assertion, *id.* P54 n.173, JA___, but neither provides any support. One speculates that section 6.3.5 might affect PJM's ability to comply with some unspecified future enhancement of FERC regulations, and the other concedes that the provision has a "worthy goal," but incorrectly opines this is already achieved in another section of the Agreement that addresses the complete cessation of PJM activities, not the loss of RTO status. *See* Reh'g Order, P55 & n.177, JA___.

Without the added language to section 6.3.5, should FERC amend Order No. 2000 to change the definition of RTO such that PJM is no longer qualified, provisions of the Owners Agreement would come into contradiction, and its very basis would be undermined. FERC's position gives it the authority to abrogate the contract by amending its RTO regulations, making PJM's continued performance untenable.

The *Atlantic City* decision directly refutes the notion that FERC can abrogate statutory and other legal rights based merely on a regulation setting out RTO qualifications. *See* pp.19-21, *supra.* FERC does not mandate RTOs; transmission

owners create them by voluntary agreement. The original agreement establishing PJM went into effect well before FERC adopted its RTO regulations, and those responsibilities continue whether FERC repeals or changes those regulations. *See Jersey Cent. Power & Light Co.*, 2 FERC ¶ 63,046, at 65,269 (1978) ("The PJM agreement has been in effect since 1956."). As amended, section 6.3.5 would allow PJM to keep functioning under the contract while it worked out with FERC whatever issues were necessary to regain its RTO status if it so desired.

Section 6.3.5 of the Amendments is a reasonable accommodation of the rights of PJM and the Transmission Owners and FERC's regulatory responsibilities. FERC's contention that it should be able to override the Owners Agreement and Amendments by regulation is contrary to law.

## B. The Overlap Provisions Are Contractual, Consistent With Precedent, And Place No Obligations On, Nor Disadvantage, Non-Incumbents.

The Overlap Provisions build on existing planning practices that this Court has already affirmed, align with FERC precedent, and do not impose obligations or confer advantages that would disrupt the rights of non-incumbent transmission developers. FERC's rejection of the Overlap Provisions was arbitrary and capricious.

37

### 1. The Overlap Provisions Embody The Parties' Negotiated Agreement To Establish A Coordination Process To Improve Planning Efficiency.

The Overlap Provisions require PJM and a Transmission Owner to consult when a PJM-regionally planned project could eliminate the need for a local project a transmission owner has planned. Amended CTOA, § 4.1.4(b)(ii), 6.3.4(b)(ii), JA____, ____. PJM and the Transmission Owners negotiated them to avoid unnecessary transmission construction where their exclusive planning authorities may overlap. *See* p.12, *supra.* The provisions work alongside a section of the PJM Tariff of more limited scope, Attachment M-3, which was approved by FERC and affirmed by this Court in *American Municipal Power*, 86 F.4th at 937. The Overlap Provisions give PJM more authority than it has under the current Attachment M-3 process, since the Transmission Owners can file changes to the Attachment M-3 process unilaterally. Placing the Overlap Provisions in the Owners Agreement requires PJM's agreement to make any changes.

Under the FPA, transmission planning responsibilities reside with transmission owners except where they voluntarily contract to transfer those responsibilities, as the Transmission Owners have done in the Owners Agreement. *Am. Mun. Power*, 86 F.4th at 927. Because the Owners Agreement establishes the framework for allocating planning authority and other functions between PJM and the Transmission Owners, it is logical and necessary that the Agreement include

provisions that explain how overlapping responsibilities are to be handled.  FERC fails to address this critical and undisputed fact.

