# ORAL ARGUMENT NOT YET SCHEDULED

# In the United States Court of Appeals for the District of Columbia Circuit

## Nos. 25-1064 and 25-1100 (consolidated)

PJM TRANSMISSION OWNERS, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

David L. Morenoff
Deputy General Counsel

Robert H. Solomon
Solicitor

Angela X. Gao
Attorney

For Respondent
Federal Energy Regulatory
Commission
Washington, DC 20426

INITIAL BRIEF: FEBRUARY 3, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.  Parties**

Except for the following, all parties and intervenors appearing before the Court are listed in Petitioners' Circuit Rule 28(a)(1) certificate:

Illinois Citizens Utility Board intends to file an amicus brief in support of Respondent.

**B.  Rulings Under Review**

1.  R.176, Order Rejecting Consolidated Transmission Owners Agreement Amendments and Denying Complaint, *Duquesne Light Co.*, 189 FERC ¶ 61,181 (Dec. 6, 2024) ("Initial Order"), JA___-___; and

2.  R.186, Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order in Part, *Duquesne Light Co.*, 192 FERC ¶ 61,051 (July 14, 2025) ("Rehearing Order"), JA___-___.

**C.  Related Cases**

No other cases are pending regarding the Commission orders on review here.

*/s/ Angela X. Gao*
Angela X. Gao
Attorney

## TABLE OF CONTENTS

PAGE

INTRODUCTION .................................................................. 1

STATUTORY AND REGULATORY PROVISIONS .................................. 5

STATEMENT OF FACTS ........................................................ 5

I.   The Federal Power Act ................................................. 5

II.  Commission Regulation To Curb Discriminatory Transmission
     And Establish Competitive Markets ................................... 8

     A.   Order 888:  Non-discriminatory open access transmission .... 8

     B.   Order 2000:  Establishing Regional Transmission
          Organizations and independence requirements .................. 9

III. PJM And Its Governing Documents ................................... 12

     A.   Operating Agreement and PJM Members ........................ 13

     B.   The Planning Protocol has resided within the Operating
          Agreement since 1997 ....................................... 15

     C.   Owners Agreement and the *Atlantic City* Settlement ........ 18

     D.   PJM's Tariff ............................................... 21

IV.  The Proceedings Below ............................................. 21

     A.   Failed membership vote ..................................... 21

     B.   Transmission Owners' and PJM's three filings ............... 23

     C.   Orders on review .......................................... 26

SUMMARY OF THE ARGUMENT ................................................ 29

ARGUMENT ............................................................... 31

I.   Standard of Review ................................................ 31

II.   Each Rejected Amendment In The Orders Is An Independent And Alternative Basis For Denying The Petitions For Review. ............ 33

III.  The Commission Reasonably Declined To Apply *Mobile-Sierra* ... 40

    A.   Legal background .................................................................. 40

    B.   The Protected Provisions are "prescriptions of general applicability." ........................................................................ 42

    C.   The Protected Provisions did not arise from adversarial arms-length bargaining. ...................................................... 48

IV.  The Commission Reasonably Rejected Amendments That Violate PJM's Independence ..................................................................... 55

    A.   Transmission Owners' statutory filing rights have not been infringed. ............................................................................. 56

    B.   The rejected amendments do not "enhance" PJM's independence, and Sections 4.1.4(a), 6.3.3(ii), 6.3.4(a) arguments are forfeited. ...................................................... 58

    C.   Section 7.9 affords Transmission Owners exclusive and undue influence over PJM's filings. ..................................... 61

    D.   Section 6.3.5 improperly elevates PJM's Owners Agreement obligations over Commission regulations and is impermissibly vague. ........................................................... 68

V.   The Commission Reasonably Rejected The Overlap Provisions ... 70

    A.   Background ......................................................................... 70

    B.   The Overlap Provisions are substantive transmission planning rules that belong in the Tariff. ............................. 71

CONCLUSION ...................................................................................... 75

# TABLE OF AUTHORITIES

**COURT CASES:** **PAGE**

*Advanced Energy Mgmt. All. v. FERC,*
    860 F.3d 656 (D.C. Cir. 2017)...........................................7

*Ameren Servs. Co. v. FERC,*
    893 F.3d 786 (D.C. Cir. 2018).........................................60

*Atl. City Elec. Co. v. FERC,*
    295 F.3d 1 (D.C. Cir. 2002) ...............................19, 56, 57

*Bos. Edison Co. v. FERC,*
    856 F.2d 361 (1st Cir. 1988)...........................................32

*Coal. of MISO Transmission Customers v. FERC,*
    45 F.4th 1004 (D.C. Cir. 2022) .......................................7

*Emera Me. v. FERC,*
    854 F.3d 9 (D.C. Cir. 2017) ...............................7, 41, 50

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ........................................................31

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ...........................................6, 31, 39

*FirstEnergy Serv. Co. v. FERC,*
    758 F.3d 346 (D.C. Cir. 2014)..........................................6

*FPC v. Sierra Pac. Power Co.,*
    350 U.S. 348 (1956) ........................................................40

# TABLE OF AUTHORITIES

**COURT CASES:**                                           **PAGE**

*Hecate Energy LLC v. FERC,*
126 F.4th 660 (D.C. Cir. 2025) ........................................... 34, 37-38

*Kan. Cities v. FERC,*
723 F.2d 82 (D.C. Cir. 1983) ........................................... 33

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ............................................... 32, 46

*MISO Transmission Owners v. FERC,*
819 F.3d 329 (7th Cir. 2016) .............................. 48-50, 53

*Midwest ISO Transmission Owners v. FERC,*
373 F.3d 1361 (D.C. Cir. 2004) ................................... 8-10

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util Dist. No. 1,*
554 U.S. 527 (2008) ....................................... 40-41, 45-46

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC,*
475 F.3d 1277 (D.C. Cir. 2007) ........................................ 6

*Nat'l Fuel Gas Supply Corp. v. FERC,*
811 F.2d 1563 (D.C. Cir. 1987) ....................................... 33

*New York v. FERC,*
535 U.S. 1 (2022) ............................................. 6, 8, 9, 41

*N.Y. Power Auth. v. FERC,*
109 F.4th 550 (D.C. Cir. 2024) ...................................... 12

# TABLE OF AUTHORITIES

**COURT CASES:**                                              **PAGE**

*NextEra Energy Res., LLC v. FERC,*
  118 F.4th 361 (D.C. Cir. 2024) ..................................................... 8, 9

*NRG Power Mktg., LLC v. FERC,*
  862 F.3d 108 (D.C. Cir. 2017) ........................................... 6, 7, 34, 37

*NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n,*
  558 U.S. 165 (2010) ..................................................... 40, 42, 46, 47

*Oklahoma Gas & Elec. Co. v. FERC,*
  827 F.3d 75 (D.C. Cir. 2016) .................................... 41, 42, 46, 48-54

*Old Dominion Elec. Co-op v. FERC,*
  518 F.3d 43 (D.C. Cir. 2008) ........................................................ 21

*Pub. Serv. Elec. & Gas Co. v. FERC,*
  783 F.3d 1270 (D.C. Cir. 2015) ................................................. 12, 13

*Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC,*
  272 F.3d 607 (D.C. Cir. 2001) .................................................... 8-11

*S.C. Pub. Serv. Auth. v. FERC,*
  762 F.3d 41 (D.C. Cir. 2014) ........................................................ 41

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.,*
  350 U.S. 32 (1956) ............................................................ 40, 56, 57

*United States v. W. Pac. R.R. Co.,*
  352 U.S. 59 (1956) ...................................................................... 32

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE**

*Verizon Commc'ns Inc. v. F.C.C.*,
    535 U.S. 467 (2002) ........................................................................ 41

*Wabash Valley Power Assoc. v. FERC*,
    45 F.4th 115 (D.C. Cir. 2022) ....................................... 32, 42-46, 48

**ADMINISTRATIVE CASE:**

*Atl. City Elec. Co.*,
    77 FERC ¶ 61,148 (1996) ........................................................ 16, 17

*Devon Power LLC*,
    134 FERC ¶ 61,208, *on reh'g*,
    137 FERC ¶ 61,073 (2011), *aff'd sub nom.*
    *New England Power Generators Ass'n, Inc. v. FERC*,
    707 F.3d 364 (D.C. Cir. 2013) ....................................................... 47

*Midwest Ind. Transmission Sys. Operator, Inc.*,
    97 FERC ¶ 61,326 (2001), *on reh'g*,
    103 FERC ¶ 61,169 (2003) ...................................................... 57, 63

*Midwest Ind. Transmission Sys. Operator, Inc.*,
    142 FERC ¶ 61,215, *on reh'g*,
    147 FERC ¶ 61,127 (2014), *aff'd sub nom.*
    *MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016) ......................................................... 46

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                    **PAGE**

Order 888, *Promoting Wholesale Competition Through Open Access
Non-Discriminatory Transmission Services by Public Utilities*,
 61 Fed. Reg. 21,540 (May 10, 1996), *aff'd sub nom.*
 *Transmission Access Policy Study Grp. v. FERC*,
 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom.*
 *New York*, 535 U.S. 1 (2022) ..........................................................9

Order 1000, *Transmission Plan. & Cost Allocation by Transmission
Owning & Operating Pub. Utils.*,
 136 FERC ¶ 61,051 (2011), *on reh'g*,
 139 FERC ¶ 61,132 (2012), *on reh'g*,
 141 FERC ¶ 61,044, *appeals dismissed sub nom.*
 *S.C. Pub. Serv. Auth. v. FERC*,
 762 F.3d 41 (D.C. Cir. 2014) ....................................................49, 70

Order 2000, *Reg'l Transmission Orgs.*,
 89 FERC ¶ 61,285 (1999), *on reh'g*,
 90 FERC ¶ 61,201 (2000), *appeals dismissed sub nom.*
 *Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*,
 272 F.3d 607 (D.C. Cir. 2001).....................................................9-12

*Pennsylvania-New Jersey-Maryland*,
 81 FERC ¶ 61,257 (1997), *vacated in part*
 *Atl. City Elec. Co. v. FERC*,
 295 F.3d 1 (D.C. Cir. 2002) ...........................................................18

*Pennsylvania-New Jersey-Maryland*,
 105 FERC ¶ 61,294 (2003) ..........................................20, 64, 66-67

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:** **PAGE**

*PJM Interconnection*,
142 FERC ¶ 61,214 (2013), *on reh'g*,
147 FERC ¶ 61,128 (2014), *appeal dismissed sub nom. Am. Transmission Sys. Inc. v. FERC*, No. 14-1085, 2016 WL 3615443, (D.C. Cir. July 1, 2016)................................................. 45-46, 50, 51

**STATUTES:**

Administrative Procedure Act

5 U.S.C. § 706(2)(A)........................................................... 33

Federal Power Act

Section 201, 16 U.S.C. § 824 ............................................. 6

Section 205, 16 U.S.C. § 824d ....................................... 2, 6

Section 205(a), 16 U.S.C. § 824d(a).................................. 6

Section 205, 16 U.S.C. § 824e ....................................... 2, 7

Section 206(a), 16 U.S.C. § 824e(a).................................. 6

Section 313, 16 U.S.C. § 825*l*(b)..................................... 62

**REGULATIONS**:

18 C.F.R. § 35.34 ........................................................... 10,

# TABLE OF AUTHORITIES

**REGULATIONS:**                                             **PAGE**

18 C.F.R. § 35.34(k)(1)(i) ...................................................................... 11

18 C.F.R. § 35.34(k)(7) ......................................................................... 11

18 C.F.R. § 35.34(j) ............................................................................... 11

18 C.F.R. § 35.34(j)(1) ........................................................................... 12

18 C.F.R. § 35.34(j)(1)(ii) ...................................................................... 12

# GLOSSARY

| | |
|---|---|
| Add. | Addendum to this brief |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Initial Order | R.176, *Duquesne Light Co.*, 189 FERC ¶ 61,181 (Dec. 6, 2024), JA___-___ |
| Operating Agreement | PJM's Operating Agreement, *available at* perma.cc/F8DN-LBT4 |
| Owners Agreement or CTOA | Consolidated Transmission Owners Agreement, *current version available at* perma.cc/KH6R-2GN5, *proposed amended version at* JA___-___ |
| Owners Filing | R.6, Transmission Owners' filing to amend the Owners Agreement under Federal Power Act Section 205 |
| P | Internal paragraph number within a Commission order |
| Pet.Br. | Petitioners' opening brief |
| Planning Protocol or RTEP Protocol | Regional Transmission Expansion Planning Protocol, located in Schedule 6 of the Operating Agreement |
| PJM | Intervenor PJM Interconnection, LLC |
| PJM.Br. | PJM's intervenor brief |

| | |
|---|---|
| PJM Filings | R.17, PJM complaint to remove the Planning Protocol from the Operating Agreement; *and*<br><br>R.13, PJM transfer filing to add Planning Protocol to the Tariff |
| Proposal | Integrated package of three filings by Transmission Owners and PJM to amend the Owners Agreement, Operating Agreement, and Tariff (R.6, R.13, R.17) |
| Protected Provisions | Articles 2, 4, 5, 6, and 7 and Attachment B of the Owners Agreement |
| R. | Commission certified index to record number |
| Rehearing Order | R.186, *Duquesne Light Co.*, 192 FERC ¶ 61,051 (July 14, 2025), JA___-___ |
| RTO | Regional Transmission Organization |
| Tariff | PJM's Open Access Transmission Tariff, *e-version available at* agreements.pjm.com/oatt/18106 |
| Transmission Owners | Petitioners, who are utilities that own transmission facilities within PJM's footprint |

# In the United States Court of Appeals for the District of Columbia Circuit

### Nos. 25-1064 and 25-1100
(consolidated)
————

PJM Transmission Owners, *et al.*,
*Petitioners*,

v.

Federal Energy Regulatory Commission,
*Respondent.*
————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission
————

## BRIEF FOR RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION
————

## INTRODUCTION

PJM Interconnection, LLC ("PJM") is the regional organization that manages the electric transmission grid for the mid-Atlantic region. PJM's membership is divided into five different industry sectors. Petitioners, representing just one of these sectors, are members who own transmission facilities within PJM ("Transmission Owners").

Among its various duties, PJM is responsible for operating and planning updates to the interstate transmission grid within its region. PJM carries out its duties according to several governing documents

that are subject to the Federal Energy Regulatory Commission's approval. Any changes to these documents must be filed with the Commission for review, under either of two statutory mechanisms—Section 205 or Section 206 of the Federal Power Act, 16 U.S.C. §§ 824d-824e.

