**ORAL ARGUMENT SCHEDULED FOR APRIL 16, 2026**

**No. 25-1064**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

PJM TRANSMISSION OWNERS,

*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

On Petition for Review of Orders of the Federal Energy Regulatory Commission

**TRANSMISSION OWNER PETITIONERS' JOINT REPLY BRIEF**

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
Phone:  (610) 774-4775
Fax:     (610) 774-4102
Email:   SMNadel@pplweb.com


[Additional Counsel On Inside Pages]

John Longstreth
Donald A. Kaplan
Kimberly B. Frank
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
Phone:  (202) 778-9000
Fax:     (202) 778-9100
Email:  john.longstreth@klgates.com
        don.kaplan@klgates.com
        kimberly.frank@klgates.com
        chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
Phone: (202) 429-8186
Email: mkallen@steptoe.com
         wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW, Suite 200
Washington, D.C. 20004
Phone: (202) 824-8011
Email: molly.suda@duke-energy.com

*Counsel for Duke Energy*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20001
Phone: (301) 956-6754
Email: gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
Phone: (703) 682-6337
Email: William.rappolt@AES.COM

*Counsel for The Dayton Power & Light Co.*

David M. Gossett
Michael Kunselman
Richard P. Sparling
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
Phone: (202) 973-4200
Email: davidgossett@dwt.com
         michaelkunselman@dwt.com
         ricksparling@dwt.com

Sara C. Weinberg
Assistant General Counsel – Federal Regulatory
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A
Cayce, South Carolina 29033
(803) 217-5753
Sara.Weinberg@dominionenergy.com

Cheri Yochelson
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
Cheri.M.Yochelson@dominionenergy.com

*Counsel for Virginia Electric & Power Company*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C. 20001-3980
Phone: (202) 383-0100
Fax: (202) 637-3593
Email: danielfrank@eversheds-sutherland.com
Email: allisonsalvia@eversheds-sutherland.com

Morgan E. Parke
Associate General Counsel
Amanda Parker
FERC Attorney
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
aparker@firstenergycorp.com

*Counsel for the FirstEnergy Transmission Companies*

Donald A. Kaplan
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 778-9000
Fax: (202) 778-9100
Email: don.kaplan@klgates.com

*Counsel for Duquesne Light Company*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corp.
1 Riverside Plaza
Columbus, OH 43215
Phone: (614) 716-2941
Email: clbumgartner@aep.com

*Counsel for American Electric Power Service Corporation*

Denise R. Foster Cronin
Sr. Vice President, Federal and RTO
Regulatory Affairs
East Kentucky Power Cooperative, Inc.
4775 Lexington Road, P.O. Box 707
Winchester, KY 40392-0707
Office: (859)745-9615

*Counsel for East Kentucky Power
Cooperative, Inc.*

Uju Okasi
Associate Counsel - Regulatory
PSEG Services Corporation
601 New Jersey Ave., N.W., Suite 310
Washington, D.C. 20001
obianuju.okasi@pseg.com

*Counsel for Public Service Electric and
Gas Company*

Final Brief: March 13, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

GLOSSARY ................................................................................................... vi

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................1

I.   The Transmission Owners Have Standing and Have Not Waived Any Argument. ........................................................................................4

II.  FERC Cannot Dismantle a Negotiated Package One Piece at a Time. ...........7

III. FERC's Rejection of the Amendments on the Basis of the transmission Owners' Undue Influence Ignores the Statute, the Text of the Amendments, and Common Sense. ..................................................................9

    A.   FERC's Real Complaint is With This Court's *Atlantic City* Decision, Not the Amendments. ....................................................................10

    B.   FERC Ignores the Demonstrable Effect of the Amendments to Strengthen PJM's Independence. ......................................................11

    C.   FERC's Objections to Section 7.9 Are Pretextual. ............................12

    D.   The Amendment to Section 6.3.5 is Grounded in PJM's FPA Contractual Obligations and is Consistent with FERC's RTO Regulations. ..................................................................................15

IV.  FERC's Refusal to Apply *Mobile-Sierra* is Arbitrary and Capricious and Contrary to Law. ..............................................................................16

    A.   FERC's "Prescriptions of General Applicability" Exception to *Mobile-Sierra* Is Unsupported in Law or Fact. ..............................17

    B.   There is No Broad "Prescriptions of General Applicability" *Exception* to *Mobile-Sierra*. ....................................................17

    C.   Even If There Were A "Prescriptions of General Applicability" Exception, It Would Not Apply to the Protected Provisions. ..............20

    D.   FERC's Adversarial Arms-Length Bargaining" Exception To *Mobile-Sierra* Is Unsupported in Law or Fact. ..............................22

V.   FERC Offers No Sound Basis For Its Rejection of the Overlap Provisions. 24

    A.   FERC Wrongly Rejected the Overlap Provisions for Causing an Alleged Harm That Has Nothing to Do with Those Provisions. ........24

    B.   The Overlap Provisions Are Not "Substantive Planning Rules." .......25

i

C. FERC Never Explains How Placement in the Owners Agreement Renders the Provisions Unjust and Unreasonable. ..............................27

CONCLUSION .................................................................................................29

**Page(s)**

**Cases**

*Advanced Energy Mgmt. All. v. FERC*,
860 F.3d 656 (D.C. Cir. 2017)......................................................................7

*American Municipal Power, Inc. v. FERC*,
86 F.4th 922 (D.C. Cir. 2023)............................................5, 22, 24, 25

*Atlantic City Elec. Co. v. FERC*,
329 F.3d 856 (D.C. Cir. 2003).....................................................1, 10, 14

*Atlantic City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002)........................................9, 10, 11, 14, 15, 21

*FPC v. Conway Corp.*,
426 U.S. 271 (1976)......................................................................19

*Gulf States Utilities Co. v. FPC*,
411 U.S. 747 (1973)......................................................................19

*Hecate Energy LLC v. FERC*,
126 F.4th 660 (D.C. Cir. 2025)...................................................7, 8

*Idaho Power Co. v. FERC*,
312 F.3d 454 (D.C. Cir. 2002 ......................................................25

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)........................................................1, 17, 19, 20

*Maine Pub. Utilities Comm'n v. FERC*,
625 F.3d 754 (D.C. Cir. 2010)....................................................18

*Maryland Office of People's Counsel v. FERC*,
164 F.4th 920 (D.C. Cir. 2026)...................................................18

*Montana Consumer Counsel v. FERC*,
659 F.3d 910 (9th Cir. 2011) ......................................................9