FERC rejected the Overlap Provisions because they contain transmission planning procedures that do not "predominately" affect the Transmission Owners' rights and responsibilities.  Initial Order PP55-56; JA___; Reh'g Order, PP67-68, JA____, ____.  However, the Overlap Provisions are like many other provisions in Articles 4 and 6 of the Owners Agreement that set out planning commitments by the Transmission Owners and PJM, respectively.  For example, existing sections 4.1.4 and 6.3.3 direct PJM to prepare the Regional Transmission Expansion Plan, with the former mandating that the Transmission Owners provide information necessary for PJM to perform that responsibility.  Amended CTOA, §§ 4.1.4, 6.3.3, JA____, ____.  Sections 4.2.1, 4.2.2, and 4.2.3 set forth the obligations of the Transmission Owners to construct what PJM plans and to acknowledge their assignments and provide a schedule for completion, *id.* §§ 4.2.1, 4.2.2, 4.2.3, JA____, ____, ____.  Section 6.3.4 directs PJM to plan for the enhancements and expansion of the PJM Transmission System utilizing a planning horizon of at least ten years.  *Id.* § 6.3.4, JA____.

FERC approved each of these provisions in the Owners Agreement, *PJM Interconnection, L.L.C.*, 114 FERC ¶ 61,283, reflecting that nothing in the FPA or FERC's own precedent and practice requires "substantive planning requirements" to

39

be in a tariff rather than an agreement.  FERC's rejection of the Overlap Provisions was arbitrary and capricious because it has accepted very similar provisions in Attachment M-3 and has accepted other planning provisions in the Owners Agreement less closely related to its core purpose of allocating planning responsibilities between PJM and the Transmission Owners.

### 2. FERC Never Explains How The Placement of The Overlap Provisions Supports A Finding That the Provisions Are Unjust And Unreasonable.

FERC's rejection of the Overlap Provisions is inconsistent with its prior approval of other planning provisions that appear in the Owners Agreement—some of which have been part of the Agreement since its inception.  *See* pp. 34-35, *supra*. FERC does not explain why these other planning provisions are properly within the scope of the Owners Agreement, but the Overlap Provisions—designed to coordinate planning responsibilities where they intersect—somehow fall outside that scope.  Nor does FERC explain how expanding the coordination procedures it previously accepted in Attachment M-3 and affirmed by this Court, *American Municipal Power*, 86 F.4th at 937, renders the Overlap Provisions unjust and unreasonable.  The Overlap Provisions build upon and complement the existing framework set forth in Attachment M-3, enhancing transparency, coordination, and efficiency in planning decisions.  *See* PJM Tariff, Attach. M-3, § (d)(2), JA____.

40

FERC's lack of explanation provides a separate ground to find FERC's decision to reject these as provisions arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted) (holding that an agency must supply "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"); *W. Deptford Energy*, 766 F.3d at 20 ("It is textbook administrative law that an agency must provide a reasoned explanation for departing from precedent or treating similar situations differently and Commission cases are no exception.") (cleaned up).

### 3. FERC's Assertion That The Overlap Provisions Affect Other Market Participants Does Not Establish That The Overlap Provisions Are Not Just And Reasonable.

The Overlap Provisions do not impose any obligations on non-incumbent transmission owners, as these entities do not possess local facilities within PJM's footprint. *See* Amended CTOA, §§ 1.27, 3.1, JA____, ____. By design, the Overlap Provisions apply only to incumbent transmission owners—those with established infrastructure over which they retain local planning authority under the Owners Agreement.

FERC offers no reasonable rationale why the Overlap Provisions improperly disadvantage other market participants, when it has allowed many other Owners Agreement provisions that directly affect those same participants. *See* Initial Order, PP55-56, JA___; Reh'g Order, P69, JA____, ____, ____. The Owners Agreement's

transfer of operating and planning authority to PJM has always had far-reaching implications, including determining whether a market participant receives transmission service from PJM or from an individual Transmission Owner. Yet FERC does not question the fairness of those foundational arrangements. *See* Reh'g Order, P60, JA____. FERC's selective scrutiny of the Overlap Provisions—based solely on their placement in the Owners Agreement—is inconsistent with its acceptance of other planning-related provisions housed in the same agreement.