One of PJM's governing documents is the **Operating Agreement**. As the name implies, this document is an agreement between PJM and all of its members and contains the rules by which PJM operates. Filing amendments to the Operating Agreement under Section 205 requires a two-thirds majority vote by PJM's members. But even if that vote fails, amendments may still be filed with the Commission under the complaint procedures of Section 206.

As relevant here, the Operating Agreement also houses the protocol PJM follows when planning upgrades to the transmission grid. This protocol has resided in the Operating Agreement for nearly 30 years. The protocol was originally placed there in 1997 to ensure that no single membership sector could wield undue influence and would instead reflect the diverse interests of all five sectors. But, according to PJM, the voting requirement for amending the protocol under Federal

Power Act Section 205 has now hampered its ability to timely respond to transmission needs.

To that end, Transmission Owners and PJM developed a proposal to transfer the protocol from the Operating Agreement into a different governing document—the **PJM Tariff**—for which PJM has unilateral Section 205 filing rights. Their stated goal was to enable PJM to make filings to amend the protocol without triggering a membership vote.

The proposal comprised amendments to three different governing documents. Naturally, the transfer would require amending both the Operating Agreement and Tariff to remove the protocol from one document and add it to the other. But, as Transmission Owners and PJM claimed, the lynchpin of the entire proposal was amending a third document: the transmission owners' agreement with PJM governing their respective rights and responsibilities ("**Owners Agreement**"). They asserted that these Owners Agreement amendments were a prerequisite to authorize the transfer.

PJM members raised numerous concerns with the proposal, particularly regarding the scope of the Owners Agreement amendments. They argued these amendments did not merely

effectuate the transfer but, instead, included many unrelated and self-serving provisions that would grant Transmission Owners too much influence over other sectors.  When portions of the proposal were submitted for membership voting, they were overwhelmingly rejected, receiving a mere 1.227 out of 5.000 sector-weighted vote.

Transmission Owners and PJM pressed forward with the proposal, filing it for Commission approval.  They presented the three sets of amendments to the Commission as a single take-it-or-leave-it proposal.  This meant the entire proposal must be rejected unless all amendments met the standard for approval.

The Commission found that the proposed amendments to the Owners Agreement went beyond facilitating the transfer and would grant Transmission Owners new exclusive privileges.  Among other concerns, certain amendments would grant Transmission Owners undue influence over any Section 205 filing PJM seeks to make to the Tariff, including changes to the planning protocol.  Other amendments would also enshrine Transmission Owners' new powers by making them more difficult to challenge in the future.  Effectively, the proposal would shift the ability to influence changes to the planning protocol from a

diffuse right shared by the entire membership to a concentrated privilege held by a single sector: Transmission Owners.

Having rejected these amendments to the Owners Agreement, the Commission procedurally dismissed, without prejudice, the amendments to the Operating Agreement and Tariff.

*The issue presented for review is*:

Whether the Commission reasonably rejected the integrated filings, opposed by most PJM members, because the proposed amendments would: (1) transfer undue control over transmission planning to just one sector of the PJM members—petitioners, the Transmission Owners—and (2) make future challenges to petitioners' new authority much more difficult to sustain.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

## STATEMENT OF FACTS

### I. The Federal Power Act

The Federal Power Act charges the Commission with regulating the "transmission of electric energy in interstate commerce," the "sale of electric energy at wholesale in interstate commerce," and "all facilities

for such transmission or sale." 16 U.S.C. § 824(b); *see also New York v. FERC*, 535 U.S. 1, 19-20 (2002). The Act directs the Commission to ensure that all rates charged for the "transmission" of electricity—as well as "all rules and regulations" pertaining to such rates—are "just and reasonable" and not unduly discriminatory or preferential. 16 U.S.C. §§ 824d(a), 824e(a); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016).

The Commission satisfies this statutory mandate through two distinct mechanisms of the Act. Section 205, 16 U.S.C. § 824d, enables a regulated utility to propose changes to its own rules or rates. To do so, the utility must first file the proposed rules or rates with the Commission for review. *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348 (D.C. Cir. 2014). The Commission will accept the utility's proposal only if "the changes are just and reasonable." *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 113 (D.C. Cir. 2017) ("*NRG Power*"). The utility bears the burden of demonstrating that its proposal is just and reasonable. 16 U.S.C. § 824d(e).

Notably, under Section 205, the Commission is limited to "an essentially passive and reactive role" where it "restricts itself to

evaluating the confined proposal." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017). The Commission may only "accept or reject the proposal" as it stands and cannot "impose a new [rule or rate] of its own making" by unilaterally modifying the proposal. *NRG Power*, 862 F.3d at 114.

Section 206, 16 U.S.C. § 824e, by contrast, permits other parties to initiate changes by challenging a utility's existing rules or rates. In response to a third-party complaint or on its own initiative, the Commission may investigate whether a previously approved rule or rate is no longer just and reasonable. *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1009 (D.C. Cir. 2022). The complainant bears the burden of proving that the existing rule is unlawful. *Id.* If this burden is met, then—and only then—may the Commission impose a new rule that it finds just and reasonable. *See Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017).

## II. Commission Regulation To Curb Discriminatory Transmission And Establish Competitive Markets

### A. Order 888: Non-discriminatory open access transmission

"In the bad old days," utilities were "vertically integrated monopolies" that owned and operated generation, transmission, and distribution facilities. *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004). Utilities sold these services to customers as a "bundled package." *Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607, 610 (D.C. Cir. 2001) ("*Snohomish*").

Later, independent generators entered the market. They could produce electricity more efficiently, and at a lower price, than the vertically integrated utilities. *Id.* at 610. Because these generators did not own transmission lines, they relied on the utilities that owned transmission facilities to deliver electricity to customers. *New York*, 535 U.S. at 8-9. "But transmission owners exploited their monopoly power to deny competing [generators] access to their facilities." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 365 (D.C. Cir. 2024). This discriminatory practice led to "artificially high electricity prices for consumers." *Id.*

To promote competition, the Commission issued Order 888,[1] which required transmission-owning utilities to grant other generators equal access to interstate transmission facilities. *NextEra*, 118 F.4th at 365-66. Transmission owners were required to provide the same transmission service for electricity generated by others as they did for their own electricity. *Id.* The Commission required transmission owners to file tariffs offering non-discriminatory, open-access transmission service separate from generation service—"thus effectively 'unbundling' sale of the power itself from sale of the transmission service." *Id.* at 366.

## B. Order 2000: Establishing Regional Transmission Organizations and independence requirements

After Order 888, the Commission identified additional barriers to competitive electricity markets. Different utilities operated different portions of the transmission grid independently, which created "engineering and economic inefficiencies." *Midwest*, 373 F.3d at 1364.

---

[1] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540 (1996), *aff'd sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York*, 535 U.S. 1.

This led to "lingering opportunities for transmission owners to discriminate in their own favor." *Id.*

The Commission therefore encouraged transmission owners to establish "Regional Transmission Organizations" ("RTOs") in which to consolidate control of their transmission lines. *See* Order 2000, *Regional Transmission Organizations*, 89 FERC ¶ 61,285 (1999), *on reh'g*, 90 FERC ¶ 61,201 (2000), *codified at* 18 C.F.R. § 35.34, *appeals dismissed sub nom. Snohomish*, 272 F.3d 607. Under Order 2000, transmission owners could voluntarily choose to transfer operational control—but not ownership—of their transmission lines to an RTO, allowing their facilities to be operated as part of an integrated regional grid. *Snohomish*, 272 F.3d at 611. The RTO would then have sole authority to provide transmission service over those facilities, thereby improving grid management and minimizing opportunities for discriminatory transmission practices. *Id.*; *Midwest*, 373 F.3d at 1365. The RTO would also assume responsibility for planning any necessary expansions or upgrades to the grid. *Snohomish*, 272 F.3d at 612.

Order 2000 establishes the "minimum" characteristics a regional entity must satisfy to receive Commission approval as an RTO.

*Snohomish*, 272 F.3d at 612 (citing 18 C.F.R. § 35.34(j)). Transmission owners and other parties wishing to form or join an RTO must adhere to these requirements. But Order 2000 neither compels RTO participation, nor "impose[s] [any] mandatory requirements." *Id.* at 609-10. Instead, "RTO participation is voluntary," and those opting in willingly assume Order 2000's requirements. *Id.* at 616.

First and foremost is that "RTOs must have independence from market participants." *Id.* at 611-12 (citing 18 C.F.R. § 35.34(j)(1)). As the Commission explained, "the principle of independence is the bedrock upon which the [RTO] must be built," so RTOs must be "independent in both reality and perception." Order 2000, 89 FERC ¶ 61,285 at p.79. The "overall purpose" of the independence requirement is to "ensure that an RTO will provide transmission service and operate the grid in a *non-discriminatory* manner" that provides "equal access" for all market participants. *Id.* p.80 (emphasis added).

Consequently, under the rule, RTOs "must have a decision-making process that is independent of control by any market participant or class of participants." 18 C.F.R. § 35.34(j)(1)(ii). This requirement applies especially to RTO "governance (e.g., voting shares

and voting rules)." Order 2000, 89 FERC ¶ 61,285 at pp.79-80. This ensures that, among the RTO's participants, no particular group can exercise undue influence or receive preferential access over others. *Id.*

## III. PJM And Its Governing Documents

PJM[2] is the Regional Transmission Organization that oversees the transmission grid for thirteen mid-Atlantic states and the District of Columbia. *Pub. Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1271 (D.C. Cir. 2015). Besides operating the transmission grid, PJM is also responsible for planning improvements to the grid that will "accommodate changing energy needs" and support competition in its region. *N.Y. Power Auth. v. FERC*, 109 F.4th 550, 553 (D.C. Cir. 2024). This process culminates in the Regional Transmission Expansion Plan—a report that PJM prepares annually to determine what new transmission projects should be built in its region.

PJM operates in accordance with several governing documents, including:

---

[2]      PJM stands for "*P*ennsylvania-New *J*ersey-*M*aryland," the states in which PJM first began operating.

(1)     the Operating Agreement ("Operating Agreement"), which

also houses the protocol for preparing the Regional

Transmission Expansion Plan ("Planning Protocol");

(2)     the Consolidated Transmission Owners Agreement ("Owners

Agreement"); and

(3)     the Open Access Transmission Tariff ("Tariff").

*See Pub. Serv.*, 783 F.3d at 1271 (discussing governing documents).

These are described in further detail below.

## A.     Operating Agreement and PJM Members

**1.**  The Operating Agreement[3] contains rules for how PJM

operates as an RTO, including its governance and membership

structure, and the rights and responsibilities of both PJM and its

members.  The Agreement establishes an independent body of staff to

operate PJM in a non-discriminatory and reliable manner, and a Board

of Managers ("Board") to supervise PJM's operations.

The Operating Agreement also establishes PJM's membership to

encompass five different industry sectors—of which Transmission

Owners represent only one.  Aside from transmission owners, members

---

[3] *See* perma.cc/F8DN-LBT4 (current version).

also include (1) generation owners, (2) other suppliers, (3) electric distributors, and (4) end-use customers. Rehearing Order P4, JA___; Operating Agreement § 11.6(a)(i). All members of PJM are parties to the Operating Agreement and have various rights and duties under the agreement.

Relevant here, all members are entitled to vote on proposals and participate in PJM's stakeholder process. Specifically, the Operating Agreement establishes a "Members Committee" comprised of representatives from every PJM member. Operating Agreement § 8. Each member is eligible to cast one vote within its sector. *Id.* § 8.4(b). Votes are then sector-weighted, with each of the five sectors contributing equally (i.e., 20%) to the overall vote. *Id.* Approval by the Members Committee requires a sector-weighted vote "greater than" a two-thirds majority (i.e., 3.335 out of 5.000). *Id.* § 8.4(c); Rehearing Order P10, JA___.

**2.** The Operating Agreement expressly reserves certain rights to the members, including the right to "amend any portion of this Agreement" and file those amendments for Commission review under Federal Power Act Section 205. Operating Agreement § 8.8(ii).

14

Therefore, before any changes to the Operating Agreement may be filed with the Commission under Section 205, the changes must first be "approv[ed] … by the Members Committee" in a sector-weighted vote. Operating Agreement § 18.6(a); Rehearing Order P10, JA___.

Even absent membership approval, however, the Board may still file a Section 206 complaint with the Commission to modify any provision of the Operating Agreement that is unjust, unreasonable, or unduly discriminatory.  Operating Agreement § 7.7(vi); Rehearing Order P8, JA___.

**3.**  The Operating Agreement also directs PJM to prepare the Regional Transmission Expansion Plan according to the Planning Protocol.  Operating Agreement § 10.4(xviii).  The Agreement further requires that "[t]he Members shall participate in regional transmission expansion planning in accordance with the [Planning] Protocol set forth in the Operating Agreement[.]"  *Id.* § 11.4.

**B.    The Planning Protocol has resided within the Operating Agreement since 1997**

The Planning Protocol comprises the rules and procedures by which PJM prepares the Regional Transmission Expansion Plan. Rehearing Order P5, JA___.  The Planning Protocol is located in the

Operating Agreement, Schedule 6, where it has resided since 1997. *Id.* P6, JA___. Because the Planning Protocol is part of the Operating Agreement, filing changes to the protocol under Section 205 requires a vote by the Members Committee. *Id.* P10, JA___.

The history of this arrangement bears mention. Before receiving RTO status, PJM was initially formed as a power pool—an association of transmission-owning utilities that voluntarily coordinates operations. In 1997, the Commission conditionally accepted a proposal by Transmission Owners to comprehensively restructure PJM from a power pool into an independent system operator. *Id.* P6, JA___. This restructuring was implemented across several documents, including early iterations of the Operating Agreement, Owners Agreement, and Tariff. *Id.*

Initially, Transmission Owners proposed placing the Planning Protocol within the Owners Agreement and subjecting transmission planning to their approval. *Atl. City Elec. Co.*, 77 FERC ¶ 61,148, 61,580 (1996); R.6, Owners Filing at 17, JA___. But the Commission expressed concerns that this proposal failed to "provide PJM with sufficient independence" and would give Transmission Owners too

much control over planning.  *Id.* at 17-18, JA___-___; *Atl. City*, 77 FERC ¶ 61,148 at pp.61,574-75.[4]

Transmission Owners subsequently revised their proposal to instead place the Planning Protocol in the Operating Agreement— "which the transmission owners did not control."  Owners Filing at 18, JA___.  This arrangement, they explained, ensured that "[n]o stakeholder or industry segment has the ability to control [PJM's] functions or to prevent [it] from acting."  *Id.* (quoting 1997 Revised Proposal at 3, Accession No. 19970619-0504, perma.cc/XPW5-DYAW). And while amendments to the Operating Agreement are subject to a vote, "the voting rights [are] structured so that *no one industry segment* can either force or block action."  *Id.* (emphasis added); *see* R.133, Harvard Protest at 8-12, JA___-___; R.119, Illinois Citizens Protest at 30-31, JA___-___.