*Morgan Stanley Capital Group, Inc. v. Pub. Utility Dist. No. 1 of
    Snohomish County, Wash.,
    554 U.S. 527 (2008)..................................................................16, 17, 19

NRG Power Marketing LLC v. FERC,
    862 F.3d 108 (D.C. Cir. 2017).................................................................8

NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n,
    558 U.S. 165 (2010)..................................................................17, 18, 19

Oklahoma Gas & Electric Co. v. FERC,
    827 F.3d 75 (D.C. Cir. 2016)................................................................19

Potomac Elec. Power Co. v. FERC,
    210 F.3d 403 (D.C. Cir. 2000)..............................................................19

Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC,
    272 F.3d 607 (D.C. Cir. 2001).........................................................16, 17

Wabash Valley Power Assoc. v. FERC,
    45 F.4th 115 (D.C. Cir. 2022).....................................17, 18, 19, 20, 21

**Agency Decisions**

*Ala. Power Co.,
    190 FERC ¶ 61,151 (2025)....................................................................21

Midwest Ind. Transmission Sys. Operator, Inc.,
    97 FERC ¶ 61,326 (2001), on reh'g, 103 FERC ¶ 61,169 (2003).......14

Pennsylvania-New Jersey-Maryland Interconnection,
    105 FERC ¶ 61,294 (2003), appeal dismissed sub nom., Old
    Dominion Elec. Coop. v. FERC, 171 F. App'x 862 (D.C. Cir.
    2005) ......................................................................................................2

PJM Interconnection, L.L.C.,
    101 FERC ¶ 61,318 (2002), order on reh'g and compliance filing,
    103 FERC ¶ 61,170 (2003)...................................................................14

PJM Interconnection, L.L.C.,
    114 FERC ¶ 61,283 (2006)......................................................................5

**Statutes**

16 U.S.C. § 824d(a) .......................................................................10, 27

16 U.S.C. § 824d(b) .............................................................................27

\* Authorities chiefly relied on

# GLOSSARY

| | |
|---|---|
| Agreement Amendments or Amendments | The amendments to the Owners Agreement FERC rejected in the Orders under review. |
| Atlantic City Settlement | Settlement Agreement, Docket No. OA97-261-006 *et al.* (filed Oct. 3, 2003), *as modified* Modification of Settlement Agreement, Docket No. OA97-261009 *et al.* (filed Jan. 20, 2004 and corrected Jan. 23, 2004). |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act, 16 U.S.C. §§ 791–828. |
| Initial Order | *Duquesne Light Company*, Order Rejecting Consolidated Transmission Owners Agreement Amendments and Denying Complaint, Docket Nos. ER24-2336-000, ER24-2336-001, ER24-2338-000, ER24-2338-001, and EL24-119-000, 189 FERC ¶ 61,181 (Dec. 6, 2024). |
| Owners Agreement | PJM Consolidated Transmission Owners Agreement |
| PJM | PJM Interconnection, LLC |
| PJM Complaint | *PJM Interconnection, L.L.C.*, FPA Section 206 Filing of *PJM Interconnection, L.L.C.*, FERC Docket No. EL24-119-000 (June 21, 2024). |
| Planning Protocol | The regional transmission planning rules in PJM. |
| Protected Provisions | Articles 2, 4, 5, 6 or 7 and Attachment B of the Owners Agreement |
| Rehearing Order | *Duquesne Light Company, et al.*, Order Addressing Arguments Raised on Rehearing, and Setting Aside Prior Order, in Part, Docket Nos. ER24-2336-002, ER24-2338-002, and EL24-119-001, 192 FERC ¶ 61,051 (July 14, 2025). |
| RTO | Regional Transmission Organization |

Shah Aff.	Amendments to the Consolidated Transmission Owners Agreement, *PJM Interconnection L.L.C.*, FERC Docket No. ER24-2336, Exhibit C, Declaration of Pulin Shah (filed June 21, 2024).

Transmission Owners	PJM Transmission Owners

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case centers on electric utilities' Federal Power Act ("FPA") section 205 "rights to initiate rate design changes with respect to services provided by their own assets." *Atlantic City Elec. Co. v. FERC*, 329 F.3d 856, 859 (D.C. Cir. 2003) ("*Atlantic City II*"). Within FERC's "passive and reactive" role in reviewing such section 205 filings, FERC may reject a public utility's rate changes only if they fall outside the broad zone of reasonableness; FERC may not substitute its own view of what might be more reasonable rates. TO Opening Br. 5-6, 22-24. FERC repeatedly touts the "reasonableness" of its decision, but the question is not whether FERC's preferred approach falls within a zone of reasonableness, but whether the proposed contract amendments, as a whole, fall outside it. *Id*. FERC's approach is inconsistent with the best reading of the FPA, and it may not defend its approach on the ground it is merely a "reasonable" one. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400-04 (2024).

The section 205 filing in this case presented a bilaterally negotiated package of amendments ("Amendments") to the Consolidated Transmission Owners Agreement ("Owners Agreement" or "Agreement"), under which the Transmission Owners have voluntarily, but not irrevocably, transferred to PJM Transmission, L.L.C. ("PJM") certain of their section 205 rights and responsibilities. The Agreement is the foundation of PJM's ability to act as a Regional Transmission

1

Organization ("RTO"); without it, there would be no PJM. In the nearly three decades that the Owners Agreement and its predecessors have been in effect, the planning process to expand the PJM transmission system has become increasingly unworkable, primarily because the ability to change the process has been taken over by third parties to the Agreement, almost none of whom own nor operate the electric transmission assets at issue and who have no section 205 filing rights themselves. This development was never anticipated when the Agreement was entered into and approved by FERC. Transmittal Letter, pp. 9-10, JA133-34; Shah Aff. ¶ 5, JA368; PJM Complaint, pp. 18-19, JA1386-87; Rehearing Request at 13-21, JA2156-64.