FERC is also wrong that the Overlap Provisions "expand" the Transmission Owners' authority. Reh'g Order, P68 & n.223, JA____, (citing Initial Order, P56, JA___, crediting arguments that a Transmission Owner right to build local projects is a "de facto" limitation on PJM planning). As this Court affirmed in *American Municipal Power*, 86 F.4th at 932-34, the authority to plan local transmission projects has always resided with the Transmission Owners and was never delegated to PJM. Indeed, FERC itself recognized that the right of the Transmission Owners to plan for local transmission needs "is already clearly established in other provisions of the [Owners Agreement]." Initial Order, P56, JA____. Nothing in the text of the Overlap Provisions modifies or expands that authority.

42

### C. FERC Improperly Rejected The Application Of The Supreme Court's *Mobile-Sierra* Presumption To The Agreement Amendments.

#### 1. The *Mobile-Sierra* doctrine

The Supreme Court has repeatedly held that the FPA is premised on voluntary contractual agreements that can be abrogated "only in circumstances of unequivocal public necessity." *See, e.g.*, *NRG Power*, 558 U.S. at 173 (citation omitted). The FPA and the Supreme Court distinguish between two types of rate-setting mechanisms: (1) *unilateral rate applications*, which require utilities to show that the rates, terms, or conditions they dictate by tariff or otherwise are just and reasonable; and (2) *bilateral or multilateral contracts*, which allow market forces to set rates, terms, or conditions applicable to the parties and presumptively produce just and reasonable outcomes. The Supreme Court has "plainly distinguished between unilaterally and bilaterally set rates, and said that the only relevant consideration for the Commission in the latter case is whether the public interest is harmed." *Morgan Stanley*, 554 U.S. at 551 n.6.

The *Mobile-Sierra* doctrine derives from two Supreme Court decisions. *Mobile* held that a rate filing is "a precondition to changing a rate, not an authorization to do so in violation of a lawful contract." *NRG Power*, 558 U.S. at 172 (citing *Mobile,* 350 U.S. at 339–44). *Sierra* held that regulated parties could voluntarily agree to rates that produce "less than a fair return," and "in such

43

circumstances the sole concern of FERC would seem to be whether the rate is so low as to adversely affect the public interest." *Sierra*, 350 U.S. at 354–55 (cleaned up).

*Mobile-Sierra* "provide[s] a definition of what it means for a rate to satisfy the just-and-reasonable standard in the contract context." *Morgan Stanley*, 554 U.S. at 546. *Accord, NRG Power*, 558 U.S. at 168. The doctrine requires FERC to presume that negotiated contracts meet the "just and reasonable" standard. *Morgan Stanley*, 554 U.S. at 530. "The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Id.*, 554 U.S. at 530.

"The purpose of the *Mobile-Sierra* doctrine is to preserve the benefits of the parties' bargain as reflected in the contract, assuming that there was no reason to question what transpired at the contract formation stage." *Atlantic City*, 295 F.3d at 14. FERC's failure to apply the *Mobile-Sierra* presumption to the Agreement flips the Supreme Court's framework on its head: suggesting that contracts between RTOs and their member transmission owners, or FERC's disfavor of certain contract provisions, can allow FERC to circumvent *Mobile-Sierra*.

FERC's rejection of the *Mobile-Sierra* presumption for the "Protected Provisions" was based fundamentally on its mischaracterization of the Owners Agreement as a "contract of general applicability," negotiated between non-adverse parties to advantage the Transmission Owners over other market participants. Reh'g Order, PP78, 80, JA___, ___ (affirming the Protected Provisions "do not qualify for

44

such protection as a matter of law" as "prescriptions of general applicability"). FERC's conclusion has no basis in judicial precedent, ignores the contractual basis of PJM's authority, and misapprehends the text and purpose of the Protected Provisions.

*First*, there is no "contract of general applicability" exception to the *Mobile-Sierra* doctrine. As defined by the Supreme Court, the doctrine protects the ability of regulated parties to freely structure their contractual relationships in ways that promote efficiency and reliability without FERC's red pen hovering over the contract. FERC's invention of a broad "general applicability" exception also undermines the independence of RTOs that FERC purports to be furthering.