Transmission Owners also agreed to cede responsibility for "regional transmission planning and operations" to PJM in the Owners Agreement.  Rehearing Order P7, JA___ .  Specifically, the 1997

_____

[4]     This order refers to Transmission Owners as "existing PJM members" or "PJM members" because, at the time, membership was limited to Transmission Owners.

Owners Agreement states: "each Party agrees" to "transfer to [PJM], in accordance with the Operating Agreement, the responsibility for preparing a Regional Transmission Expansion Plan" consistent with the "[Planning] Protocol." *Id.* (quoting 1997 Owners Agreement § 2.3.7).

The Commission subsequently accepted these features of the proposal. *Pennsylvania-New Jersey-Maryland*, 81 FERC ¶ 61,257, p.62,275 (1997).

**C.    Owners Agreement and the *Atlantic City* Settlement**

**1.**  The Owners Agreement[5] is executed by all transmission owners in PJM, including Petitioners. This agreement "transfers to PJM" certain rights and responsibilities previously held by Transmission Owners, including the authority to "operat[e]" and "provide transmission service over" Transmission Owners' facilities. Owners Agreement §§ 4.1.1, 4.1.2.

As mentioned, the Agreement also transfers regional transmission planning authority to PJM, dating back to PJM's 1997 restructuring. *Supra*, pp.17-18. The current iteration of this provision, which is substantively similar to the 1997 Owners Agreement, states: "Each

---

[5]    *See* perma.cc/KH6R-2GN5 (current version).

party shall transfer to PJM, pursuant to this Agreement and in accordance with the Operating Agreement, the responsibility to prepare a Regional Transmission Expansion Plan[.]" Owners Agreement § 4.1.4.

**2.** The Agreement also establishes the division of certain Federal Power Act Section 205 filing rights between Transmission Owners and PJM. This arrangement arose from a settlement between the parties. During PJM's restructuring, the Commission initially ordered that only PJM should be able to file changes to the Tariff's rates, terms, and conditions under Federal Power Act Section 205. *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 7 (D.C. Cir. 2002). This Court disagreed because Transmission Owners, as utilities, also have rights under Section 205 to file changes to rates charged for services rendered with their facilities. *Id.* at 9-10. While "utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under section 205," the Court concluded that the Commission cannot force them to do so. *Id.* at 10-11.

Following remand, Transmission Owners and PJM reached a settlement to "voluntarily allocate" these Section 205 filing rights between them, which the Commission accepted. Rehearing Order P9,

JA___; *see Pennsylvania-New Jersey-Maryland*, 105 FERC ¶ 61,294, PP10-12, 30-32 (2003) ("*Atlantic City Settlement*"). The terms of this settlement are memorialized in the Owners Agreement (§§ 7.3-7.6) and Tariff (§ 9).

Under the settlement, Transmission Owners have the "exclusive and unilateral" right to make Section 205 filings relating to the Tariff's "rate design." *Atlantic City Settlement*, 105 FERC ¶ 61,294 at P11. PJM, meanwhile, has the exclusive and unilateral right to make Section 205 filings regarding the Tariff's "terms and conditions." *Id.* Before making their respective filings, Transmission Owners and PJM must first "consult" with the Members Committee and each other, but no approval is required for filing. *Id.*

If disputes arise as to whether a proposed filing is "rate-related" or "terms and conditions-related"—that is, whether Transmission Owners or PJM should make the Section 205 filing—the settlement provided for dispute resolution procedures before a neutral third party, with the option to appeal to the Commission. *Id.* P34.

### D. PJM's Tariff

The Open Access Transmission Tariff sets forth the "rates, terms, and conditions" of service over PJM's transmission grid. *Old Dominion Elec. Co-op. v. FERC*, 518 F.3d 43, 46 (D.C. Cir. 2008). Unlike the Planning Protocol in the Operating Agreement, PJM may unilaterally file changes to the Tariff's terms and conditions without receiving membership approval. Rehearing Order P 22, JA___.

## IV. The Proceedings Below

### A. Failed membership vote

In February 2024, a subset of transmission owners posted draft Owners Agreement amendments that would purportedly transfer the Planning Protocol from the Operating Agreement to the Tariff. R.121, PJM States Protest at 6-8, JA___-___; AMP Protest at 8-9, Att. A-B, JA___-___, ___-___. Several stakeholders raised concerns that many of these amendments were unnecessary to the stated goal of affording PJM unilateral Section 205 filing rights over the Planning Protocol. Instead, these amendments would undermine PJM's independence by granting transmission owners undue influence, while excluding all other PJM members, and would ultimately harm retail consumers. *See*, *e.g.*, PJM States Protest, JA___-___; Harvard Protest, JA___-___; R.119,

Illinois Citizens Protest, JA___-___; R.132, Consumer Advocates

Protest, JA___-___; R.144, Ohio Consumers Protest, JA___-___.

Stakeholders also noted that "[t]he location" of the Planning

Protocol in the Operating Agreement "reflects a long history of

compliance and compromise," and disagreed that the transfer could be

effectuated by "simply amending the [Owners Agreement]."  AMP

Protest at Att. A, JA___ (further noting that Operating Agreement

amendments require "a two-thirds vote of the membership").

The Board, in response, directed PJM to propose amendments to

the Operating Agreement and Tariff to effectuate transfer of the

Planning Protocol, which were then submitted to the Members

Committee for voting.  *See* Board Letter (Apr. 17, 2024),

perma.cc/G7RH-3MTS.

On May 6, 2024, PJM members overwhelmingly rejected the

proposed revisions to the Operating Agreement and Tariff.  AMP

Protest at Att. C, JA___-___ (voting results breakdown).  The proposal

received a mere 1.227 (out of 5.000) sector-weighed vote, falling far

short of the two-thirds majority needed for approval.  *Id.*, JA___;

Rehearing Order P12, JA___.

Besides Transmission Owners' sector, very few (if any) members from the other four sectors voted for the proposal. AMP Protest at 10-11, Att. C, JA___-___, ___. And even among transmission owners, support for the proposal was not unanimous. *Id.* at Att. C, JA___ (9% of transmission owner sector votes rejected proposal); *id.* at 11, JA___ (transmission owners in other sectors, such as AMP Transmission and Old Dominion Electric Cooperative, voted against proposal).

Because the membership vote failed, PJM could not submit the Operating Agreement amendments under Federal Power Act Section 205. The Board therefore directed PJM to file the amendments under Section 206 instead. Rehearing Order P12, JA___.

## B. Transmission Owners' and PJM's three filings

This appeal arises from three filings made by Transmission Owners and PJM that purportedly seek to transfer the Planning Protocol from the Operating Agreement to the Tariff:

(1) Transmission Owners' amendments to the Owners Agreement under Section 205;

(2) PJM's complaint to remove the Planning Protocol from the Operating Agreement under Section 206; and

(3) PJM's amendments to the Tariff to add the Planning Protocol under Section 205.

Rehearing Order P11, JA___.

Transmission Owners and PJM state that the main purpose of these filings is to give PJM the ability to make independent Federal Power Act Section 205 filings to propose changes to the Planning Protocol. *Id.* Because the Planning Protocol is currently located in the Operating Agreement, PJM must receive the Member Committee's approval to file changes to the Protocol under Section 205. *Id.* P22, JA___. This arrangement, they contend, hampers PJM's ability to meet its transmission planning responsibilities. By moving the Protocol to the Tariff, PJM would have the right to unilaterally file changes to the Protocol under Section 205 without membership approval. *Id.*

Transmission Owners and PJM both requested that the Commission treat all three filings as an integrated proposal and accept these filings without modification or condition. *Id.* P18, JA___. The parties further claimed that the Owners Agreement Amendments are a "prerequisite" to effectuating the changes in the PJM Filings, and that

the PJM Filings are submitted for purposes of "implementing" the

Owners Agreement amendments. *Id.*

This appeal concerns only the merits of certain Owners

Agreement amendments, which are summarized in the table below. A

table with the text of these amendments is also provided in the

Addendum to this brief at A15-16.

| RTO Independence Rejections | |
|---|---|
| **7.9**<br>Filings Contravening Agreement & Dispute Resolution<br><br>JA\_\_\_ | Forbids PJM from making any Section 205 filing that "contravenes" the Owners Agreement without the Transmission Owners' consent.<br><br>If PJM seeks to modify its Tariff under Section 205, and a Transmission Owner "believes" that the filing "contravenes" the Owners Agreement, then PJM and the Transmission Owner must enter dispute resolution procedures. |
| **4.1.4(a)**,<br>**6.3.3(ii)**,<br>**6.3.4(a)**,<br>RTEP Planning Provisions<br><br>JA\_\_\_, \_\_\_, \_\_\_ | Requires the Regional Transmission Expansion Plan to be prepared in accordance with the Owners Agreement. |
| | Requires that any changes to the Planning Protocol must be consistent with the terms of the Owners Agreement. |
| | Requires that PJM prepare the Regional Transmission Expansion Plan to address planning criteria in the Owners Agreement. |

| | |
|---|---|
| **6.3.5**<br>RTO Status<br>Provision<br><br>JA___ | Requires PJM to maintain its status as an RTO "consistent with the obligations under [the Owners Agreement]." |
| **Overlap Provision Rejections** ||
| **4.1.4(b)(ii)**,<br>**6.3.4(b)(ii)**:<br>Overlap Provisions<br><br>JA___, ___ | [§§ 4.1.4(b) and 6.3.4(b)(ii) are identical]<br><br>Where a regional transmission project would more efficiently or cost effectively address the same need that a Transmission Owner's local project is planned for, then PJM must consult with the Transmission Owner to determine whether the need for the local project will be addressed.<br><br>If the Transmission Owner determines the local need will not be addressed and that it must continue to plan its local project, then it will document to PJM and the relevant planning committee the rationale supporting its decision. |
| ***Mobile-Sierra* Rejection** ||
| **9.16.3**:<br>Mobile-Sierra<br>Provision<br><br>JA___ | Applies *Mobile-Sierra* presumption to Articles 2, 4, 5, 6, and 7 and Attachment B of the Owners Agreement. |

## C.     Orders on review

The Commission rejected eight proposed amendments to the

Owners Agreement on three independent bases.  Rehearing Order P 23,

JA___.  First, the Commission found that certain amendments violated

the RTO independence requirements of Order 2000 because they would allow Transmission Owners to exclusively and unduly influence PJM's decisionmaking. *Id.* PP36-40, 44-49, 54-56, JA___-___, ___-___, ___-___; Initial Order PP 24-25, 43-48, JA___-___. These amendments allowed Transmission Owners to delay PJM's Section 205 filings through broad dispute resolution requirements, and required PJM to maintain its status as an RTO consistent with the Owners Agreement. They also required PJM to prepare the Regional Transmission Expansion Plan, and Planning Protocol, in accordance with the Owners Agreement. Overall, the Commission concluded that these amendments provided Transmission Owners with unique and unilateral opportunities to influence PJM, in violation of Order 2000's independence requirements. Rehearing Order P54, JA___.

Second, the Commission rejected Transmission Owners' attempt to insert substantive transmission planning rules into the Owners Agreement. Rehearing Order PP67-74, JA___-___; Initial Order PP55-56, JA___-___. These provisions, the Commission explained, had significant impacts on the regional transmission planning process and

stakeholders, and it was unreasonable to maintain them in Transmission Owners' agreement, rather than PJM's Tariff.

Third, the Commission rejected Transmission Owners' proposed *Mobile-Sierra* provision, which would have applied the *Mobile-Sierra* presumption to most of the Owners Agreement and made it more difficult to challenge Transmission Owners' new privileges in the future. The Commission determined that the *Mobile-Sierra* presumption did not apply because the contract provisions at issue were (1) prescriptions of general applicability; and (2) arose from parties with a common interest in excluding competition. Rehearing Order PP84-90, JA___-___; Initial Order PP76-77, JA___-___. [6]

After rejecting certain amendments to the Owners Agreement, the Commission initially proceeded to deny PJM's complaint on the merits and dismiss PJM's transfer filing. Initial Order PP104-110, JA___-___. On rehearing, however, the Commission modified its decision to procedurally dismiss PJM's complaint as moot. Rehearing Order

---

[6] The Commission also declined to apply *Mobile-Sierra* on additional grounds not maintained on appeal. *See* Rehearing Order PP93, 95-97, JA___, ___-___(settlement; discretion); Initial Order PP74-75, 78-81, JA___-___ (same).

PP104-105, JA___.  The Commission explained that, because all three proposals were filed as an integrated package, it did not need to reach the remaining merits.  *Id.*

## SUMMARY OF THE ARGUMENT

This case concerns an attempt to concentrate control within one sector of PJM's membership in violation of the Commission's independence requirements for Regional Transmission Organizations. Here, the Commission reasonably rejected certain amendments that would have granted Transmission Owners exclusive and undue influence over PJM's filings with the Commission, inserted substantive and expanded transmission planning rules into the Owners Agreement rather than PJM's Tariff, and protected those provisions against future challenges under the heightened review standards of the *Mobile-Sierra* doctrine.  Each of these rejected amendments, presented to the Commission as part of an integrated bundle, is an independent and alternative basis for denying the petitions for review.

While Transmission Owners and PJM contend that the proposal would enhance PJM's independence by moving the Planning Protocol from the Operating Agreement to the Tariff, the Commission

reasonably determined that the rejected amendments in the Owners Agreement are not part of that transfer. Instead, the rejected amendments undermine PJM's independence by affording Transmission Owners the exclusive opportunity to delay and shape PJM's filings to revise not only the Planning Protocol, but also the entire Tariff. The Commission cannot approve unreasonable amendments merely because they are packaged together with others that may be reasonable. Given the take-it-or-leave-it nature of the proposal, the Commission may only reject the entire package, which is precisely what it did here.

The Commission also appropriately rejected Transmission Owners' attempt to insert substantive transmission planning rules into the Owners Agreement rather than the Tariff. The Overlap Provisions markedly expand the scope of existing Tariff procedures, and could have significant impacts on PJM's regional transmission planning process and other PJM members. The Commission correctly found it unreasonable to maintain such planning rules in an agreement only Transmission Owners are party to rather than the Tariff.

Finally, the Commission appropriately rejected a provision that would have conferred enhanced *Mobile-Sierra* protection to the bulk of the Owners Agreement—including the various rejected amendments. These so-called "Protected Provisions" of the Owners Agreement are tariff-like prescriptions of general applicability that are not negotiated on an individual basis and would be unilaterally imposed on any new transmission owner that joins PJM. Moreover, several of the provisions—such as the amendments violating PJM's independence and the Overlap Provisions—are self-serving and were negotiated by parties with a common interest in excluding or disadvantaging competitors. This Court and others have repeatedly held that *Mobile-Sierra* protection does not apply to such provisions.