The parties that do own and operate these electric transmission assets, the Transmission Owners and PJM, agreed more than twenty years ago that PJM should exercise control over section 205 filings as to the matters transferred to it by the Transmission Owners. *Pennsylvania-New Jersey-Maryland Interconnection*, 105 FERC ¶ 61,294, PP 30-33 (2003) (accepting settlement transferring to PJM the right to file changes to Tariff terms and conditions, while retaining Transmission Owner filing rights as to cost recovery and transmission rate design), *appeal dismissed sub nom., Old Dominion Elec. Coop. v. FERC*, 171 F. App'x 862 (D.C. Cir. 2005) ("*Atlantic City Settlement*"). Because of a decision made early in PJM's history as an independent entity, before the *Atlantic City Settlement*, the rules governing how PJM plans transmission expansion, known as the Planning Protocol, were not

included in PJM's filing rights. Transmittal Letter, pp. 10-11, 17-19, JA134-35, 141-43. To correct this, PJM and the Transmission Owners carefully negotiated the Amendments to the Owners Agreement to provide PJM control over FPA section 205 filings and to add the Planning Protocol as a Tariff term and condition. *Id.* at pp. 8, 19, 42, 44, 50, JA141, 143, 166, 168, 174. The Amendments also clarified related aspects of the Agreement. *Id.* at pp. 19-22, JA141-46. These clarifications are fully consistent with FERC and judicial precedent, and several are based on provisions FERC had already approved. *Id.* at 10, JA134; TO Opening Br. 29-31.

To protect their control over PJM's transmission planning, many of these third parties aligned to oppose the Amendments at FERC, raising objections that mischaracterize the Amendments and ignore their purpose. They continue to press that erroneous position in this Court. *See, e.g.*, AMP Br. 2 (stating incorrectly that the Amendments "would have all but eliminated the role that PJM stakeholders collectively have in proposed changes to the rules").

In rejecting the Amendments, FERC did not adopt many of the arguments these parties advanced, but did conclude and continues to argue that several isolated provisions would compromise PJM's "independence." FERC Br. 25-26, 55-70. PJM itself strongly disagrees. PJM Br. 18-28. FERC's attempts to justify this conclusion in this Court repeats the same errors in its Orders: ignoring the Transmission Owners' statutory filing rights and contractual authority to reach

agreement as to how they are to be voluntarily transferred, failing to accurately state and interpret the Amendments, basing its conclusions on assertions without support in the record, and misapplying precedent.

FERC never made the required assessment of whether the Amendments before it, which enhance PJM's independence by providing it exclusive authority to make section 205 filings to amend its planning rules, was just and reasonable as a whole. Thus, its attacks on specific provisions of the Amendments are improper. They are also erroneous. FERC does not adequately explain how PJM's independence could be compromised by a dispute resolution provision of the type it has approved before, including in the Owners Agreement itself, or by provisions requiring the Transmission Owners and PJM to consult when planned projects serve both local and regional needs. Nor can FERC invent exceptions to the Supreme Court's *Mobile-Sierra* doctrine protecting bilateral agreements.

The Orders should be vacated and the matter remanded with instructions to accept the Amendments.

## I. THE TRANSMISSION OWNERS HAVE STANDING AND HAVE NOT WAIVED ANY ARGUMENT.

Respondent-Intervenors, but not FERC, assert that the Transmission Owners lack standing to challenge FERC's finding that sections 4.1.4(a), 6.3.3(ii), and 6.3.4(a) of the proposed Amendments are unjust and unreasonable for failing to seek rehearing as to those provisions. R-I Br. 11, 15-17. FERC frames a similar argument

4

as one of waiver.  FERC Br. 59–60.  The standing argument is incorrect because it requires a finding on the merits that an argument has been waived, and the waiver argument has no merit.

All three sections mentioned above, which both FERC and Respondent-Intervenors treat collectively, accomplish the primary purpose of the CTOA Amendments to move the Planning Protocol to the PJM Tariff and confirm that PJM will conduct its planning in accordance with the contractually transferred responsibilities set forth in the Owners Agreement.[1]  FERC's failure to approve that transfer was challenged in specifications A and B of the Transmission Owners Rehearing Request:

> A. The December 6 Order exceeds its jurisdiction by relying upon the Commission's regulations governing RTO independence to override the Transmission Owners' statutory rights to voluntary cede or revoke FPA rights and responsibilities to PJM pursuant to a contract, the CTOA.
>
> ***

---

[1] Proposed sections 4.1.4(a) and 6.3.4(a) are materially identical, requiring PJM to prepare its regional plan consistent with a Tariff schedule, Attachment M-3, and the Owners Agreement.  Amended CTOA, §§ 4.1.4(a), 6.3.4(a), JA286, 299.  Proposed section 6.3.3(ii) simply adds planning criteria such as reliability rules, PJM's manuals, and "good utility practice."  Amended CTOA, § 6.3.3(ii), JA298.  Except for the transfer of the Planning Protocol, all of the provisions referred to in these sections relevant to planning were previously approved by FERC.  *See, e.g., Am. Mun. Power*, 86 F.4th 922 at 932-34 (D.C. Cir. 2002); *PJM Interconnection, L.L.C.,* 114 FERC ¶ 61,283 (2006) (approving the Owners' Agreement, which included planning provisions).

B. The December 6 Order wrongfully concludes that by giving PJM "the exclusive and unilateral right" to file changes to the Planning Protocol, a right that PJM does not currently have, and eliminating the Transmission Owners' sector-weighted vote in the Members Committee on PJM-proposed changes to the Planning Protocol, the CTOA Amendments are undermining PJM independence.

Rehearing Request at 9-10 (citations omitted), JA2152-53. Specifications N, O, and P also address FERC's failure to approve the transfer.[2] The Initial Order rejected the transfer on the basis that some sections of the CTOA Amendments "may provide [the Transmission Owners] a unique and exclusive opportunity in reality or in perception to unduly influence how PJM operates." Initial Order P47, JA21. The Transmission Owners addressed this error extensively in the Rehearing Request at 13-21, JA2156-64, specifically referencing the same language cited by FERC, Rehearing Order, P47, JA90-91. FERC Br. 59; Rehearing Request at 13, JA2156, and citing section 4.1.4(a) at 19, JA2162 ("[FERC's decisions on PJM independence] ignores that nothing in the CTOA Amendments alters the exclusive delegation to PJM in proposed section 4.1.4(a) to prepare the Regional Transmission

---

[2] N: "The December 6 Order erroneously relies on a settlement that does not exist to reject the PJM Complaint [to implement the transfer]; O: The December 6 Order incorrectly assumes that the PJM Members Committee has section 205 rights under the FPA. . . . P: The December 6 Order's rejection of PJM's FPA section 206 complaint is inconsistent with the Transmission Owners' right to file to change the CTOA. Rehearing Request at 12-13 (citations omitted), JA2155-56.

Expansion Plan."). *See also* Rehearing Request at 13-21, 51-60, JA2156-64, 2194-2203.

The Transmission Owners did not discuss these sections in detail on rehearing, but only because FERC barely mentioned them in its Initial Order. FERC's general conclusions including these sections were expressly excepted to as noted above. *See* pp. 5–6*, supra*. Far from showing waiver, this shows that FERC failed to provide any reasoned basis in either Order to support any specific finding that these sections were unjust and unreasonable. They are not. *See* pp. 24–28*, infra*.