*Second*, there is no basis for FERC's view that the Protected Provisions somehow tilt the playing field in favor of the Transmission Owners. The Overlap Provisions FERC cites are not evidence of a non-adversarial contracting process and do not disadvantage non-incumbent transmission developers. PJM is an independent, sophisticated party that freely negotiated the Agreement Amendments with the Transmission Owners. If this process is determined to not be protected by *Mobile-Sierra*, provisions negotiated between an RTO—independent as a matter of law—and its member transmission owners would presumptively not be protected, even though these contractual commitments are what makes the entire RTO framework possible.

45

The *Mobile-Sierra* presumption limits FERC's authority by keeping the agency from elevating its own policy and outcome preferences above contract terms and conditions freely negotiated by sophisticated market participants.  This Court should confirm that the *Mobile-Sierra* framework applies to the Protected Provisions.

> **2.  There Is No "Contract of General Applicability" Exception To *Mobile-Sierra* And The Original And Amended Owners Agreement Are The Types Of Agreement That *Mobile-Sierra* Is Intended To Protect.**

FERC framed its *Mobile-Sierra* discussion with a limitation of its own making that it "applies to an agreement only if the agreement has certain characteristics that justify the presumption."  Reh'g Order, P75, JA____.  This limitation, not supported by judicial precedent, denies *Mobile-Sierra* protection to otherwise eligible agreements among sophisticated parties negotiated freely at arm's length, but not to "'generally applicable' rates, terms, or conditions, which may apply to other parties in the future, with limited, if any, room for negotiation."  *Id*. P85, JA___.  Instead, FERC awards itself discretion whether to apply *Mobile-Sierra.  Id*., JA__.

This constriction of *Mobile-Sierra* as a limited doctrine is antithetical to the Supreme Court's reasoning in *Morgan Stanley* and *NRG Power*.  No precedent contemplates a concept of "generally applicable" rates, terms, or conditions immune from *Mobile-Sierra* because they may apply to other parties in the future.  Contrary to FERC's reframing, "the *Mobile-Sierra* presumption remains the default rule" for

FERC's review of contracts freely negotiated between market participants. *Morgan Stanley*, 554 U.S. at 534. And *NRG Power* squarely held that this rationale applies in full to non-parties affected by the contract as well. 558 U.S. at 174–76. That includes future contractual parties.

The Supreme Court has made clear that it is not FERC's role to "undermine the stabilizing force of contracts that the FPA embraced as an alternative to 'purely tariff-based regulation.'" *Morgan Stanley*, 554 U.S. at 548 (citation omitted). Indeed, far from condoning FERC's restrictive reading of *Mobile-Sierra*, *Morgan Stanley* explained that "[o]ver the past 50 years, decisions of this Court and the Courts of Appeals have refined the *Mobile-Sierra* presumption to allow *greater* freedom of contract." *Id*. at 534 (emphasis added). Efforts to artificially confine the doctrine—to sellers, to non-"dysfunctional" markets, to the contracting parties rather than all participants—have broadly failed. *See Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 404–05, 409–10 (D.C. Cir. 2000) (applicable to purchasers)*;Morgan Stanley*, 554 U.S. at 547 (applies in times of alleged market dysfunction); *NRG Power*, 558 U.S. at 175 (applicable to non-participants).

*NRG Power* explains that because the *Mobile-Sierra* doctrine provides stability to markets through the autonomous action of market participants, the presumption that freely and fairly negotiated contracts are "just and reasonable" must bind all participants in that market. *NRG Power*, 558 U.S. at 174–76.