## ARGUMENT

## I. Standard of Review

Reviewing courts assess Commission orders under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). That standard is "deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court is not to

ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power*, 577 U.S. at 292. "Rather, the court must uphold a [decision] if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up).

The Court exercises its independent judgment on questions of law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024). But the Court may give special weight to the agency's view on questions that fall within its technical expertise. *Id.* at 402 (citing cases). To that end, "agencies always—or almost aways—exercise some measure of expertise when interpreting contracts germane to their administrative fields." *Bos. Edison Co. v. FERC*, 856 F.2d 361, 363 (1st Cir. 1988); *cf. United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 65-68 (1956) ("tariff construction" demands "close familiarity" with technical aspects of industry and ratemaking, even if formally a question of law).

"Whether the *Mobile-Sierra* doctrine applies to a given rate is a question of contract interpretation." *Wabash Valley Power Assoc. v. FERC*, 45 F.4th 115, 120 (D.C. Cir. 2022). Affording special weight to

the Commission's interpretation comports with judicial practice "even before *Chevron*," when this Court held that "deference to [agency] views" was appropriate "where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices." *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1570 (D.C. Cir. 1987) (internal quotations omitted); *see also Kan. Cities v. FERC*, 723 F.2d 82, 87 (D.C. Cir. 1983) (affording "great weight to the [judgment] of the expert agency that deals with [documents] of this sort on a daily basis").

## II. Each Rejected Amendment In The Orders Is An Independent And Alternative Basis For Denying The Petitions For Review.

**1.** In their filing of amendments to the Owners Agreement, Transmission Owners requested that the Commission "accept the [Owners Agreement] Amendments for filing without … modification, or condition." *Id.* at 2, JA___. They explained that these amendments, intended to grant PJM unilateral filing authority, were all part of a "carefully negotiated integrated package of reforms" that is "not severable without upsetting the balance of the negotiations and requiring the parties to reevaluate the overall value of the proposed

amendments." Initial Order P23 n.48, JA___ (citing Owners Filing at 50, JA___); Pet.Br. 22 (arguing that any modifications by FERC would necessarily "undo the compromise" underlying their original proposal).

Under these circumstances, the Commission may only passively "accept or reject" the confined proposal, rather than surgically modify it to remove offending provisions. *NRG Power*, 862 F.3d at 114; *see supra* pp.6-7. Finding any one of these amendments unreasonable, then, leaves the Commission with no choice but to reject the "entire package." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 667-68 (D.C. Cir. 2025).

Consequently, as the Commission explained, "each ground of rejection serves as an *independent* basis to reject the [Ownership Agreement] Amendments as a whole." Initial Order P23 n.48, JA___ (emphasis added); *see also* Rehearing Order P23 & n.169, JA___, ___ (noting orders included several "independent" bases for rejection). This Court may therefore deny the petitions for review if it agrees that at least one of Transmission Owners' amendments was reasonably rejected—even if others were not.

**2.** The "integrated package" includes not only the amendments in Transmission Owners' filing, but also those in PJM's two filings.

Rehearing Order PP18, 24, JA___, ___.  Both Transmission Owners and

PJM requested that the Commission treat all three filings as a single

"integrated package."  *Id.*  This arrangement reflected their "mutual

understanding" that the Owners Agreement amendments were

purportedly necessary to "effectuate the changes contained in the PJM

Filings."  Owners Filing at 2, JA___; PJM Filings at 4-5, JA___.  They

alleged that "Commission acceptance of the [Owners Agreement]

Amendments," without "modification" or "condition," "is a *prerequisite*

to PJM's preparing of the [Regional Transmission Expansion Plan]

pursuant to the PJM Tariff rather than the Operating Agreement."

Owners Filing at 2, JA___ (emphasis added).  Therefore, rejection of

Transmission Owners' filing would likewise require the Commission to

deny PJM's filings.

Consistent with the parties' request, the Commission treated all

three filings as an integrated proposal.[7]  Rehearing Order P24, JA___.

After rejecting certain Owners Agreement amendments on the merits,

---

[7]     Nonetheless, the Commission "took no position as to whether PJM
has the legal authority to effectuate the changes proposed in [its filings]
in the absence of the [Ownership Agreement] Amendments or vice
versa."  Initial Order P22, JA___; Rehearing Order P24, JA___.

the Commission on rehearing reasonably exercised its discretion to procedurally dismiss PJM's filings as moot. *Id.* P104, JA___ (explaining that, in the context of an integrated proposal, PJM's filings essentially amount to "a request for a declaratory order, which the Commission has broad discretion to address or dismiss"); *see also* Initial Order PP21, 110, JA___, ___ (dismissing PJM's section 206 complaint also discharges PJM's transfer filing, "which PJM states is its proposed replacement rate" if the complaint is granted); PJM Filings at n.5, JA____ (acknowledging that granting the complaint is a prerequisite to granting the transfer filing). Therefore, the Commission took "no position on the merits" of PJM's filings or "the arguments raised on rehearing" with respect to those filings. Rehearing Order P104, JA___.

**3.** Intervenor PJM does not dispute that the Commission has discretion to procedurally dismiss the remainder of an inseverable proposal after finding certain amendments unreasonable. It claims, however, that the Commission inappropriately ignored "the positive impact on PJM's transmission planning authority" conferred by the changes in PJM's filings. PJM.Br. 20-23. Transmission Owners similarly argue that the Commission did not consider whether the

proposal was reasonable "on an overall basis," Pet.Br. 22.  They

essentially contend that, despite finding specific amendments

unreasonable, the Commission should have nonetheless approved the

entire proposal because "*other* proposed changes to the [Operating

Agreement] and Tariff would increase PJM's independence."  Rehearing

Order P39, JA___ (emphasis added).

But the Commission is "generally limited to rejecting a proposal

that contains unjust and unreasonable provisions, even if other aspects

of the proposal may be just and reasonable."  *Id.* (citing *NRG Power*,

862 F.3d at 115).  Indeed, precedent on which Transmission Owners

rely forecloses such arguments.  *See* Pet.Br. 22-24.  *Hecate* involved a

comprehensive package of tariff amendments submitted by PJM as an

integrated proposal, which the Commission approved in its entirety.

126 F.4th at 664.  On appeal, petitioner challenged only a single

provision in this package as unreasonable, but otherwise agreed that

the overall proposal would provide critical benefits to PJM.  *Id.* at 664-

65.  This Court explained that, assuming petitioner was correct that

this provision should have been rejected, then "the Commission would

have no choice but to reject PJM's entire package of reforms." *Id.* at 667.

Rather than balance a defective provision against other possible benefits of the package, as Transmission Owners and PJM urge, the appropriate "fix" is for the parties "to resubmit a new comprehensive proposal" that "attempt[s] to cure the [defect] of the challenged [provision]." *Id.*; *see also* Rehearing Order P36 n.112, JA___ (noting Transmission Owners and PJM have not identified any authority that obligates the Commission "to engage in such a balancing act" where portions of the proposal are "unjust and unreasonable").

Here, the Commission dismissed PJM's filings "without prejudice on procedural grounds." Rehearing Order P105, JA___. It emphasized that this dismissal "does not preclude a future filing proposing to move the [Planning Protocol] from the [Operating Agreement] to the Tariff." *Id.* Consistent with *Hecate*, then, the parties remain "free to resubmit a new comprehensive proposal" for moving the Planning Protocol to the Tariff that "attempts to cure" the identified defects in the Owners Agreement amendments. 126 F.4th at 667.

**4.**  For similar reasons, the Commission did not, as Transmission Owners assert, exceed its authority or "undo [the underlying] compromise" by rejecting the integrated proposal.  Pet.Br. 22-24. Rather, the Commission did precisely what this Court's caselaw requires and what the parties expressly requested.  Upon finding certain proposed amendments unjust and unreasonable, the Commission rejected the "entire package of reforms" as it stood, instead of "modify[ing]" the unlawful amendments.  *Hecate*, 126 F.4th at 667.

Transmission Owners wrongly allege that the Commission somehow "revised the deal" merely by rejecting amendments it found unlawful and explaining that the procedural dismissal of PJM's filings was without prejudice.  Br. 22.  To be clear, the Commission did not "revise" or modify the proposal in any way.  Nor did its orders propose specific modifications for the parties to file.  Instead, the Commission simply reviewed the Owners Agreement amendments, identified amendments that it found unjust and unreasonable, and explained why it rejected those amendments as unlawful—as the Commission is obligated to do under the Administrative Procedure Act.  *Elec. Power*, 577 U.S. at 292; Rehearing Order P38, JA___.

Nor did the Commission reject the proposal "simply because it would have preferred" an alternative approach, Pet.Br. 23-24. Rather, the Commission evaluated the proposal before it and "found that [Transmission Owners] had not met their burden of showing that the proposal was just and reasonable under [Federal Power Act Section 205]." Rehearing Order P38, JA___. And merely noting that parties are free to try again and file another proposal to achieve their stated goals does not apply "improper pressure" to rework the agreement. Br. 24.

## III. The Commission Reasonably Declined To Apply *Mobile-Sierra*

### A. Legal background

Under *Mobile-Sierra*, the Commission presumes that the rate set by a "freely negotiated wholesale-energy contract" meets the statutory "just and reasonable" requirement. *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010) ("*NRG*"); *see also United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956). The *Mobile-Sierra* doctrine is "grounded in the commonsense notion that, 'in wholesale markets, the party charging the rate and the party charged [are] often sophisticated businesses enjoying presumptively equal bargaining

power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them.'" *Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 545 (2008) (quoting *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 479 (2002)).

If the *Mobile-Sierra* presumption applies to a given rate, then the Commission may set that rate aside only upon finding that it "seriously harm[s] the public interest." *See Emera*, 854 F.3d at 665 (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 81 (D.C. Cir. 2014)). This "public interest" standard is not an exception to the Federal Power Act's "just and reasonable" standard; rather, it is a "differing *application* of that just-and-reasonable standard" in the contract context. *Morgan Stanley*, 554 U.S. at 535.

Yet the *Mobile-Sierra* presumption does not apply to every contract provision. *See Oklahoma Gas & Elec. Co. v. FERC,* 827 F.3d 75, 79-80 (D.C. Cir. 2016) (rejecting argument that "any valid, freely negotiated contract automatically is subject to *Mobile-Sierra*" and declining to apply presumption to provision of a Transmission Owners Agreement negotiated between transmission owners and RTO). As the Supreme Court explained, "the *Mobile-Sierra* presumption rests" on the

"premise" that a given contract rate is the "product of fair, arms-length negotiations." *Morgan Stanley*, 554 U.S. at 554. So if a contract possesses characteristics that "eliminate [this] premise," then "the Commission should not presume that the contract is just and reasonable." *Id.*

To that end, courts and the Commission have found *Mobile-Sierra* protections inapplicable where the disputed contract provision either: (1) involves "prescriptions of general applicability," rather than terms freely negotiated on an individual basis, *Wabash*, 45 F.4th at 120-21; or (2) did not arise through "adversarial" "arms-length bargaining," *Oklahoma*, 827 F.3d at 79-80. Both of these independent grounds support the Commission's determination here that, as a matter of law, *Mobile-Sierra* does not apply to the relevant Owners Agreement provisions. *See* Rehearing Order PP75, 84-90, 93, 95-97, JA___, ___-___, ___-___; Initial Order PP57-58, 74-81, JA___, ___-___.

**B. The Protected Provisions are "prescriptions of general applicability."**

**1.** This Court has explained that "[t]he *Mobile-Sierra* doctrine applies to 'contractually negotiated rates,' not 'prescriptions of general applicability.'" *Wabash*, 45 F.4th at 120 (citing *NRG*, 558 U.S. at 176).

42

The former involves provisions that are "freely negotiated between individual parties with comparable bargaining power," consistent with *Mobile-Sierra*'s underlying premise. *Id.* By contrast, the latter is more akin to generally applicable tariff provisions that are unilaterally imposed, contrary to *Mobile-Sierra*'s premise of fair, arms-length negotiations. *Id.*; Rehearing Order P85, JA___.

The circumstances of *Wabash* are instructive. *See* Rehearing Order P88, JA___; *contra* Pet.Br. 51. There, the Commission rejected a proposal to apply *Mobile-Sierra* to certain rate-related provisions in contracts between a cooperative and its individual members. 45 F.4th at 119. The Court agreed that *Mobile-Sierra* does not apply to these provisions, which were "more akin to a generally applicable going rate, than to a contractual rate freely negotiated." *Id.* at 120. Notably, while the cooperative had executed contracts with individual members, the Court observed that the rate provisions themselves were not individualized and were instead in "virtually identical" contracts, suggesting that "individual members face a 'binary,' take-it-or-leave-it choice." *Id.* Moreover, because the cooperative acts "by simple

majority, it may approve rates over the objections of dissenting members," similarly to unilaterally imposed tariff rates. *Id.*

Here, as in *Wabash*, the Commission appropriately rejected proposed Section 9.16.3 of the Owners Agreement, which applies *Mobile-Sierra* protection to various provisions that "are more akin to generalized tariff provisions than individualized contract provisions." Rehearing Order P95, JA___. Section 9.16.3 confers *Mobile-Sierra* on a "wide swath" of pro forma provisions in the Owners Agreement— Articles 2, 4, 5, 6, and 7 and Attachment B—that apply generally to all transmission owners. *Id.* P84, JA___. Each individual transmission owner in PJM is required to "execute the [Owners Agreement]" to join and, in doing so, must "accept these provisions as they are, with limited room for negotiation." Initial Order P77, JA___ (citing Tariff definition of "Transmission Owner" as "a signatory to the [Owners Agreement]"); Rehearing Order PP85, 88, JA___.

Transmission Owners allege that "a new transmission owner seeking to join [PJM]" could simply "negotiate a change in the terms and conditions" not to its liking. Br. 50. But "[a]mending the Owners Agreement requires action by a two-thirds majority" of the current

transmission owners, substantially inhibiting an individual's ability to negotiate a change to these provisions. Initial Order P77, JA___ (citing Owners Agreement § 8.5.1, JA___); Rehearing Order P88, JA___; *see also Wabash*, 45 F.4th at 230 (noting each individual member has "very small bargaining power relative to the joint venture"). Therefore, any individual transmission owner is "placed in a position that differs fundamentally from that of parties who are able to negotiate freely" like typical "buyers and sellers" entitled to the *Mobile-Sierra* presumption. Initial Order P77, JA___; Rehearing Order P88, JA___.