## II. FERC CANNOT DISMANTLE A NEGOTIATED PACKAGE ONE PIECE AT A TIME.

Rather than be confined to the "passive and reactive role" defined by the FPA, *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662–63 (D.C. Cir. 2017), FERC dismantled a carefully negotiated package, isolated individual provisions, deemed them "unjust and unreasonable" in a vacuum, and on that basis discarded the Amendments in their entirety. FERC cites no authority for its actions.

*Hecate Energy LLC v. FERC*, 126 F.4th 660, 667 (D.C. Cir. 2025) expressly provides that FERC may not "undo the compromise" in a section 205 filing and "eviscerate the terms of the bargain." FERC turns *Hecate* on its head by arguing it allows FERC to "reject[] a proposal that contains unjust and unreasonable provisions, even if other aspects of the proposal may be just and reasonable[,]" and

to reject the whole proposal if FERC believes an individual component is, in isolation, unreasonable. FERC Br. 37.

*Hecate* addressed the standing of an intervenor (Hecate) to bring a "limited protest" to one part of a PJM section 205 filing that presented a comprehensive package of reforms to PJM's interconnection process. *Hecate*, 126 F.4th at 662-64. Hecate challenged the exclusion of its project from an expedited process that was one of the proposed reforms in the package. *Id*. This Court held that Hecate lacked standing because it failed to show its requested relief would spur PJM to include Hecate's project in the expedited process. This Court emphasized FERC's "passive and reactive role" in which it is restricted to "evaluating the confined proposal" and may not consider individual components in isolation. *Id*. at 665-67.

In *Hecate*, as here, PJM's package of reforms was "the subject of extensive negotiation and compromise," and this Court held that FERC "cannot modify PJM's proposal by removing" the single challenged reform or push "modifications that undo the compromise that had been the basis for PJM's proposal and eviscerate the terms of the bargain underlying the original proposal." *Id.* (quoting *NRG Power Marketing LLC v. FERC*, 862 F.3d 108, 114-16 (D.C. Cir. 2017)) (cleaned up). FERC's claim that it can use one or several provisions it deems "unreasonable" to reject the "entire package" turns the *limits* to FERC's authority recognized in *Hecate* into an affirmative *grant* of authority to reject a negotiated package in its entirety if

it finds one provision unreasonable in a vacuum. But *Hecate* holds just the opposite—FERC must consider the reforms as a whole package. Other precedent is in accord. *See Montana Consumer Counsel v. FERC*, 659 F.3d 910, 918 (9th Cir. 2011) ("[I]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry is at an end.") (cleaned up).

FERC's rejection of the Amendments must be overturned because it never considered the justness and reasonableness of the package as a whole. Moreover, FERC's discussion of the individual provisions ignores the Transmission Owners' statutory and contractual rights and is arbitrary and capricious.

## III. FERC'S REJECTION OF THE AMENDMENTS ON THE BASIS OF THE TRANSMISSION OWNERS' UNDUE INFLUENCE IGNORES THE STATUTE, THE TEXT OF THE AMENDMENTS, AND COMMON SENSE.

In deeming the Amendments unjust and unreasonable, FERC ignores that their primary purpose is to increase PJM's independence by freeing PJM to make changes in the Planning Protocol without having to overcome a veto by the Members Committee. FERC instead focuses on interpretations and "perceptions" of the dispute resolution provision proposed in section 7.9, and the requirement to maintain RTO status in section 6.3.5. FERC Br. 55-56, 61-70. FERC's conclusion bears no relationship to the text, purpose, or effect of either provision.

**A.    FERC's Real Complaint is With This Court's *Atlantic City* Decision, Not the Amendments.**

FERC claims it is not infringing the Transmission Owners' filing rights, FERC Br. 56–57, but its decision directly impairs these rights by limiting the Transmission Owners' ability to enforce negotiated terms with PJM allocating these rights.  FERC characterizes the dispute resolution provision of section 7.9 as one sided, precluding PJM from making certain filings "unless the Transmission Owners '*consent*' to the filing."  FERC Br. 61 (emphasis added).  This completely mischaracterizes the provision.  The actual language of the provision equally reinforces the contractual rights of both PJM and the Transmission Owners because it states that "*Neither the Parties nor PJM* shall make" such filings.  Amended CTOA, § 7.9 (emphasis added), JA308.  If the Transmission Owners seek to make such a filing, *it is PJM* that must "consent."  The provision does not limit PJM's independence; it recognizes that both parties to the Agreement have the right to protect their ends of the mutual bargain they made.  "FERC's approach does worse than take a sentence out of context–it takes an element of a sentence out of context." *Atlantic City II*, 329 F.3d at 858.

FERC's complaint seems to be that the Transmission Owners retained any rights to protect themselves by contract at all, even though the FPA recognizes the importance of contracts in the statutory scheme.  16 U.S.C. § 824d(a).  This Court has twice rejected FERC's efforts to divest the Transmission Owners of such rights.

*Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 9-11 (D.C. Cir. 2002), *mandate enforced*, 329 F.3d at 858-59.  If the Transmission Owners cannot enforce PJM's obligations under the Owners Agreement, then they have no rights that FERC cannot take away.  FERC lacks such boundless authority.

**B.      FERC Ignores the Demonstrable Effect of the Amendments to Strengthen PJM's Independence.**

The 2003 *Atlantic City* Settlement left PJM with independent control of filing rights with respect to all of the transmission functions assigned to it by the Owners Agreement except for planning.  Transmittal Letter, pp. 8-10, JA132-34.  PJM had exclusive and unilateral filing rights with respect to the terms and conditions of transmission service, including interconnections, but its independence in carrying out the core function of planning the expansion of the transmission system was still encumbered by the necessity to obtain a two-thirds sector-weighted vote of the Members Committee to change the planning rules.

That encumbrance was a historical artifact—an accommodation by the Transmission Owners to get FERC's approval to move forward with setting up PJM as an independent system operator in 1997.  Transmittal Letter, pp. 17-19, JA141-43; FERC Br. 16–17 (stating that the Transmission Owners revised their initial proposal to accommodate FERC's concern with PJM planning independence).  While initially intended to provide PJM independence, this structural limitation now hampers PJM's independence by limiting its ability to adapt the Planning Protocols

11

to new challenges.  Shah Aff. ¶¶ 10-34, JA370-77; PJM Complaint, 18-28, JA1386-96.  The Members' Committee's unusual powers undermine PJM's independence because interest groups representing a minority of the Members can defeat or delay needed changes, a result not contemplated when the structure was set up.  *Id.*  FERC objects to the Transmission Owners' proposal to potentially delay a PJM filing while seeking to resolve whether it violates their contractual rights, yet today the Members Committee can block *any* filing to modify the Planning Protocol with a little over one-third of the sector-weighted vote, a vote frequently dominated by a few proxy votes.  Shah Aff. ¶¶ 3-4, Attachment A, JA367-68, 379-86.  The proposed Amendments eliminate this encumbrance and enhance PJM's independence.