47

Otherwise, "[a] presumption applicable to contracting parties only, and inoperative as to everyone else . . . could scarcely provide the stability *Mobile-Sierra* aimed to secure." *Id*. at 176. This rationale—that asserted impacts on third parties are irrelevant to whether a contract receives *Mobile-Sierra* deference—requires rejection of FERC's *per se* rule that fairly negotiated contracts with "generally applicable terms" that may apply to future parties render an agreement unprotected by *Mobile-Sierra*. Such a rule is fundamentally inconsistent with the Supreme Court's ruling in *NRG Power*, which declined to uphold just such reasoning. *See* 558 U.S. at 176. The Protected Provisions are a particularized and carefully negotiated allocation of rights and responsibilities between the Transmission Owners and PJM, that FERC has provided no sound basis for exempting from *Mobile-Sierra.*

Moreover, membership in PJM—as generally with other RTOs—is voluntary. Transmission owners choose whether to join PJM and maintaining the freedom to leave. Amended CTOA, § 3.2, JA____. *See Pub. Util. Dist. No. 1 of Snohomish Cnty.,* 272 F.3d at 613-16. Only through a voluntary arm's length agreement can transmission owners choose to delegate these rights and join an RTO. By stabilizing the relationship between PJM and the Transmission Owners that assign it control of over $80 billion worth of infrastructure and transfer significant regulatory rights and responsibilities, the Protected Provisions work to stabilize the regional market in the

face of obstruction from non-contracting parties like those the Court saw as creating instability in *NRG Power*.

Even under its restricted "general applicability" view, FERC regularly grants *Mobile-Sierra* protection to such "generally applicable" rules under self-conferred agency discretion. For example, in *Alabama Power Co.*, 190 FERC ¶ 61,151, P119 (2025) ("*Alabama Power*"), FERC provided *Mobile-Sierra* protection to an agreement governing the Southeastern Energy Exchange Market even though there, as here, "[a]ny prospective new Member seeking to join SEEM will be required to accept the SEEM Agreement, with limited, if any, opportunity to negotiate differing terms from those presented here." *Id.*

FERC granted *Mobile-Sierra* protection in *Alabama Power* as a matter of this discretion, because it was "a notable step forward to enhance the existing bilateral market in the Southeast and benefits participants," and would "increase efficiency, liquidity, transparency, and competition . . . and better utilize existing transmission capacity in the region." *Id.* P122. Of course, the same could be and has been said of agreements creating RTOs. *See Transmission Agency of N. Cal.*, 495 F.3d at 667 (encouraging utilities to take the step forward and create RTOs to separate operation of the transmission grid from economic interests in generation and "promote efficiency by taking advantage of economies of scale in segmentation and control of facilities"). More fundamentally, FERC cannot replace a doctrine that the Supreme

49

Court has created to provide regulatory certainty for contracts with a discretionary grant only to favored contracts on regulatory whim. If some "generally applicable" agreements can be sufficiently in the public interest to receive protection, then the exclusion of other such agreements from automatic *Mobile-Sierra* protection inverts the FPA burden placed on FERC to show that the contract's terms are not "just and reasonable."

FERC's approach—to treat multilateral contracts where new parties seeking to join the RTO will, as a matter of practice, generally accept the pre-existing terms—is arbitrary and capricious and contrary to law. Nothing in judicial precedent recognizes or even hints at such a concept. Nor is FERC's reasoning grounded in fact. A new transmission owner seeking to join an RTO may negotiate a change in the terms and conditions or simply decide not to join that RTO, as membership is voluntary under the FPA.

FERC's apparent justification for asserting broad agency power to reject *Mobile-Sierra* appears to be pre-*Loper Bright* authority that "defer[red] to the Commission's reasonable interpretation of ambiguous contracts within its jurisdiction." *See* Initial Order, P77 n.183 (citing *Wabash Valley Power Ass'n, v. FERC*, 45 F.4th 115, 119 (D.C. Cir. 2022)); JA___. Such deference cannot survive *Loper Bright*, which requires the court to decide "*all* relevant questions of law"

50

arising on review of agency actions.  603 U.S. at 392 (alteration in original) (citation omitted).

The facts of *Wabash Valley* are inapposite as well.  There, the governing contracts required Wabash Valley's members to pay rates set forth in a formula rate tariff and gave the Wabash Valley board broad discretion to change those rates unilaterally.  *Wabash Valley*, 45 F.4th at 120.  The Court thus applied the unremarkable proposition that a contract to agree to pay non-negotiated tariff rates— little different than a tariff change filed unilaterally under section 205—does not qualify for the protection *Mobile-Sierra* assures to truly bilaterally-negotiated rates. *Id.* at 121.  The Agreement Amendments at issue here—stabilizing and clarifying the terms of the relationship between the Transmission Owners and PJM—are markedly different in kind and effect.