Transmission Owners also point out that membership in PJM is "voluntary," and those dissatisfied with the Owners Agreement may freely leave or decline to join. Br. 48, 50. Yet that same reasoning applies to unilaterally imposed tariff provisions, which likewise present "a binary, take-it-or-leave-it choice." *Wabash*, 45 F.4th at 120. Simply because a party with little bargaining power could theoretically choose to leave does not satisfy *Mobile-Sierra*'s premise—which instead involves "sophisticated businesses enjoying presumptively equal bargaining power." *Morgan Stanley*, 554 U.S. at 545.

Indeed, the Commission has previously declined to apply *Mobile-Sierra* to transmission owner agreements on this basis—including to the Owners Agreement in PJM. *See PJM Interconnection*, 142 FERC ¶ 61,214, PP186-87 (2013), *on reh'g*, 147 FERC ¶ 61,128, P110 n.200 (2014) (finding Owners Agreement provisions are "prescriptions of general applicability" because "New PJM Transmission Owners are placed in a position that differs fundamentally from that of parties who are able to negotiate freely"); *Midwest Indep. Transmission Sys. Operator*, 142 FERC ¶ 61,215, P181 (2013) (same); Rehearing Order PP87-88, JA___ (citing same).

**2.** Transmission Owners next argue that *Wabash* is no longer good law because it was decided pre-*Loper Bright*. Br. 50-51. But the Court there independently interpreted Supreme Court precedent in determining that *Mobile-Sierra* does not apply to "prescriptions of general applicability." *See* 45 F.4th at 120 (citing *NRG*, 558 U.S. at 176, and *Morgan Stanley*, 554 U.S. at 532, 545); *see also Oklahoma*, 827 F.3d at 78-79 (independently analyzing Supreme Court precedent). And in any event, Transmission Owners "have not shown that the Commission's reasoning in [the challenged orders, and in earlier cases]

regarding when the *Mobile-Sierra* presumption should be applied was incorrect." Rehearing Order P89, JA___.

Nor does Transmission Owners' invocation of *NRG* help them. Br. 47-48. *NRG* held that "the *Mobile-Sierra* presumption does not depend on the identity of the complainant who seeks the FERC investigation." 558 U.S. at 176. In other words, assuming *Mobile-Sierra* applies to a contract challenged by one of the contracting parties, then the presumption must still apply were that contract challenged by a third party. *Id.* The Court did not, however, reach the issue of whether *Mobile-Sierra* should apply to the contract in the first place.

Instead, the Court expressly reserved for remand the question of whether "the rates at issue in this case … were '*prescriptions of general applicability* rather than 'contractually negotiated rates,' [in which case] *Mobile-Sierra is inapplicable*"—which is the precise analytical framework the Commission applied here. *Id.* (emphases added); *see* Rehearing Order P85, JA___. And on remand from *NRG*, the Commission concluded that the rates at issue were prescriptions of general applicability and, therefore, not contractually negotiated rates to which the *Mobile-Sierra* assumption necessarily applies. *See Devon*

*Power LLC*, 134 FERC ¶ 61,208 PP1-2, 11-13, *on reh'g*, 137 FERC

¶ 61,073 PP21-24 (2011). This Court dismissed the challenge to that

finding for lack of standing. *New England Power Generators Ass'n, Inc.*

*v. FERC*, 707 F.3d 364, 369-70 (D.C. Cir. 2013).

## C. The Protected Provisions did not arise from adversarial arms-length bargaining.

**1.** Alternatively, courts and the Commission have declined to

apply *Mobile-Sierra* to contract provisions that did not arise from

"arms-length bargaining." *Oklahoma*, 827 F.3d at 79-80. Specifically,

"the term must be the product of adversarial negotiations between

sophisticated parties pursuing *independent* interests." *Id.* (emphasis

added). That is because *Mobile-Sierra* presumes that the "parties

brought adverse interests to the table" so "their contract could be

assumed to have *split the difference*." *MISO Transmission Owners v.*

*FERC*, 819 F.3d 329, 335 (7th Cir. 2016) (emphasis added). That

premise fails, however, where both sides share common interests and

"thus lack the same incentive as a buyer negotiating with an unrelated

seller for the lowest possible prices." *Wabash Valley*, 45 F.4th at 120-

21. In those circumstances, the Commission cannot presume that the

terms resulting from their negotiation are, as the statute requires, "just and reasonable." *Id.*

This principle applies especially to "self-protective" or "anti-competitive" terms arising from the contracting parties' shared interest in "protect[ing] themselves from competition from third parties." *Oklahoma*, 827 F.3d at 80 (citing *MISO*, 819 F.3d at 335). "Just as unfair dealing, fraud, or duress will remove a provision from the ambit of *Mobile-Sierra*, so also will terms arrived at by horizontal competitors with a common interest to exclude any future competition." *Id.*

Several of the Commission's Order 1000 compliance cases are illustrative. Prior to those cases, incumbent transmission owners were allowed to have the first crack at building transmission projects included in an RTO's regional transmission plan. *MISO*, 819 F.3d at 332. These federal "rights of first refusal," often housed in transmission owners' agreements with the RTO, afforded transmission owners a unique opportunity to build the projects without having to face competition from new transmission developers. *Id.* at 332-33. This disincentivized new developers who could build the projects at lower cost, ultimately driving up costs for consumers. *Id.*

In Order 1000, the Commission ordered removal of these rights of first refusal from transmission owner agreements. *Id.* Transmission owners from various RTOs argued that these provisions were protected under *Mobile-Sierra* and could not be abrogated. This Court disagreed, explaining that these "self-protective" terms did not arise from "adversarial negotiations" with "independent interests," but rather from transmission owners' shared interest in excluding competition from new transmission developers—which are "a far cry from … the original *Mobile-Sierra* cases." *Oklahoma*, 827 F.3d at 79-80; *see also MISO*, 819 F.3d at 334-35; *Emera*, 854 F.3d at 667 n.2.

Commission precedent likewise applies this reasoning to the right-of-first-refusal provisions in PJM's Owners Agreement. *PJM Interconnection*, 142 FERC ¶ 61,214, PP188-190 (2013), *on reh'g*, 147 FERC ¶ 61,128, PP104-117 (2014), *appeal dismissed sub. nom. Am. Transmission Sys. Inc. v. FERC*, No. 14-1085, 2016 WL 3615443, (D.C. Cir. July 1, 2016). The Commission found that "PJM Transmission Owners had a common interest" in "protect[ing] themselves from competition in transmission development." 147 FERC ¶ 61,128 at 110. And while Transmission Owners "may have engaged in extensive

negotiations with respect to the [Owners Agreement] in general, their common interest relating to the right-of-first-refusal provisions undermines any assurance of justness and reasonableness associated with arm's-length negotiation[s]." *Id.*; *see also* Rehearing Order P86 & n.279, JA___ (citing same).

**2.**  Here, the Commission reasonably determined that "at least certain of the Protected Provisions" did not arise from adversarial "arm's-length negotiations" that would ensure just and reasonable terms.  Rehearing Order P86, JA___.  As with the right-of-first-refusal provisions, certain proposed amendments within the Protected Provisions implicate "a common, non-adversarial interest" among Transmission Owners in excluding other members from PJM's regional transmission planning process.  *Id.* (citing *PJM Interconnection*, 142 FERC ¶ 61,214 at P189, and *Oklahoma*, 827 F.3d at 80).

For example, the Overlap Provisions (§§ 4.1.4(b)(ii) and 6.3.4(b)(ii), *see infra*, pp.70-75) "ensure that [Transmission Owners] have the right to build local projects even if a regional project overlaps," which "indirectly prevent[s] that project from being developed through the competitive regional transmission planning process."  Rehearing Order

P86, JA___.  The Commission also observed that several proposed

amendments in the Protected Provisions provide Transmission Owners

with an exclusive and "collective ability to impact PJM's regional

transmission planning process," to the disadvantage of other members.

*Id.*; *see*, *e.g.*, *id.* P49, JA___ (§ 7.9 provides Transmission Owners

"ability to unilaterally and uniquely impact PJM's FPA section 205

filing rights"); *id.* P54, JA___ (§ 6.3.5 "provides [Transmission Owners]

with a unique and exclusive opportunity to influence how PJM

operates").  Such "self-protective" provisions are a "far cry from those in

the original *Mobile-Sierra* cases."  *Oklahoma*, 827 F.3d at 80.

On appeal, Transmission Owners now argue that the Overlap

Provisions do not actually protect them from competition because they

require only "consult[ation]" between PJM and Transmission Owners.

Br. 54-55.  But that ignores the next sentence of the Overlap Provisions,

which states that "if the [*Transmission Owner*] *determines* that such

need will not be addressed and *that it must continue to plan* [its own

local project], it shall document to PJM and the relevant PJM

transmission planning committee the rationale supporting its

determination."  Owners Filing, JA___, ___ (emphasis added).  If a

Transmission Owner believes the need for its local project has not been met, nothing in these provisions prevents the Transmission Owner from proceeding with its overlapping local project, even if the regional project would be more efficient and cost effective. *See also* Initial Order P56 & n.129, JA___ ("Overlap Provisions may impact PJM's regional transmission planning process") (citing PJM States Protest at 25-31, JA___-___; PJM States Response at 5-6, JA___-___).

Transmission Owners also contend that the Commission looked at the wrong relationship. Rather than examine Transmission Owners' aligned interests, they say the Commission should have considered the relationship between the collective Transmission Owners and PJM. Pet.Br. 55-56. To start, that ignores court precedent examining analogous transmission owners agreements and whether those transmission owners—as "horizontal competitors"—shared a "common interest to exclude any future competition." *Oklahoma*, 827 F.3d at 80; *MISO*, 819 F.3d at 333-34 (same); *see also* Rehearing Order P90, JA___.

Regardless, even assuming Transmission Owners' frame of reference, their interests were aligned with PJM's in the proposal. Both parties sought to eliminate the Members Committee's ability to vote on

PJM's Section 205 filings to the Planning Protocol, while retaining an exclusive say for Transmission Owners.  *See*, *e.g.*, PJM.Br. 22 (proposal allows PJM to file without "secur[ing] prior authorization from … Members Committee"); *id.* 25 (acknowledging Transmission Owners have "'exclusive ability' to invoke" Section 7.9's dispute resolution procedures as "the only counter-party to the Owners Agreement"); *see also* Pet.Br. 11 (proposal eliminates requirement for "the vote of a Members Committee that has become *dominated by non-utilities*," i.e., other PJM members); *id.* 32 (alleging dispute resolution procedures are reasonable because "PJM has only the rights the Transmission Owners have assigned it").

The cumulative effect, the Commission explained, is "to shift the ability to influence PJM's FPA Section 205 filings from a diffuse right shared by [all PJM members] representing diverse interests, to a concentrated right possessed by a single class of stakeholders, the [Transmission Owners]."  Rehearing Order P22, JA___.  Consequently, these provisions reflect a common interest in excluding other PJM members from participating in or influencing aspects of PJM's operations, while protecting their own interests.  Such provisions are

not entitled to application of the *Mobile-Sierra* presumption as a matter of law. *Oklahoma*, 827 F.3d at 80.

## IV. The Commission Reasonably Rejected Amendments That Violate PJM's Independence

The Commission rejected Sections 7.9, 4.1.4(a), 6.3.3(ii), 6.3.4(a), and 6.3.5 of the Owners Agreement because they violate Order 2000's requirement that Regional Transmission Organizations be "independent of control by any market participant or class of participants in both reality and perception." Rehearing Order P32, JA___ (citing Order 2000, 89 FERC ¶ 61,285 at pp.79-80); *see supra* pp.9-12 (discussing Order 2000).

These amendments broadly bind PJM's operations to Transmission Owners' Agreement. Specifically, Section 7.9 forbids PJM from making a filing that "contravenes" the Owners Agreement, and further requires PJM to enter dispute resolution if a Transmission Owner "believes" that the filing will do so. JA___; Rehearing Order P45, JA___. Sections 4.1.4(a), 6.3.3(ii), and 6.3.4(a) likewise restrict PJM's transmission planning, mandating that the Regional Transmission Expansion Plan be "consistent with" the Owners Agreement. JA___, ___-___; Rehearing Order PP47-48, JA___-___. And

Section 6.3.5 ties PJM's RTO status to undefined "obligations" of the

Owners Agreement.  *Id.*  These amendments, as the Commission found,

afford Transmission Owners "exclusive" opportunities to "unduly

influence" how PJM operates, in violation of Order 2000.  *Id.* PP44, 54,

JA___, ___; Initial Order PP44, 47, JA___, ___.

## A. Transmission Owners' statutory filing rights have not been infringed.

By rejecting these amendments as unjust and unreasonable, the

Commission did not implicate the Federal Power Act Section 205 filing

rights at issue in *Atlantic City*.  Rehearing Order PP36-37, JA___-___;

*see* Pet.Br. 19-21, 25-27.  As this Court explained in *Atlantic City*, under

Section 205(d), utilities have the right to file changes to "initially"

establish their rates.  295 F.3d at 9-10 (quoting *Mobile*, 350 U.S. at

341).  However, those filings are then subject to review by the

Commission, whereupon it may reject them if the proposed changes are

not "just and reasonable."  *Id.*

Specifically, the issue in *Atlantic City* was limited to whether the

Commission could "prohibit public utilities from filing changes *in the*

*first instance.*"  *Id.* at 10 (emphasis added).  No party disputed that the

Commission was authorized and, in fact, statutorily obligated, to review

those changes once filed.  Indeed, *Atlantic City* affirmed the Commission's statutory responsibility to reject "changes proposed by the public utility [that] are not 'just and reasonable.'"  Rehearing Order P37, JA___.

Here, the Commission did not require Transmission Owners to cede any statutory filing rights under Section 205.  *Id.*  Transmission Owners remain free to file what they wish with the Commission.  But the Commission nonetheless has a statutory duty to review Transmission Owners' filings and, upon finding them "unjust and unreasonable," reject those filings.  Merely because the Commission has now reviewed their filings and found them unreasonable does not mean that Transmission Owners' statutory filing rights have been abrogated. *See Atlantic City*, 295 F.3d at 10 ("Sections 205 (and 206)" are simply parts of a statutory scheme wherein "all rates are *established initially* by public utilities, by contract or otherwise, and all rates are *subject to being modified by the Commission* upon a finding that they are unlawful" (quoting *Mobile*, 350 U.S. at 341)).[8]

_____

[8]     In fact, the Commission has "previously rejected provisions that provide transmission owners with an exclusive opportunity to influence

**B. The rejected amendments do not "enhance" PJM's independence, and Sections 4.1.4(a), 6.3.3(ii), 6.3.4(a) arguments are forfeited.**

Echoing prior arguments (*supra* pp.36-38), Transmission Owners claim the Commission ignored that the Owners Agreement amendments actually "enhance" PJM's independence because their "central purpose" is to free PJM from a membership vote. Br. 27-28. Not so. The Commission considered that argument but determined the alleged "enhancements to PJM's independence … would result from making the [Planning Protocol] part of the PJM Tariff," which is "not part of the proposed [Owners Agreement] amendments." Rehearing Order P39, JA___. And, as explained above, the Commission cannot approve amendments that violate PJM's independence merely because *other* amendments in the proposal may increase PJM's independence. *Id.*; *supra* pp.36-38.