FERC expressly ignores this impact.  Rehearing Order P39 ("The Commission's finding here is not related to whether or not PJM independence is increased or decreased or remains the same as a result of any move of the RTEP Protocol from the [Operating Agreement] to the PJM Tariff[.]"), JA84.  FERC instead points to several peripheral provisions as undermining PJM's independence, and its conclusions are entirely baseless.

C.    **FERC's Objections to Section 7.9 Are Pretextual.**

Proposed Section 7.9 specifies the enforcement rights and dispute resolution procedures that apply to provisions of the Agreement constituting the bargain between PJM and the Transmission Owners, specifically Articles 2, 4, 5, 6 , 7 and

Attachment B ("Protected Provisions"). FERC's Brief focuses on three aspects of section 7.9: (1) the ability of a single Transmission Owner to invoke dispute resolution; (2) the Transmission Owners' ability to delay a section 205 filing by ten-days to permit the dispute resolution procedures to take place; and (3) the supposed breadth of the provisions subject to section 7.9. FERC Br. 63.

First, since each Transmission Owner has turned over control of very substantial assets to PJM and has individual as well as collective rights under the Owners Agreement, each must logically be able to invoke the protections of the Agreement just as PJM can invoke dispute resolution against a single Transmission Owner. Second, while FERC argues the maximum ten-day delay in filing while a contractual issue is resolved "significantly impacts" PJM's ability to independently make section 205 filings, FERC Br. 62, the current Operating Agreement provisions are more stringent. Under the current Operating Agreement, the Members Committee can entirely prevent PJM from filing, with no provision for dispute resolution, and can table a filing for 30 days at a time with no limit on the number of delays it can impose. Unlike the Members Committee veto, any Transmission Owner "influence" over a filing as a result of invoking this provision would require a neutral party finding PJM violated the Owners Agreement or a compromise of a real dispute, which PJM can also initiate. Finally, FERC complains about the breadth of the dispute resolution clause, FERC Br. 63, but dispute resolution can be

13

invoked only for violations of the Agreement, not for any other PJM organic document.  Nor does FERC explain how another method could provide effective redress to protect the parties' contractual rights.

FERC's claimed reliance on *Midwest Ind. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326 (2001), *on reh'g*, 103 FERC ¶ 61,169 (2003)("*MISO Order No. 2000 Compliance* Order"), to reject section 7.9 is further evidence of its error.  FERC Br. 63.  FERC justified its decision in that case by relying on an earlier decision on remand from *Atlantic City*, the *very order* this Court threw out in *Atlantic City II.* 103 FERC ¶ 61,169, P 29 (citing *PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,318 (2002), *order on reh'g and compliance filing,* 103 FERC ¶ 61,170 (2003)).

FERC objects to the dispute resolution provisions as covering "a wide swath" and a "broad range of terms and conditions," FERC Br. 65 (quoting Rehearing Order P84, JA110), but never analyzes the specific provisions involved, all of which relate to the Transmission Owners' voluntary transfer of filing rights and the contractual relationship between them and PJM.  The provisions are actually narrow and focused on the contractual rights and obligations of the parties in entrusting PJM with more than $88 billion of transmission assets, and FERC never explains how their enforcement would harm PJM independence.

FERC tries to distinguish section 7.9 from the virtually identical dispute resolution provision governing PJM Tariff filing rights in current section 7.6 by

suggesting the latter applies only to a "narrowly defined category of disputes": whether a Tariff filing is "rate-related or terms-and-conditions related." FERC Br. 65. FERC's distinction ignores that the PJM Tariff covers more than 6,000 pages and includes many rates, rules and procedures, covering far more than the Owners Agreement. FERC's claim that the Transmission Owners transferred the right to negotiate changes to the Owners Agreement in the *Atlantic City* Settlement is also wrong; that settlement addressed the right to file tariff terms and conditions and says nothing about amending the Agreement or moving the Planning Protocol to the Tariff.

D. **The Amendment to Section 6.3.5 is Grounded in PJM's FPA Contractual Obligations and is Consistent with FERC's RTO Regulations.**

FERC defends its rejection of proposed section 6.3.5 because it qualifies PJM's obligation to be an RTO with the words, "consistent with its obligations under [the Owners Agreement.]" FERC Br. 68. FERC claims this elevates the Agreement above its regulation on RTO independence, *Order No. 2000*.

FERC's premise that its regulation governing RTOs takes precedence over the Transmission Owners' rights to structure the transference of their filing rights is inconsistent with *Atlantic City*, which noted that such a right cannot be overridden by a FERC Order that "is only a regulation." 295 F.3d at 11. The Owners Agreement addresses the delegation to PJM of certain core duties of the

15

Transmission Owners under state and federal law. This delegation is a voluntary contractual commitment, and section 6.3.5 simply confirms that the contract will be honored.

FERC claims section 6.3.5 is overbroad because it does not specify which obligations under the Owners Agreement are covered. FERC Br. 69. PJM's obligations are necessarily limited to these functions specified elsewhere in the Agreement that would have to be performed by the Transmission Owners if not transferred to PJM under the Agreement. The Agreement specifies that PJM is delegated responsibility to direct the operation of the transmission system, provide transmission service to customers, coordinate outages and plan the system to maintain reliability, as set out in Articles 4 and 6. Article 7 governs section 205 filings and distribution of revenues. Each is a critical function to sustain reliable service to PJM's 67 million customers—an obligation the Transmission Owners voluntarily shared with PJM, and which cannot properly be suspended to maintain a "status" defined in a FERC regulation, which in any event is voluntary. *See Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC*, 272 F.3d 607, 613-16 (D.C. Cir. 2001).