Nothing in the FPA or judicial precedent makes the Owners Agreement or the Protected Provisions of the Agreement Amendments ineligible for the longstanding principle "that FERC may abrogate a valid contract only if it harms the public interest."  *Morgan Stanley,* 554 U.S. at 548.  FERC cannot rewrite judicial interpretations of the FPA to add exceptions to *Mobile-Sierra* that the courts have not adopted.  *See Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1259–60 (D.C. Cir. 2007) ("Congress did not—and [the agency] may not, consistent with *Chevron*, create an additional exception to the statute on its own."); *In re Sealed Case*, 237

51

F.3d 657, 670 (D.C. Cir. 2001) ("Agencies are not empowered to carve out exceptions to statutory limits on their authority."). Particularly after *Loper Bright*, this Court cannot condone FERC's "disfigurement of the venerable *Mobile-Sierra* doctrine." *Morgan Stanley*, 554 U.S. at 548.

### 3. The Protected Provisions Of The Agreement Amendments Do Not Unfairly Tilt The Playing Field.

The Supreme Court described the limited circumstances in which the *Mobile-Sierra* presumption does *not* apply: "FERC has ample authority to set aside a contract where there is unfair dealing at the contract formation stage—for instance, if it finds traditional grounds for the abrogation of the contract such as fraud or duress." *Morgan Stanley*, 554 U.S. at 547. Unlawful market activity by one of the contracting parties is also one of the extreme circumstances that can void *Mobile-Sierra*'s presumption. *Id.* at 554. FERC does not, however, assert that any such extreme activity occurred here. To the contrary, FERC concedes the Agreement Amendments, including the Overlap Provisions, are the result of bilateral good-faith negotiations between the Transmission Owners and PJM. Reh'g Order, P40, JA____.

FERC similarly contorts what it means for an agreement to be freely negotiated between adverse parties. An "arm's-length" negotiation is not necessarily a boxing match between hostile adversaries; as long as parties with independent interests seek to advance those interests through the negotiation, the

52

relationship is "arm's-length." Mutually beneficial provisions that facilitate the parties' economic relationship are hallmarks of a contract, not a divergence from it. As such, a requirement that parties engage in consultation around investment and planning that impacts both parties is an accepted feature of arm's-length agreements. *See*, *e.g.*, *U.L. Coleman Co., v. Bossier City-Parish Metro. Planning Comm'n*, Civ. No. 08-2011, 2017 WL 970285 at *3, 8 (W.D. La. Mar. 13, 2017) (treating agreement where "the City agrees to allow Coleman the opportunity to review and provide comments to the Project Plans prior to their finalization, which comments the City shall take into full, good faith consideration" as an arm's-length negotiation). Reading what constitutes a valid contract so narrowly as to exclude from *Mobile-Sierra*'s purview anything that borders on cooperation between independent parties fundamentally misunderstands how negotiations work and undermines the "stabilizing force of contracts that the FPA [has] embraced as an alternative to purely tariff-based regulation." *Morgan Stanley*, 554 U.S. at 548.

FERC nevertheless argues it can circumvent *Mobile-Sierra* because—in its view—the Owners Agreement "did not arise in circumstances that provide the assurance of justness and reasonableness associated with arm's-length negotiations." Reh'g Order, P86, JA____. In the only cited example, FERC argues that "PJM Transmission Owners have a common, non-adversarial interest in the Overlap Provisions, which ensure that they have the right to build local projects even if a

regional project overlaps, and indirectly prevent that project from being developed through the competitive regional transmission planning process." *Id.* (cleaned up), JA___.