Transmission Owners contend that the rejected amendments to the Owners Agreement do, in fact, move the Planning Protocol between

RTO [Section 205] filings because such provisions are contrary to RTO independence." Rehearing Order P37, JA___ (citing *Midwest Ind. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326, p.62,505 (2001), *on reh'g*, 103 FERC ¶ 61,169, P41 (2003) ("MISO Order 2000 Compliance")).

two other, separate documents.  Br. 28.  They allege, on appeal, that this transfer specifically "depends on" amended Sections "4.1.4(a)(i)" and "6.3.4(a)" of the Owners Agreement.  *Id.*[9]  So they say the Commission was wrong to find that these amendments violate PJM's independence.

This argument is forfeited because Transmission Owners did not challenge the Commission's rejection of these particular amendments on rehearing.  Amended Sections 4.1.4(a) and 6.3.4(a) are part of the "RTEP Planning Provisions," along with Section 6.3.3(ii).  Initial Order P28, JA___.  In the Initial Order, the Commission rejected these amendments for violating RTO independence because they require the Regional Transmission Expansion Plan to be "planned in accordance with the [Owners Agreement]."  *Id.* P47, JA___; *see also id.* P25, JA___ ("[W]e find that proposed CTOA sections" "4.1.4(a), 6.3.3(ii), 6.3.4(a)"

---

[9]    Even had Transmission Owners preserved these challenges, this argument would at most apply to the rejection of Sections 4.1.4(a) and 6.3.4(a).  They have not alleged that transferring the Planning Protocol also specifically "depends on" the other amendments rejected on RTO independence grounds—Sections 7.9, 6.3.3(ii), and 6.3.5.

"violate the independence requirements of Order No. 2000"); *id.* P23, JA___ (same).

Yet as the Commission found on rehearing, Transmission Owners failed to challenge that determination in their rehearing request. Rehearing Order n.169, JA___.  Transmission Owners' request instead challenged the Commission's RTO independence rejections only as to "sections 7.9 and 6.3.5."  Owners Reh'g Req. at 13, JA___; *see id.* at 9-11, JA___-___ (under "Specification of Errors and Statement of Issues," identifying only "section 7.9" and "section 6.3.5" in issues D and E).

Transmission Owners have therefore forfeited any arguments disputing the Commission's finding that Sections 4.1.4(a) and 6.3.4(a), along with Section 6.3.3(ii), violate PJM's independence.  *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) ("each argument" must be raised on rehearing "with specificity"; "objections may not be preserved indirectly or implicitly" (cleaned up)); 16 U.S.C. § 825*l*(b).

In any event, Transmission Owners miss the point.  As the Commission explained, its findings were "not related to" what impact transferring the Planning Protocol has on PJM's independence. Rehearing Order P39, JA___.  For example, the Commission found that

Section 7.9 (discussed *infra*) would provide Transmission Owners with "an exclusive ability to affect" PJM's Section 205 filings, in violation of Order 2000's requirement that RTOs have a decision-making process that is independent of control by any group of members. *Id.* That *remains* a violation of Order 2000's requirements, regardless of whether PJM's independence is supposedly "enhanced" in *other* ways. *Id.*

## C. Section 7.9 affords Transmission Owners exclusive and undue influence over PJM's filings.

**1.** Order 2000 requires Regional Transmission Organizations to be independent of control by any market participant or class of participants, "in both reality and perception." Initial Order P43, JA___; *supra* pp.11-12. Here, the Commission reasonably determined that Section 7.9 violates Order 2000's requirements by providing Transmission Owners an exclusive opportunity to delay and unduly influence PJM's Section 205 filings. Rehearing Order PP44-49, JA___-___; Initial Order PP43-46, JA___-___.

Section 7.9 comprises two parts. First, PJM shall not "make *any* filing under Section 205 of the Federal Power Act that *contravenes* Articles 2, 4, 5, 6, 7, or Attachment B of the [Owners] Agreement" unless the Transmission Owners "consent" to the filing. Proposed

§ 7.9, JA___.  Second, if PJM seeks to "modify the PJM Tariff, including the … Planning Protocol," and a Transmission Owner "believes" that PJM's filing will "contravene any part of Articles 2, 4, 5, 6, or 7 or Attachment B" of the Owners Agreement, then PJM and the Transmission Owner must enter dispute resolution proceedings.  *Id.* [10]

Under this second provision, so long as at least one Transmission Owner "believes" that PJM's filing "contravene[s]" the Owners Agreement, then PJM must enter dispute resolution proceedings and delay its filing until after those proceedings end.  Rehearing Order P44, JA___; *see also* Attachment B, JA___.  Notably, this applies not only to the Planning Protocol, but to any Tariff changes PJM wishes to make under Section 205.  Rehearing Order P45, JA___.

The Commission found Section 7.9 significantly impacts PJM's ability to independently make Section 205 filings by affording Transmission Owners the power to "delay the filing until after dispute resolution procedures" and "potentially influence those filings before they are made with the Commission."  Rehearing Order P44, JA___.

_____

[10]    The same limitations also apply to Transmission Owners who seek to make filings contravening their own agreement.

The power to "delay" is "particularly significant" because Section 205 filings, if approved, generally only take effect "prospectively" from the date of filing. *Id.* n.139, JA___.

And Section 7.9's first provision, the Commission found, could broadly "restrict PJM's ability to submit '*any* filing under Section 205.'" Initial Order P46, JA___. This includes not only changes to PJM's Tariff, but also "[the Operating Agreement], Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, or any document containing PJM's rates and charges, or rules and regulations" affecting such rates. *Id.*

The Commission also relied on its Order 2000 precedent rejecting similar provisions that provide "transmission owners with exclusive influence or control" over an RTO's filings. Initial Order P45, JA___. Specifically, in the *MISO Order 2000 Compliance* orders, the Commission rejected provisions that restricted an RTO from making any filings that would "adversely impact" transmission owners' revenues, and another that gave transmission owners an exclusive veto over the RTO's filings affecting pricing. 97 FERC ¶ 61,326, p.62,205, *on reh'g*, 103 FERC ¶ 61,169, P41. Here, while Section 7.9 does not

establish "an explicit veto privilege" for Transmission Owners, it nonetheless affords them similarly "inappropriate" and exclusive "influence or control" over PJM's filings.  Initial Order P45, JA___; Rehearing Order P45, JA___.

2.  Transmission Owners argue that proposed Section 7.9 is no different than existing Section 7.6, which was adopted under the *Atlantic City Settlement* (discussed *supra*, pp.18-20) and uses similar dispute resolution procedures.  Pet.Br. 29-30.  Their comparison is inapt.  For one, the terms of that settlement expressly preclude any precedential value: "This Settlement Agreement applies only in this case, and the Commission's approval of it does not establish any policy or precedent for other cases."  Rehearing Order P45, JA___ (quoting Settlement Agreement, Joint Statement at 6).

For another, they ignore significant differences between these two provisions.  *Atlantic City Settlement* allocated specific Section 205 filing rights between Transmission Owners and PJM, with Transmission Owners entitled to file changes to Tariff "rate[s]," and PJM entitled to file changes to Tariff "terms and conditions."  105 FERC ¶ 61,294 at P34.  Section 7.6 is expressly limited to "a dispute aris[ing] as to *which*

*Party* has Section 205 rights to make" a proposed Tariff filing—i.e.,

whether that filing is rate-related or terms-and-conditions-related.

§ 7.6, JA___ (emphasis added). Therefore, Section 7.6 applies only to a

single, narrowly defined category of disputes. Rehearing Order P45,

JA___.

By contrast, the scope of potential disputes under Section 7.9 is

unduly broad. Unlike Section 7.6, proposed Section 7.9 is not limited

only to Tariff filings and broadly applies to "*any* … section 205 filing

that PJM might wish to make." *Id.* (emphasis added).

Transmission Owners contend that Section 7.9 is nonetheless

limited to disputes arising from filings that "contravene any part of

Articles 2, 4, 5, 6, or 7 or Attachment B." Br. 31. But these Articles

represent "a wide swath" of the Owners Agreement and "encompass a

broad range of terms and conditions," Rehearing Order P84, JA___,

such as: "Purposes and Objectives of the Agreement" (Art. 2), "Parties'

Commitments" (Art. 4), Parties' Retained Rights (Art. 5), "PJM's Rights

and Commitments (Art. 6), "Changes to Rate Design and Tariff Terms

and Conditions; Distribution of Revenues" (Art. 7), and "New Dispute

Resolution Procedures" (Att. B). *See* Amended Owners Agreement,

JA___, ___, ___, ___, ___, ___.  Rather than a question of rates-versus-terms-and-conditions, a dispute under Section 7.9 could arise any time a transmission owner "believes" PJM's filing "contravenes" any number of provisions lurking within these Articles.

Transmission Owners claim not to know "why this distinction matters," Br. 32.  But as the Commission explained, while Sections 7.6 and 7.9 may "contain similar *procedures*, [S]ection 7.9 covers a *broader range of potential filings* and so will provide [Transmission Owners] with more opportunities to unduly influence, delay or block filings." Rehearing Order P47, JA___.  The same goes for Transmission Owners' cited cases purportedly involving "similar dispute resolution procedures," Br. 30.  The Commission reasonably concluded that Section 7.9 was an "overly broad encroachment" on PJM's Section 205 filing rights that has "more far-reaching effects" than previously approved Section 7.6.  Rehearing Order P45, JA___.

Trying a different approach, Transmission Owners claim that "PJM has only the rights the Transmission Owners have assigned it," so they should be allowed to encumber those rights how they like.  Br. 32. The problem is, Transmission Owners already voluntarily gave up those

Section 205 filing rights to PJM long ago, in the 2003 *Atlantic City Settlement*. 105 FERC ¶ 61,294 at P11. PJM now holds "exclusive and unilateral" Section 205 filing rights to change the Tariff's terms and conditions, § 7.5.1(i), JA___, and is subject to Order 2000's independence requirements. Transmission Owners cannot now attempt to claw back some of those already-ceded rights under the guise of elucidating the "extent of those rights," Br. 32.

**3.** Transmission Owners and PJM also argue that PJM's independence cannot truly be compromised because dispute resolution procedures will delay the filing by only 10 days, after which PJM may still file a complaint under Section 206 if it loses the dispute. Pet.Br. 32-33; PJM.Br. 26-27.

These arguments overlook that the threat to PJM's independence arises primarily from Transmission Owner's "ability to *unilaterally and uniquely* impact" PJM's Section 205 filings. Rehearing Order P49, JA___. Section 7.9 affords Transmission Owners exclusive opportunities to influence or hamper PJM's filings that no other member possesses—contrary to Order 2000's requirement that PJM's decision-making process be independent of control by "any class of

participants." Thus, the precise length of delay reflects "differences in degree, not kind, from threats to RTO independence" that the Commission has previously found unreasonable. *Id.*

Section 7.9's exclusivity, in combination with its overly broad language that could "restrict PJM's ability to submit '*any* filing under Section 205,'" justifies the Commission's determination that this provision violates Order 2000's independence requirements. Rehearing Order PP48-49, JA___-___.

### D. Section 6.3.5 improperly elevates PJM's Owners Agreement obligations over Commission regulations and is impermissibly vague.

Existing Section 6.3.5 obligates PJM to "[m]aintain its status as an RTO." § 6.3.5, JA___. As amended, this provision now requires PJM to maintain that status "consistent with its obligations under [the Owners Agreement]." *Id.* The Commission reasonably rejected this amendment on two grounds.

First, the Commission explained that this amendment did not satisfy Order 2000's requirement that RTOs be independent in "both reality and perception." Initial Order P47, JA___. Requiring PJM's RTO status to be maintained "consistent with" its Ownership

Agreement "obligations" is best read as an attempt to elevate PJM's obligations to the Owners Agreement (i.e., to Transmission Owners) above Commission regulations, by directly linking PJM's RTO status to its Owners Agreement obligations, rather than to Commission regulations.  Rehearing Order P54, JA___.

Second, the Commission found this provision was impermissibly vague.  The language broadly states that PJM must maintain its RTO status consistent with its Owners Agreement "obligations," but does not specify or define *which* obligations those are.  Initial Order P48, JA___. This provision could refer to any obligation "currently in the Owners Agreement" or to obligations "that might be added in the future," which would change the meaning.  *Id.*

Transmission Owners allege that the additional language merely ensures that PJM can continue operating even if it lost RTO status.  Br. 35-37.  But the Commission disagreed with that reading, explaining that the proposed language "is not specific to this particular responsibility under the agreement," nor does it specify under what circumstances it applies.  Rehearing Order P55, JA___.  And it remains

unclear how Section 6.3.5 could be applied, "specifically, when PJM would be in violation of this provision."  Initial Order P48, JA___.

## V. The Commission Reasonably Rejected The Overlap Provisions

### A. Background

Regional transmission projects are PJM-planned projects that are required to meet certain PJM criteria for system-wide reliability, operational, or economic needs.  Rehearing Order P57, JA___.  These projects are planned according to the Planning Protocol and must receive approval from the PJM Board for inclusion in the Regional Transmission Expansion Plan.  *Id.*  Under Order 1000, regional projects are subject to a competitive bidding process to ensure that they are built in a cost-effective manner.  *See supra* pp.49-50.

Local projects are another category of projects.  These projects are planned by Transmission Owners and are not needed for compliance with PJM's criteria.  Rehearing Order P57, JA___.  Transmission Owners instead plan these projects to meet local reliability or economic needs based on their own respective transmission systems.  *Id.*

The rules and procedures governing the local transmission planning process are found in "Attachment M-3" of the Tariff.  *Id.* P58,

JA___.  Under this process, a subregional transmission planning committee is responsible for reviewing local projects.  The committee will hold meetings with PJM stakeholders to review and comment on the criteria, assumptions, and models that Transmission Owners use; project need; and potential solutions.  *Id.*

Subsequently, Transmission Owners must submit their local projects to PJM for inclusion in a local plan, after which stakeholders will have an opportunity to comment on the plan before it is integrated into the Regional Transmission Expansion Plan.  *Id.*  These local projects are not subject to approval by PJM's Board; PJM conducts only a "do not harm" test to ensure that local projects do not negatively affect the grid's reliability.  *Id.*  Local projects are also exempt from the competitive bidding process and are instead developed by Transmission Owners.