## IV. FERC'S REFUSAL TO APPLY *MOBILE-SIERRA* IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW.

Because the *Mobile-Sierra* doctrine is rooted in the basic contractual principle that bilateral agreements between sophisticated parties are presumed lawful, and thus "just and reasonable," the Supreme Court has repeatedly turned away FERC's

efforts to limit its application.  *See*, *e.g.*, *NRG Power*, 558 U.S. at 172-77; *Morgan Stanley Capital Group, Inc. v. Pub. Utility Dist. No. 1 of Snohomish County, Wash.*, 554 U.S. 527, 545-51 (2008).  FERC's proclamation of broad discretion to reject *Mobile-Sierra* based on factors of its own choosing is inconsistent with the FPA and *Loper Bright*.  Here, FERC improperly declined to apply *Mobile-Sierra* protection to the Protected Provisions because they were "prescriptions of general applicability," and were not negotiated through "adversarial arms' length bargaining."  FERC Br. 42.

### A. FERC's "Prescriptions of General Applicability" Exception to *Mobile-Sierra* Is Unsupported in Law or Fact.

FERC claims *Mobile-Sierra* protection applies only to "contractually negotiated rates," not "prescriptions of general applicability."  FERC Br. 42. FERC rests this assertion on its own prior orders and a single pre-*Loper Bright* decision, *Wabash Valley Power Assoc. v. FERC*, 45 F.4th 115 (D.C. Cir. 2022).  FERC also erroneously argues that that the Protected Provisions, which are carefully negotiated provisions specific to the Agreement are "generally applicable."  Both assertions are incorrect.

### B. There is No Broad "Prescriptions of General Applicability" *Exception* to *Mobile-Sierra*.

FERC rests its broad, *per se* "prescriptions of general applicability" exception to *Mobile-Sierra* on flawed dicta in *Wabash* that "[t]he Mobile-Sierra doctrine

applies to 'contractually negotiated rates,' not 'prescriptions of general applicability.'" *Wabash*, 45 F.4th at 120 (quoting *NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 558 U.S. 165, 176 (2010)).[3] This quoted language from *NRG Power* was not part of the Supreme Court's holding or even its reasoning. To the contrary, it ***quotes the objectors to the settlement*** at issue who ***unsuccessfully*** sought a distinction between "prescriptions of general applicability" and "contractually negotiated rates. *NRG Power*, 558 U.S. at 176. The Supreme Court did not accept those objectors' view. Instead, it remanded the case for determination whether the rates qualified as "contract rates" at all. *Id.* at 175-76. On remand, FERC argued it had discretion to apply *Mobile-Sierra* whether or not they were contract rates, but this Court held it could not decide that issue because FERC had not "articulated in its orders a rationale for [such] discretion." *Maine Pub. Utilities Comm'n v. FERC*, 625 F.3d 754, 759 (D.C. Cir. 2010). Neither the Supreme Court nor this Court adopted an exception for "prescriptions of general applicability." FERC's argument rests on a game of telephone beginning with *NRG Power*'s description of a party's position and not the Supreme Court's analysis.

---

[3] FERC cites several of its own decisions that have no precedential value. *See Maryland Office of People's Counsel v. FERC*, 164 F.4th 920, 926 (D.C. Cir. 2026) (giving "no deference to an agency's interpretation of judicial precedent").

*Wabash*'s holding was also restricted to the specific facts of that case, which unlike the carefully negotiated provisions here, it likened to a form contract. Even then, *Wabash* expressly declined to apply a "*per se* rule that the presumption can never apply to form contracts[.]" 45 F.4th at 121. *Wabash*'s rejection of FERC's attempt to create exceptions to *Mobile-Sierra* aligns with repeated rejections of FERC's attempts to roll back *Mobile-Sierra* protection to amass additional authority to amend contracts. *See, e.g.*, *Morgan Stanley*, 554 U.S. at 547 (*Mobile-Sierra* applies in times of alleged of market dysfunction); *NRG Power*, 558 U.S. at 175 (*Mobile-Sierra* applicable to non-participants); *Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 404–05, 409–10 (D.C. Cir. 2000) (*Mobile-Sierra* applicable to purchasers). FERC's role is not to interfere with the "stabilizing force of contracts that the FPA embraced as an alternative to purely tariff-based regulation." *Morgan Stanley*, 554 U.S. at 548 (cleaned up).

Courts have applied a *per se* rule against *Mobile-Sierra* application only where a contract is unlawful due to fraud, duress, unlawful market activity, or anticompetitive behavior. *Morgan Stanley*, 554 U.S. at 547, 554; *Oklahoma Gas & Electric Co. v. FERC*, 827 F.3d 75, 80 (D.C. Cir. 2016). This narrow exception, unlike FERC's sweeping one in this case, is directly rooted in Supreme Court precedent. *Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 758-60 (1973)*; FPC v. Conway Corp.*, 426 U.S. 271, 279 (1976).

The Supreme Court has not condoned efforts to erode *Mobile-Sierra*, and FERC lacks authority to devise new exceptions to it. FERC is also incorrect that *Wabash* is persuasive notwithstanding *Loper Bright*. *Wabash*'s demand for deference to FERC's "reasonable interpretation of ambiguous contracts within its jurisdiction" amounts to an application of the *Chevron* doctrine the Supreme Court rejected in *Loper Bright*.

### C. Even If There Were A "Prescriptions of General Applicability" Exception, It Would Not Apply to the Protected Provisions.

Even if a "prescriptions of general applicability" exception existed in some form, it would not apply as the Protected Provisions are "contractually negotiated rates.". FERC's argument that they are not because the Agreement presents individual utilities with a "binary, take-it-or-leave-it choice" by requiring a vote of members to amend it is incorrect for at least four reasons.

***First***, *Wabash* expressly declined to apply a *per se* rule against application of the presumption even as to form contracts that cannot be amended. 45 F.4th at 121. Even if it had, in *Wabash*, the utility could **unilaterally** impose or change a rate at its sole discretion. *Id.* at 120. The uniform, *pro forma* rate terms were contained in "virtually identical" contracts, functioning "more akin to a generally applicable going rate" than any negotiated contract term. *Id.* The Protected Provisions, by contrast, are bilaterally negotiated, not unilaterally imposed, and the parties retain authority to change the Agreement, as they have proposed in the Amendments, but

20

only when the Transmission Owners and PJM agree.  In *Wabash*, conversely, one party was at liberty to change its "virtually identical" contracts at will, functionally "imposing a unilateral tariff rate."  *Id*. at 120-21.  *Wabash* in no way supports a standard that allows FERC to treat every multi-party agreement as a pseudo-tariff based solely on the practical challenges inherent in reaching consensus among several parties to amend any agreement.