As an initial matter, FERC acknowledges that multi-party agreements can qualify for *Mobile-Sierra* protection, including agreements that allow for new signatories after initially being executed. Reh'g Order, P87 & n.284 (quoting *Midwest Indep. Transmission Sys. Operator, Inc.,* MISO Order No. 1000 Compliance Rehearing Order, 147 FERC ¶ 61,127, P118 (2014)), JA____. FERC also agrees that the "*Mobile-Sierra* doctrine may apply to situations where multiple parties are on one side of the bargaining table." *Id.*, JA___. The Owners Agreement was just such an agreement, negotiated between the Transmission Owners and PJM, and the Agreement Amendments are the same. *See* Application at 8, JA___.

The Overlap Provisions do not support FERC's conclusion that the Protected Provisions did not arise in circumstances that provide the assurance of justness and reasonableness associated with arm's-length negotiations. It claims that the Transmission Owners' intent is "protecting themselves from competition." Reh'g Order, P86 (citation omitted), JA___. But the Overlap Provisions do no such thing. As the text of the provision demonstrates, the Overlap Provisions simply require PJM and a Transmission Owner to consult when there is an overlap between the

54

regional plan and the Transmission Owner's local project.[3]  The purpose of the provision is to make sure that PJM plans a project that more efficiently and cost effectively addresses both regional and local needs, if possible.  It has no impact on PJM's obligation or ability to address regional needs or use competitive solicitations to do so.

FERC considers the Overlap Provisions to create a questionable relationship between the parties, but the relationship between PJM and the Transmission Owners is an arm's-length relationship between independent parties with distinct responsibilities seeking to address an issue in which cooperation and consultation are necessary to avoid unnecessary expense and effort.  Their entire focus is bilateral, the relationship between PJM and a Transmission Owner, not a non-adversarial relationship aimed at excluding competitors.

---

[3] "Where Transmission Facilities planned by a Party may overlap with Transmission Facilities proposed to be included in the Regional Transmission Expansion Plan such that the Transmission Facilities proposed to be included in the Regional Transmission Expansion Plan would more efficiently and cost effectively address the need for which the Party's Transmission Facilities are planned, PJM **shall consult** with the Party to determine if the need for which the Party's Transmission Facilities are planned will be addressed.  If the Party determines that such need will not be addressed and that it must continue to plan the Party's Transmission Facilities, it shall document to PJM and the relevant PJM transmission planning committee the rationale supporting its determination."  § 4.1.4(b)(ii), § 6.3.4(b)(ii) (emphasis added), JA ____, ____.

FERC treats PJM and the Transmission Owners as inherently unable to produce arm's-length agreements because PJM, as an RTO, is simply the sum of its Transmission Owner member parts and is thus in essence negotiating with itself. This is anathema to the entire RTO design, which envisions RTOs as "independent of any market participant" even while "exercis[ing] operational control over transmission facilities owned by the RTO's members." *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 938 (8th Cir. 2020) (citing *Morgan Stanley*, 554 U.S. at 536). "A presumption of validity that disappears" simply because an RTO is a contracting party "is no presumption of validity at all." *Morgan Stanley*, 554 U.S. at 550. If FERC's view of the Overlap Provisions were adopted, it is hard to imagine what cooperative contractual provisions could be established between PJM and the Transmission Owners—or any RTO and member utilities—that would not be treated as suspiciously non-adversarial.

Finally, FERC suggests a problem in the fact that any new transmission owner must join a single Owners Agreement. Initial Order, P77, JA____. But it was FERC, not the Transmission Owners, that insisted upon a single Owners Agreement. *PJM Interconnection, L.L.C.*, 109 FERC ¶ 61,012, PP21-24 (2004); *PJM Interconnection, L.L.C.*, 114 FERC ¶ 61,283. *See* p.10, *supra*. FERC cannot rationally circumvent *Mobile-Sierra* based on a circumstance of its own design.

## CONCLUSION

For the foregoing reasons, the Court should grant the Petition for Review and reverse FERC's rejection of the Agreement Amendments.