## B. The Overlap Provisions are substantive transmission planning rules that belong in the Tariff.

**1.**  The Overlap Provisions, Sections 4.1.4(b)(ii) and 6.3.4(b)(ii), establish procedures for when a regional project overlaps with a local project.  Both provisions are identical in text.  The first sentence states that, when a regional project "would more efficiently or cost effectively

address" the need that a local project is being planned for, then PJM must "consult" the Transmission Owner "to determine if the need" for the local project "will be addressed." § 4.1.4(b)(ii), JA___. Subsequently, if the Transmission Owner "determines that such need will not be addressed and that it must continue to plan" its local project, then the Transmission Owner "shall document" "the rationale supporting its determination" to PJM and the relevant subregional committee. *Id.*

The Commission rejected the Overlap Provisions because they are "substantive transmission planning procedures" that impact the regional transmission planning process and affect all market participants, and therefore, should be maintained in the PJM-wide Tariff instead of an agreement limited to Transmission Owners. Rehearing Order PP67-74, JA___-___.

Specifically, the Overlap Provisions do not predominantly affect only the "rights and responsibilities" of Transmission Owners and PJM. *Id.* P67, JA___. Instead, these provisions address substantive aspects of transmission planning, such as the interaction between regional and local projects, and when and how PJM and the Transmission Owner

must consult regarding whether a regional project could more efficiently or cost-effectively address a local need. *Id.*

Transmission Owners argue that the Overlap Provisions are like other Owners Agreement provisions that concern planning obligations for PJM and Transmission Owners. Br. 39. But "while these other provisions may have *indirect* impacts on market participants, the relevant question is whether market participants are the *predominantly* impacted parties." Rehearing Order P69, JA___. Here, Transmission Owners cite provisions that delegate transmission planning authority or commitments to Transmission Owners and PJM; therefore, these provisions predominantly involve their rights and responsibilities. By contrast, the Overlap Provisions have broader impacts on the regional transmission planning process and stakeholders, such as when a Transmission Owner decides to proceed with its local project, even though the regional project would address the need more efficiently. *Id.*

Moreover, the Overlap Provisions establish similar procedures as the existing overlap procedures in Attachment M-3 of the Tariff. *Id.* P68, JA___. But while Attachment M-3 is limited to overlaps involving local projects addressing an end-of-life need, the Overlap Provisions

would substantively expand the scope of existing overlap procedures to apply to *any* local transmission project.  *Id.*  For that reason, the Overlap Provisions are an "expansion of an existing transmission planning process [established] in Attachment M-3" and, therefore, are reasonably housed together in the Tariff.  *Id.*; *see* Pet.Br. 40 (acknowledging Overlap Provisions "expand" existing Tariff processes).

In fact, as the Commission explained, maintaining the Overlap Provisions in the Owners Agreement, separately from Attachment M-3 of the Tariff, would create confusion.  Rehearing Order P71, JA___.  Given the interplay between these planning procedures, market participants would find it difficult to know which document should apply.  For example, a dispute involving a local project could involve both the new local transmission planning procedures of the Overlap Provisions, as well as existing Attachment M-3 procedural requirements, each of which have their own dispute resolution procedures.  *Id.*

Finally, certain of Transmission Owners' arguments appear to involve the merits of the Overlap Provisions.  *See*, *e.g.*, Br. 40-41.  But, as the Commission explained, it found that the "placement" of these

provisions in the Ownership Agreement "was itself unjust and unreasonable." Rehearing Order P74, JA___. Therefore, the Commission "did not need to reach the potential substantive concerns with the proposed process," and appropriately declined to do so. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions for review.

Respectfully submitted,

David L. Morenoff
Deputy General Counsel

Robert H. Solomon
Solicitor

*/s/ Angela X. Gao*
Angela X. Gao
Attorney

Federal Energy Regulatory
   Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6790
*angela.gao@ferc.gov*

February 3, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32.3, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Schoolbook 14-point font.

*/s/ Angela X. Gao*
Angela X. Gao
Attorney

Federal Energy Regulatory
   Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6790
*angela.gao@ferc.gov*

February 3, 2026

# ADDENDUM

# TABLE OF CONTENTS

**STATUTES:**                                                                      **PAGE**

Administrative Procedure Act:

    5 U.S.C. § 706(2)(A)....................................................................A1

Federal Power Act

    Section 205, 16 U.S.C. § 824d ..................................................A2

    Section 206, 16 U.S.C. § 824e ..................................................A4

    Section 313(b), 16 U.S.C. § 825*l*(b) .........................................A7

Regulation:

    18 C.F.R. § 35.34 ......................................................................A9

Other materials:

    Table of Rejected Amendments.............................................A15



vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating



mental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

**(c) Compliance with order of Commission**

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

**Executive Documents**

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

**§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein pro-

vided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, §205, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, §3006, Oct. 23, 2018, 132 Stat. 3868.)



AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

## Editorial Notes

### AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

### Statutory Notes and Related Subsidiaries

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

### (a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

### (b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

### (c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

---
[1] See References in Text note below.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

**Editorial Notes**

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: "The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: Provided, however, That such complaints may be withdrawn and refiled without prejudice."

LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the

costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.]."

STUDY

Pub. L. 100–473, § 5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, § 207, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824g. Ascertainment of cost of property and depreciation

### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, § 208, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824h. References to State boards by Commission

### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, § 209, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824i. Interconnection authority

### (a) Powers of Commission; application by State regulatory authority

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

(A) the physical connection of any cogeneration facility, any small power production fa-



not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, §311, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859.)

## § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

#### Editorial Notes

##### Codification

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

#### Statutory Notes and Related Subsidiaries

##### Change of Name

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

#### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

#### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be

modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

### (b) Writs of mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

### (c) Employment of attorneys

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

### (d) Prohibitions on violators

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of



(2) Activity of the Fund during the period, including amounts received from the utility, a summary amount for purchases of fund investments and a summary amount for sales of fund investments, gains and losses from investment activity, disbursements from the Fund for decommissioning activity and payment of Fund expenses, including taxes; and

(3) Fund assets and liabilities at the end of the period. The report should not include the liability for decommissioning.

(4) Public utilities owning nuclear plants must maintain records of individual purchase and sales transactions until after decommissioning has been completed and any excess jurisdictional amounts have been returned to ratepayers in a manner that the Commission determines. The public utility need not include these records in the financial report that it furnishes to the Commission by March 31 of each year.

(e) The utility must also mail a copy of the financial report provided to the Commission pursuant to paragraph (d) of this section to anyone who requests it.

(f) If an independent public accountant has expressed an opinion on the report or on any portion of the report, then that opinion must accompany the report.

[Order 580–A, 62 FR 33348, June 19, 1997, as amended at 69 FR 18803, Apr. 9, 2004; Order 658, 70 FR 34343, June 14, 2005; Order 737, 75 FR 43404, July 26, 2010]

## Subpart F—Procedures and Requirements Regarding Regional Transmission Organizations

### § 35.34  Regional Transmission Organizations.

(a) *Purpose.* This section establishes required characteristics and functions for Regional Transmission Organizations for the purpose of promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the provision of electric transmission services. This section further directs each public utility that owns, operates, or controls facilities used for the transmission of electric energy in interstate commerce to make certain filings with respect to forming and participating in a Regional Transmission Organization.

(b) *Definitions.* (1) *Regional Transmission Organization* means an entity that satisfies the minimum characteristics set forth in paragraph (j) of this section, performs the functions set forth in paragraph (k) of this section, and accommodates the open architecture condition set forth in paragraph (l) of this section.

(2) *Market participant* means:

(i) Any entity that, either directly or through an affiliate, sells or brokers electric energy, or provides ancillary services to the Regional Transmission Organization, unless the Commission finds that the entity does not have economic or commercial interests that would be significantly affected by the Regional Transmission Organization's actions or decisions; and

(ii) Any other entity that the Commission finds has economic or commercial interests that would be significantly affected by the Regional Transmission Organization's actions or decisions.

(3) *Affiliate* means the definition given in section 2(a)(11) of the Public Utility Holding Company Act (15 U.S.C. 79b(a)(11)).

(4) *Class of market participants* means two or more market participants with common economic or commercial interests.

(c) *General rule.* Except for those public utilities subject to the requirements of paragraph (h) of this section, every public utility that owns, operates or controls facilities used for the transmission of electric energy in interstate commerce as of March 6, 2000 must file with the Commission, no later than October 15, 2000, one of the following:

(1) A proposal to participate in a Regional Transmission Organization consisting of one of the types of submittals set forth in paragraph (d) of this section; or

(2) An alternative filing consistent with paragraph (g) of this section.

(d) *Proposal to participate in a Regional Transmission Organization.* For purposes

of this section, a proposal to participate in a Regional Transmission Organization means:

(1) Such filings, made individually or jointly with other entities, pursuant to sections 203, 205 and 206 of the Federal Power Act (16 U.S.C. 824b, 824d, and 824e), as are necessary to create a new Regional Transmission Organization;

(2) Such filings, made individually or jointly with other entities, pursuant to sections 203, 205 and 206 of the Federal Power Act (16 U.S.C. 824b, 824d, and 824e), as are necessary to join a Regional Transmission Organization approved by the Commission on or before the date of the filing; or

(3) A petition for declaratory order, filed individually or jointly with other entities, asking whether a proposed transmission entity would qualify as a Regional Transmission Organization and containing at least the following:

(i) A detailed description of the proposed transmission entity, including a description of the organizational and operational structure and the intended participants;

(ii) A discussion of how the transmission entity would satisfy each of the characteristics and functions of a Regional Transmission Organization specified in paragraphs (j), (k) and (l) of this section;

(iii) A detailed description of the Federal Power Act section 205 rates that will be filed for the Regional Transmission Organization; and

(iv) A commitment to make filings pursuant to sections 203, 205 and 206 of the Federal Power Act (16 U.S.C. 824b, 824d, and 824e), as necessary, promptly after the Commission issues an order in response to the petition.

(4) Any proposal filed under this paragraph (d) must include an explanation of efforts made to include public power entities and electric power cooperatives in the proposed Regional Transmission Organization.

(e) [Reserved]

(f) *Transfer of operational control.* Any public utility's proposal to participate in a Regional Transmission Organization filed pursuant to paragraph (c)(1) of this section must propose that operational control of that public utility's transmission facilities will be transferred to the Regional Transmission Organization on a schedule that will allow the Regional Transmission Organization to commence operating the facilities no later than December 15, 2001.

NOTE TO PARAGRAPH (f): The requirement in paragraph (f) of this section may be satisfied by proposing to transfer to the Regional Transmission Organization ownership of the facilities in addition to operational control.

(g) *Alternative filing.* Any filing made pursuant to paragraph (c)(2) of this section must contain:

(1) A description of any efforts made by that public utility to participate in a Regional Transmission Organization;

(2) A detailed explanation of the economic, operational, commercial, regulatory, or other reasons the public utility has not made a filing to participate in a Regional Transmission Organization, including identification of any existing obstacles to participation in a Regional Transmission Organization; and

(3) The specific plans, if any, the public utility has for further work toward participation in a Regional Transmission Organization, a proposed timetable for such activity, an explanation of efforts made to include public power entities in the proposed Regional Transmission Organization, and any factors (including any law, rule or regulation) that may affect the public utility's ability or decision to participate in a Regional Transmission Organization.

(h) *Public utilities participating in approved transmission entities.* Every public utility that owns, operates or controls facilities used for the transmission of electric energy in interstate commerce as of March 6, 2000, and that has filed with the Commission on or before March 6, 2000 to transfer operational control of its facilities to a transmission entity that has been approved or conditionally approved by the Commission on or before March 6, 2000 as being in conformance with the eleven ISO principles set forth in Order No. 888, FERC Statutes and Regulations, Regulations Preamble January 1991–June 1996 ¶31,036 (Final Rule on Open Access and Stranded Costs; see 61 FR 21540, May 10, 1996), must, individually or jointly with other entities, file with the Commission, no later than January 15, 2001:

(1) A statement that it is participating in a transmission entity that has been so approved;

(2) A detailed explanation of the extent to which the transmission entity in which it participates has the characteristics and performs the functions of a Regional Transmission Organization specified in paragraphs (j) and (k) of this section and accommodates the open architecture conditions in paragraph (l) of this section; and

(3) To the extent the transmission entity in which the public utility participates does not meet all the requirements of a Regional Transmission Organization specified in paragraphs (j), (k), and (l) of this section,

(i) A proposal to participate in a Regional Transmission Organization that meets such requirements in accordance with paragraph (d) of this section,

(ii) A proposal to modify the existing transmission entity so that it conforms to the requirements of a Regional Transmission Organization, or

(iii) A filing containing the information specified in paragraph (g) of this section addressing any efforts, obstacles, and plans with respect to conformance with those requirements.

(i) *Entities that become public utilities with transmission facilities.* An entity that is not a public utility that owns, operates or controls facilities used for the transmission of electric energy in interstate commerce as of March 6, 2000, but later becomes such a public utility, must file a proposal to participate in a Regional Transmission Organization in accordance with paragraph (d) of this section, or an alternative filing in accordance with paragraph (g) of this section, by October 15, 2000 or 60 days prior to the date on which the public utility engages in any transmission of electric energy in interstate commerce, whichever comes later. If a proposal to participate in accordance with paragraph (d) of this section is filed, it must propose that operational control of the applicant's transmission system will be transferred to the Regional Transmission Organization within six months of filing the proposal.

(j) *Required characteristics for a Regional Transmission Organization.* A Regional Transmission Organization must

satisfy the following characteristics when it commences operation:

(1) *Independence.* The Regional Transmission Organization must be independent of any market participant. The Regional Transmission Organization must include, as part of its demonstration of independence, a demonstration that it meets the following:

(i) The Regional Transmission Organization, its employees, and any non-stakeholder directors must not have financial interests in any market participant.

(ii) The Regional Transmission Organization must have a decision making process that is independent of control by any market participant or class of participants.

(iii) The Regional Transmission Organization must have exclusive and independent authority under section 205 of the Federal Power Act (16 U.S.C. 824d), to propose rates, terms and conditions of transmission service provided over the facilities it operates.

NOTE TO PARAGRAPH (j)(1)(iii): Transmission owners retain authority under section 205 of the Federal Power Act (16 U.S.C. 824d) to seek recovery from the Regional Transmission Organization of the revenue requirements associated with the transmission facilities that they own.