*Second*, FERC's position is inconsistent with its own precedent. FERC explicitly conceded *Mobile-Sierra* could apply to agreements with multiple participants on one side, Rehearing Order P87, JA113, and has approved *Mobile-Sierra* protection in a multi-party agreement where, exactly as here, "[a]ny prospective new Member seeking to join [] will be required to accept the [] Agreement, with limited, if any, opportunity to negotiate differing terms from those presented here."  *Ala. Power Co.*, 190 FERC ¶ 61,151, P 122 (2025).

*Third*, the only reason there is a single Owners Agreement is that FERC insisted on it.  TO Opening Br. 61.  FERC does not explain how it can rationally circumvent *Mobile-Sierra* based on a circumstance of its own design.

*Finally*, PJM members are not trapped but have an express right to leave PJM that this Court protected in *Atlantic City,* 295 F.3d at 11-13. *See* Agreement, § 3.2. This right protects members from ill-treatment and makes their continued accession to PJM a matter of contractual negotiation.  Their continued participation in PJM is

21

not the product of coercion, structural subordination, or tariff-like imposition.  It is the product of ongoing, voluntary contractual commitment.

**D.     FERC's Adversarial Arms-Length Bargaining" Exception To *Mobile-Sierra* Is Unsupported in Law or Fact.**

FERC asserts it "reasonably determined that at least certain of the Protected Provisions did not arise from adversarial arm's-length negotiations that would ensure just and reasonable terms[,]" comparing them to rights of first refusal it has rejected as anticompetitive.  FERC Br. 48–55.  It cites as evidence (1) the Overlap Provisions confirming that Transmission Owners can choose to build local projects that overlap with PJM projects after consultation with PJM; and (2) the Members' Committee's loss of authority, which "reflects a common interest in excluding other PJM members from participating in or influencing aspects of PJM's operations."  *Id*.  FERC misreads the provisions and their intent.

The Overlap Provisions provide the Transmission Owners no new or additional authority to build facilities, and they *enhance* PJM's independence and efficiency by improving coordination to mitigate conflicts over transmission planning.  *See* pp. 24–28 *infra*.  FERC's argument that the Overlap Provisions are anticompetitive because they allow a Transmission Owner to proceed with an overlapping local project after consultation, FERC Br. 52–53, ignores that this Court has already confirmed a Transmission Owner's right to do so in *American Municipal Power, Inc. v. FERC*, 86 F.4th 922 (D.C. Cir. 2023).  The only addition here is that

22

the Transmission Owners must consult with PJM before doing so. Amended CTOA, § 4.1.4(b)(ii), 6.3.4(b)(ii), JA287, 299. FERC's contention that this will prevent regional projects from proceeding is entirely speculative and not based on the Amendments. PJM must still proceed to address regional needs in any event. Operating Agreement, Sch. 6, § 1.4(a), JA2449.

Sections 6.3.5 and 7.9 are standard alternative dispute resolution provisions and contractual protection that raise no genuine competitive concerns. *See* pp. 12–16 *supra*. For example, FERC incorrectly states that section 7.9 grants Transmission Owners the "exclusive ability" to invoke the dispute-resolution procedure. But section 7.9 applies even-handedly to PJM as the other party to the Agreement and also allows PJM to invoke dispute resolution.

***Second***, framing this issue as about "competition" is a misnomer. The Transmission Owners are not "horizontal competitors" conspiring to exclude new entrants from the market[4]—they are simply trying to get PJM's planning process to function more smoothly and independently. It is not anticompetitive for the parties who transferred operational control of their transmission assets to PJM to adjust the

---

[4] In any case, FERC never explains what market competition is affected. PJM is the sole regional transmission planner and the other PJM sectors are defined to comprise energy suppliers, consumers advocates and end users, not transmission owners. Operating Agreement, §§ 7.7(iv); 8.1.1; 8.2.3, JA2405, 2408, 2410.

terms of that relationship, simply because others who have not made any comparable commitments would like a seat at that table.

The FPA confines FERC to determining whether rates and terms are just and reasonable. FERC's speculation about how the Protected Provisions could theoretically not be just and reasonable places FERC in an "active and proactive" agency role, not the "passive and reactive role" assigned under the FPA. FERC will have its opportunity to review and determine whether PJM's proposed changes to the Planning Protocol are just and reasonable when such proposed changes are filed.

## V. FERC OFFERS NO SOUND BASIS FOR ITS REJECTION OF THE OVERLAP PROVISIONS.

### A. FERC Wrongly Rejected the Overlap Provisions for Causing an Alleged Harm That Has Nothing to Do with Those Provisions.

FERC's analysis of the Overlap Provisions rests on the incorrect assumption that PJM would otherwise be able to prevent a Transmission Owner from pursuing a local project in favor of a preferred regional alternative, ignoring that the Transmission Owners have always retained the right to plan and construct local transmission facilities. *Am. Mun. Power*, 86 F.4th at 932-34. FERC acknowledged in its Initial Order that the right to plan local transmission projects "is already clearly established in other provisions" of the Owners Agreement, Initial Order P56, JA26, but complains now that the Overlap Provisions would allow a Transmission Owner to proceed with a local project even where PJM identified a potentially more efficient

regional alternative.  FERC Br. 52-53, 73.  That outcome exists *with or without* the Overlap Provisions and cannot be a basis to reject them.  Because the authority to proceed with local projects arises from the FPA and the pre-existing allocation of authority under the Agreement that the Overlap Provisions leave entirely untouched, it is not rational decision-making to treat the continued exercise of undisputed local planning authority as a defect of the Overlap Provisions.  *See Idaho Power Co. v. FERC*, 312 F.3d 454, 456, 461-62 (D.C. Cir. 2002) (rejecting FERC's "nonsensical" interpretation of tariff language as arbitrary and capricious).  FERC's failure to deal with *Am. Mun. Power* and to confront the legal implications of its own reasoning independently renders the rejection of the Overlap Provisions arbitrary and capricious.

The Overlap Provisions simply reflect the Transmission Owners' agreement to consult with PJM—rather than act unilaterally—when regional and local planning responsibilities intersect, and to explain their reasoning if they determine a local project remains necessary.  The ultimate decision remains exactly where it always has been—with the Transmission Owners for local projects and with PJM for regional projects.