Respectfully submitted,

/s/ *John Longstreth*

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
Phone:  (610) 774-4775
Fax:      (610) 774-4102
Email:   SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Kimberly B. Frank
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
Phone:  (202) 778-9000
Fax:      (202) 778-9100
Email:  john.longstreth@klgates.com
            don.kaplan@klgates.com
            kimberly.frank@klgates.com
            chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
Phone:  (202) 429-8186
Email:  mkallen@steptoe.com
            wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW, Suite 200
Washington, D.C. 20004

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203

57

Phone:  (202) 824-8011
Email:  molly.suda@duke-energy.com

*Counsel for Duke Energy*

Phone:  (703) 682-6337
Email:  William.rappolt@AES.COM

*Counsel for The Dayton Power &
Light Co.*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20001
Phone:  (301) 956-6754
Email:  gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic
City Electric Company, Baltimore Gas and
Electric Company, Commonwealth Edison
Company, Delmarva Power & Light
Company, PECO Energy Company, and
Potomac Electric Power Company*

David M. Gossett
Michael Kunselman
Richard P. Sparling
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
Phone:  (202) 973-4200
Email:  davidgossett@dwt.com
          michaelkunselman@dwt.com
          ricksparling@dwt.com

Sara C. Weinberg
Assistant General Counsel – Federal
Regulatory
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A
Cayce, SC 29033
Phone:  (803) 217-5753
Sara.weinberg@dominionenergy.com

Cheri Yochelson
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
Cheri.M.Yochelson@dominionenergy.com

Morgan E. Parke
Associate General Counsel
Amanda Parker
FERC Attorney
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
aparker@firstenergycorp.com

*Counsel for the FirstEnergy
Transmission Companies*

Regina Y. Speed-Bost
Founder and Managing Partner
SB Law, PLLC
200 Massachusetts Ave., N.W.
7th Floor
Washington, D.C.  20001
Phone:  (202) 963-2700

58

*Counsel for Virginia Electric and Power Company*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C.  20001-3980
Phone:  (202) 383-0100
Fax:  (202) 637-3593
Email:  danielfrank@eversheds-sutherland.com
Email:  allisonsalvia@eversheds-sutherland.com

Denise R. Foster Cronin
Sr. Vice President, Federal and RTO Regulatory Affairs
East Kentucky Power Cooperative, Inc.
4775 Lexington Road, P.O. Box 707
Winchester, KY  40392-0707
Office:  (859)745-9615
Cell:  (610)220-6382

*Counsel for East Kentucky Power Cooperative, Inc.*

Email:  rspeed-bost@sblawlegal.com

*Counsel for Duquesne Light Company*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corp.
1 Riverside Plaza
Columbus, OH 43215
Phone:  (614) 716-2921
Email:  clbumgartner@aep.com

*Counsel for American Electric Power Service Corporation*

Uju Okasi
Associate Counsel - Regulatory
PSEG Services Corporation
601 New Jersey Ave., N.W., Suite 310
Washington, D.C. 20001
obianuju.okasi@pseg.com

*Counsel for Public Service Electric and Gas Company*

November 7, 2025

59

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| PJM Transmission Owners,<br>Petitioner, | ) <br> ) <br> ) | |
| v. | ) <br> ) | No. 25-1064 |
| Federal Energy Regulatory Commission,<br>Respondent. | ) <br> ) <br> ) | |

### CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(7)(B) and 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned certifies that the foregoing brief complies with the applicable type-volume limitations. The brief was prepared using a proportionally spaced type (Times New Roman, 14 point) and contains 12,706 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2016) used to prepare the brief.

Respectfully submitted,

*s/ John Longstreth*
John Longstreth

November 7, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| PJM Transmission Owners,<br>    Petitioner, | ) <br> ) <br> ) | |
| v. | ) <br> ) | No. 25-1064 |
| Federal Energy Regulatory Commission,<br>    Respondent. | ) <br> ) <br> ) | |

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Rule 25(f) of the Circuit Rules of this Court, I hereby certify that I have, this 7th day of November 2025, served the foregoing via the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*s/ John Longstreth*
John Longstreth