(iv)(A) The Regional Transmission Organization must provide:

(*1*) With respect to any Regional Transmission Organization in which market participants have an ownership interest, a compliance audit of the independence of the Regional Transmission Organization's decision making process under paragraph (j)(1)(ii) of this section, to be performed two years after approval of the Regional Transmission Organization, and every three years thereafter, unless otherwise provided by the Commission.

(*2*) With respect to any Regional Transmission Organization in which market participants have a role in the Regional Transmission Organization's decision making process but do not have an ownership interest, a compliance audit of the independence of the Regional Transmission Organization's decision making process under paragraph (j)(1)(ii) of this section, to be performed two years after its approval as a Regional Transmission Organization.

A11

(B) The compliance audits under paragraph (j)(1)(iv)(A) of this section must be performed by auditors who are not affiliated with the Regional Transmission Organization or transmission facility owners that are members of the Regional Transmission Organization.

(2) *Scope and regional configuration.* The Regional Transmission Organization must serve an appropriate region. The region must be of sufficient scope and configuration to permit the Regional Transmission Organization to maintain reliability, effectively perform its required functions, and support efficient and non-discriminatory power markets.

(3) *Operational authority.* The Regional Transmission Organization must have operational authority for all transmission facilities under its control. The Regional Transmission Organization must include, as part of its demonstration of operational authority, a demonstration that it meets the following:

(i) If any operational functions are delegated to, or shared with, entities other than the Regional Transmission Organization, the Regional Transmission Organization must ensure that this sharing of operational authority will not adversely affect reliability or provide any market participant with an unfair competitive advantage. Within two years after initial operation as a Regional Transmission Organization, the Regional Transmission Organization must prepare a public report that assesses whether any division of operational authority hinders the Regional Transmission Organization in providing reliable, non-discriminatory and efficiently priced transmission service.

(ii) The Regional Transmission Organization must be the security coordinator for the facilities that it controls.

(4) *Short-term reliability.* The Regional Transmission Organization must have exclusive authority for maintaining the short-term reliability of the grid that it operates. The Regional Transmission Organization must include, as part of its demonstration with respect to reliability, a demonstration that it meets the following:

(i) The Regional Transmission Organization must have exclusive authority for receiving, confirming and implementing all interchange schedules.

(ii) The Regional Transmission Organization must have the right to order redispatch of any generator connected to transmission facilities it operates if necessary for the reliable operation of these facilities.

(iii) When the Regional Transmission Organization operates transmission facilities owned by other entities, the Regional Transmission Organization must have authority to approve or disapprove all requests for scheduled outages of transmission facilities to ensure that the outages can be accommodated within established reliability standards.

(iv) If the Regional Transmission Organization operates under reliability standards established by another entity (*e.g.*, a regional reliability council), the Regional Transmission Organization must report to the Commission if these standards hinder it from providing reliable, non-discriminatory and efficiently priced transmission service.

(k) *Required functions of a Regional Transmission Organization.* The Regional Transmission Organization must perform the following functions. Unless otherwise noted, the Regional Transmission Organization must satisfy these obligations when it commences operations.

(1) *Tariff administration and design.* The Regional Transmission Organization must administer its own transmission tariff and employ a transmission pricing system that will promote efficient use and expansion of transmission and generation facilities. As part of its demonstration with respect to tariff administration and design, the Regional Transmission Organization must satisfy the standards listed in paragraphs (k)(1)(i) and (ii) of this section, or demonstrate that an alternative proposal is consistent with or superior to satisfying such standards.

(i) The Regional Transmission Organization must be the only provider of transmission service over the facilities under its control, and must be the sole administrator of its own Commission-approved open access transmission tariff. The Regional Transmission Organization must have the sole authority to receive, evaluate, and approve or deny

345

all requests for transmission service. The Regional Transmission Organization must have the authority to review and approve requests for new interconnections.

(ii) Customers under the Regional Transmission Organization tariff must not be charged multiple access fees for the recovery of capital costs for transmission service over facilities that the Regional Transmission Organization controls.

(2) *Congestion management.* The Regional Transmission Organization must ensure the development and operation of market mechanisms to manage transmission congestion. As part of its demonstration with respect to congestion management, the Regional Transmission Organization must satisfy the standards listed in paragraph (k)(2)(i) of this section, or demonstrate that an alternative proposal is consistent with or superior to satisfying such standards.

(i) The market mechanisms must accommodate broad participation by all market participants, and must provide all transmission customers with efficient price signals that show the consequences of their transmission usage decisions. The Regional Transmission Organization must either operate such markets itself or ensure that the task is performed by another entity that is not affiliated with any market participant.

(ii) The Regional Transmission Organization must satisfy the market mechanism requirement no later than one year after it commences initial operation. However, it must have in place at the time of initial operation an effective protocol for managing congestion.

(3) *Parallel path flow.* The Regional Transmission Organization must develop and implement procedures to address parallel path flow issues within its region and with other regions. The Regional Transmission Organization must satisfy this requirement with respect to coordination with other regions no later than three years after it commences initial operation.

(4) *Ancillary services.* The Regional Transmission Organization must serve as a provider of last resort of all ancillary services required by Order No. 888,

FERC Statutes and Regulations, Regulations Preamble January 1991–June 1996 ¶ 31,036 (Final Rule on Open Access and Stranded Costs; see 61 FR 21540, May 10, 1996), and subsequent orders. As part of its demonstration with respect to ancillary services, the Regional Transmission Organization must satisfy the standards listed in paragraphs (k)(4)(i) through (iii) of this section, or demonstrate that an alternative proposal is consistent with or superior to satisfying such standards.

(i) All market participants must have the option of self-supplying or acquiring ancillary services from third parties subject to any restrictions imposed by the Commission in Order No. 888, FERC Statutes and Regulations, Regulations Preamble January 1991–June 1996 ¶ 31,036 (Final Rule on Open Access and Stranded Costs), and subsequent orders.

(ii) The Regional Transmission Organization must have the authority to decide the minimum required amounts of each ancillary service and, if necessary, the locations at which these services must be provided. All ancillary service providers must be subject to direct or indirect operational control by the Regional Transmission Organization. The Regional Transmission Organization must promote the development of competitive markets for ancillary services whenever feasible.

(iii) The Regional Transmission Organization must ensure that its transmission customers have access to a real-time balancing market. The Regional Transmission Organization must either develop and operate this market itself or ensure that this task is performed by another entity that is not affiliated with any market participant.

(5) *OASIS and Total Transmission Capability (TTC) and Available Transmission Capability (ATC).* The Regional Transmission Organization must be the single OASIS site administrator for all transmission facilities under its control and independently calculate TTC and ATC.

(6) *Market monitoring.* To ensure that the Regional Transmission Organization provides reliable, efficient and not unduly discriminatory transmission service, the Regional Transmission Organization must provide for objective

monitoring of markets it operates or administers to identify market design flaws, market power abuses and opportunities for efficiency improvements, and propose appropriate actions. As part of its demonstration with respect to market monitoring, the Regional Transmission Organization must satisfy the standards listed in paragraphs (k)(6)(i) through (k)(6)(iii) of this section, or demonstrate that an alternative proposal is consistent with or superior to satisfying such standards.

(i) Market monitoring must include monitoring the behavior of market participants in the region, including transmission owners other than the Regional Transmission Organization, if any, to determine if their actions hinder the Regional Transmission Organization in providing reliable, efficient and not unduly discriminatory transmission service.

(ii) With respect to markets the Regional Transmission Organization operates or administers, there must be a periodic assessment of how behavior in markets operated by others (*e.g.*, bilateral power sales markets and power markets operated by unaffiliated power exchanges) affects Regional Transmission Organization operations and how Regional Transmission Organization operations affect the efficiency of power markets operated by others.

(iii) Reports on opportunities for efficiency improvement, market power abuses and market design flaws must be filed with the Commission and affected regulatory authorities.

(7) *Planning and expansion.* The Regional Transmission Organization must be responsible for planning, and for directing or arranging, necessary transmission expansions, additions, and upgrades that will enable it to provide efficient, reliable and non-discriminatory transmission service and coordinate such efforts with the appropriate state authorities. As part of its demonstration with respect to planning and expansion, the Regional Transmission Organization must satisfy the standards listed in paragraphs (k)(7)(i) and (ii) of this section, or demonstrate that an alternative proposal is consistent with or superior to satisfying such standards.

(i) The Regional Transmission Organization planning and expansion process must encourage market-driven operating and investment actions for preventing and relieving congestion.

(ii) The Regional Transmission Organization's planning and expansion process must accommodate efforts by state regulatory commissions to create multi-state agreements to review and approve new transmission facilities. The Regional Transmission Organization's planning and expansion process must be coordinated with programs of existing Regional Transmission Groups (See §2.21 of this chapter) where appropriate.

(iii) If the Regional Transmission Organization is unable to satisfy this requirement when it commences operation, it must file with the Commission a plan with specified milestones that will ensure that it meets this requirement no later than three years after initial operation.

(8) *Interregional coordination.* The Regional Transmission Organization must ensure the integration of reliability practices within an interconnection and market interface practices among regions.

(l) *Open architecture.* (1) Any proposal to participate in a Regional Transmission Organization must not contain any provision that would limit the capability of the Regional Transmission Organization to evolve in ways that would improve its efficiency, consistent with the requirements in paragraphs (j) and (k) of this section.

(2) Nothing in this regulation precludes an approved Regional Transmission Organization from seeking to evolve with respect to its organizational design, market design, geographic scope, ownership arrangements, or methods of operational control, or in other appropriate ways if the change is consistent with the requirements of this section. Any future filing seeking approval of such changes must demonstrate that the proposed changes will meet the requirements of paragraphs (j), (k) and (l) of this section.

[Order 2000–A, 65 FR 12110, Mar. 8, 2000, as amended by Order 679, 71 FR 43338, July 31, 2006]

## Summary of Owners Agreement Amendments

| | RTO Independence Rejections |
|---|---|
| **7.9**: Filings Contravening CTOA & Dispute Resolution | **7.9 Filings Contravening the Agreement.**<br><br>Neither the Parties nor PJM shall make any filing under Section 205 of the Federal Power Act that contravenes Articles 2, 4, 5, 6, 7 or Attachment B of the Agreement or seeks to modify the terms of said Articles, unless PJM consents to such filing by the Parties or the Parties, acting through a vote pursuant to Section 8.5.1, consent to such filing by PJM.  If either PJM or the Parties seek to revise or modify the PJM Tariff, including the Regional Transmission Expansion Planning Protocol, under Federal Power Act Section 205, and PJM or a Party believes that such revisions or modifications contravene any part of Articles 2, 4, 5, 6 or 7 or Attachment B of the Agreement, PJM and such Party or Parties shall follow the dispute resolution procedures set forth in Section 9.19. |
| **4.1.4(a), 6.3.3(ii), 6.3.4(a)**: RTEP Planning Provisions | ~~4.1.4 Planning Information.~~<br><br>**4.1.4 Preparation of the Regional Transmission Expansion Plan.**<br>(a) Each ~~party~~Party shall transfer to PJM, pursuant to this Agreement ~~and in accordance with~~, the ~~Operating Agreement, the~~exclusive responsibility to prepare a Regional Transmission Expansion Plan ~~and to~~to provide for the expansion and enhancement of the Parties' Transmission Facilities in the PJM Region in accordance with and subject to:<br><br>(i)  The Regional Transmission Expansion Planning Protocol that will be set forth exclusively in PJM Tariff, Schedule 19;<br><br>(ii)  PJM Tariff, Attachment M-3; and<br><br>(iii) This Agreement.<br><br>PJM shall . . .<br><br>(ii) Develop and file pursuant to Section 7.5.1 of this Agreement changes to the Regional Transmission Expansion Planning Protocol consistent with (i) the terms of this Agreement; (ii) applicable reliability principles, guidelines, and standards of the Applicable Regional Reliability Council and NERC; (iii) the PJM Manuals; and (iv) Good Utility Practice;<br><br>**6.3.4**<br>(a) Conduct its planning for the expansion and enhancement of ~~transmission facilities~~Transmission Facilities based on a planning horizon of at least ten years, or such longer period as may be otherwise required ~~by the PJM Tariff or Operating Agreement, including~~under the Regional Transmission Expansion Planning Protocol~~.~~, PJM Tariff, Schedule 19 and prepare a Regional Transmission Expansion Plan to provide for the expansion and enhancement of the Parties' Transmission Facilities to address one or more of the following planning criteria:<br><br>(i)  The Regional Transmission Expansion Planning Protocol that will be set forth exclusively in PJM Tariff, Schedule 19;<br><br>(ii)  PJM Tariff, Attachment M-3; and<br><br>(iii)  This Agreement. |

| | |
|---|---|
| **6.3.5**: RTO Status Provision | PJM shall: . . .<br><br>**6.3.5**<br><br>Maintain its status as an RTO, consistent with its obligations under this Agreement. |

| **Overlap Provisions Rejections** |
|---|

| | |
|---|---|
| **4.1.4(b)(ii)**, **6.3.4(b)(ii)**: Overlap Provisions | [§§ 4.1.4(b)(ii) & 6.3.4(b)(ii) are identical in text]<br><br>(ii) Where Transmission Facilities planned by a Party may overlap with Transmission Facilities proposed to be included in the Regional Transmission Expansion Plan such that the Transmission Facilities proposed to be included in the Regional Transmission Expansion Plan would more efficiently or cost effectively address the need for which the Party's Transmission Facilities are planned, PJM shall consult with the Party to determine if the need for which the Party's Transmission Facilities are planned will be addressed. If the Party determines that such need will not be addressed and that it must continue to plan the Party's Transmission Facilities, it shall document to PJM and the relevant PJM transmission planning committee the rationale supporting its determination. |

| **Mobile-Sierra Rejections** |
|---|

| | |
|---|---|
| **9.16.3**: Mobile-Sierra Provision | **9.16.3** **Modification.**<br><br>Articles 2, 4, 5, 6 and 7 and Attachment B of this Agreement (i) contain individualized terms or conditions that were negotiated at arm's length between and among PJM and the Parties acting independently of each other; (ii) do not constitute rates, terms, or conditions that are generally applicable; (iii) constitute a contract between and among PJM and the Parties; (iv) are subject to change solely by written amendment agreed upon by PJM and the Parties, with the Parties acting by vote in accordance with Section 8.5.1 of this Agreement, and filed with and accepted by FERC; and (v) shall not be subject to change through a unilateral filing with FERC by either PJM or the Parties except by a showing that the affected provision seriously harms the public interest. |

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Angela X. Gao*
Angela X. Gao
Attorney

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-6883
angela.gao@ferc.gov