### B.    The Overlap Provisions Are Not "Substantive Planning Rules."

FERC repeatedly asserts that the Overlap Provisions are "substantive transmission planning rules" that belong in the Tariff.  FERC Br. 27, 30, 71,72.  But

25

FERC never explains what substantive obligations these provisions impose on anyone other than PJM and the incumbent Transmission Owners. By their terms, the Overlap Provisions simply require PJM and the Transmission Owners to consult when a regional project could address a local need and properly leaves the ultimate local planning determination with the Transmission Owner. Amended CTOA, §§ 4.1.4(b)(ii), 6.3.4(b)(ii), JA287, 299. The provisions neither bar PJM from advancing a regional project nor confer any approval, veto, or blocking right on Transmission Owners. Accordingly, the Overlap Provisions do not alter planning criteria, restructure PJM's planning process, or constrain PJM's regional planning authority. FERC's contrary assertion that the Overlap Provisions "markedly expand the scope of existing Tariff procedures" and "could have significant impacts on PJM's regional transmission planning process and other PJM members," FERC Br. 30, is speculation unsupported by record evidence and does not reflect reasoned decision-making.

The Overlap Provisions are also materially indistinguishable from numerous coordination and information sharing obligations already embedded in Articles 4 and 6 of the Owners Agreement that FERC has approved without suggesting that they were "substantive planning rules" that must appear in the Tariff. TO Opening Brief 39-41. These include provisions directing PJM to prepare the Regional Transmission Expansion Plan and requiring Transmission Owners to supply

26

information, acknowledge assignments, and coordinate construction schedules. *Id*. FERC attempts to distinguish these other provisions by claiming they have indirect impacts on market participants while "[t]he Overlap Provisions have broader impacts on regional transmission planning process and stakeholders." FERC Br. 73. FERC never identifies those purportedly "broader" impacts other than the continued exercise of local planning authority that Transmission Owners always had.

**C.** **FERC Never Explains How Placement in the Owners Agreement Renders the Provisions Unjust and Unreasonable.**

At bottom, FERC rejected the Overlap Provisions not because of what they do (or do not do), but because of their location. Rehearing Order P74, JA105. FERC's response fails to address how placement in the Owners Agreement—rather than the Tariff—renders the provisions unjust, unreasonable, unduly discriminatory, or preferential, as the FPA requires. 16 U.S.C. §§ 824d(a), (b). Whether or not the Overlap Provisions constitute "substantiative transmission planning rules," nothing in the FPA requires substantive planning requirements to be in a tariff rather than an agreement and FERC has pointed to no such requirement. Indeed, the Planning Protocol is now a schedule to the Operating Agreement. The agency's explanation that the "placement" of these provisions in the Ownership Agreement was "itself unjust and unreasonable," Rehearing Order P74, JA105, is simply an *ipse dixit* statement preference, unsupported by statutory text or precedent, and falls short of reasoned decision-making.

Because the Overlap Provisions regulate only the conduct of PJM and Transmission Owners in areas where their planning responsibilities overlap, they fit squarely within the Owners Agreement's function of allocating and coordinating responsibilities between those parties. FERC's insistence that the provisions must appear in the Tariff ignores that the Tariff governs access to transmission service and that the Overlap Provisions neither regulate access to transmission service nor impose obligations on third parties. Rather, they memorialize how PJM and the Transmission Owners will coordinate their respective exercise of authority. The Overlap Provisions are not a tariff level rule and asserting they cannot be in the Agreement is simply an unreasoned makeweight reason to reject them.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Petition for Review and

reverse FERC's rejection of the Agreement Amendments.

Respectfully submitted,

*/s/ John Longstreth*

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
Phone:  (610) 774-4775
Fax:     (610) 774-4102
Email:   SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Kimberly B. Frank
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
Phone:  (202) 778-9000
Fax:     (202) 778-9100
Email:  john.longstreth@klgates.com
            don.kaplan@klgates.com
            kimberly.frank@klgates.com
            chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
Phone:  (202) 429-8186
Email:  mkallen@steptoe.com
            wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW, Suite 200
Washington, D.C. 20004
Phone:  (202) 824-8011
Email:  molly.suda@duke-energy.com

*Counsel for Duke Energy*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20001
Phone:  (301) 956-6754
Email:  gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

Sara C. Weinberg
Assistant General Counsel – Federal Regulatory
Dominion Energy Services, Inc.
220 Operation Way, MC OSC 1A
Cayce, SC 29033
Phone:  (803) 217-5753
Sara.weinberg@dominionenergy.com

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
Phone:  (703) 682-6337
Email:  William.rappolt@AES.COM

*Counsel for The Dayton Power & Light Co.*

David M. Gossett
Michael Kunselman
Richard P. Sparling
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
Phone:  (202) 973-4200
Email:  davidgossett@dwt.com
        michaelkunselman@dwt.com
        ricksparling@dwt.com

Morgan E. Parke
Associate General Counsel
Amanda Parker
FERC Attorney
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
aparker@firstenergycorp.com

*Counsel for the FirstEnergy Transmission Companies*

Cheri Yochelson
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, RS-5
Richmond, VA 23219
(804) 819-2691
Cheri.M.Yochelson@dominionenergy.com

*Counsel for Virginia Electric and Power Company*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C.  20001-3980
Phone:  (202) 383-0100
Fax:  (202) 637-3593
Email:  danielfrank@eversheds-sutherland.com
Email:  allisonsalvia@eversheds-sutherland.com

Denise R. Foster Cronin
Sr. Vice President, Federal and RTO Regulatory Affairs
East Kentucky Power Cooperative, Inc.
4775 Lexington Road, P.O. Box 707
Winchester, KY  40392-0707
Office:  (859)745-9615
Cell:  (610)220-6382

*Counsel for East Kentucky Power Cooperative, Inc.*

Donald A. Kaplan
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
Phone:  (202) 778-9000
Fax:     (202) 778-9100
Email:  don.kaplan@klgates.com

*Counsel for Duquesne Light Company*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corp.
1 Riverside Plaza
Columbus, OH 43215
Phone:  (614) 716-2921
Email:  clbumgartner@aep.com

*Counsel for American Electric Power Service Corporation*

Uju Okasi
Associate Counsel - Regulatory
PSEG Services Corporation
601 New Jersey Ave., N.W., Suite 310
Washington, D.C. 20001
obianuju.okasi@pseg.com

*Counsel for Public Service Electric and Gas Company*

March 13, 2026

31

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| PJM Transmission Owners, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 25-1064 |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 32(a)(7)(B) and 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned certifies that the foregoing brief complies with the applicable type-volume limitations. The brief was prepared using a proportionally spaced type (Times New Roman, 14 point) and contains 6,474 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2016) used to prepare the brief.

Respectfully submitted,

*s/ John Longstreth*
John Longstreth

March 13, 2026

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| PJM Transmission Owners, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 25-1064 |
| | ) | |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Rule 25(f) of the Circuit Rules of this Court, I hereby certify that I have, this 13th day of March 2026, served the foregoing via the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*s/ John Longstreth*
John Longstreth

1